UNITED STATES DISTRICT COURT
FOR THE
DISTRICT OF MASSACHUSETTS

Civil Action No.

JOEL PENTLARGE,

    Plaintiff,

v.

ROBERT MURPHY,
KATHLEEN DENNEHY, and
THE MASSACHUSETTS DEPARTMENT OF CORRECTION,

    Defendants.

04-30177-KPN

COMPLAINT

FILING FEE PAID:
RECEIPT # 305725
AMOUNT $ 150.00
BY DPTY CLK ___
DATE 9/8/04

## INTRODUCTION

1. The plaintiff Joel Pentlarge is a civilly committed prisoner who is being held at the Nemansket Correctional Center by the defendants, Robert Murphy, the Superintendent of the Nemanset Correctional Center and Kathleen Dennehy the Commissioner of Correction. The plaintiff has been civilly committed as a sexually dangerous person. The defendants are violating the plaintiff's right under the Fourteenth Amendment to the United States Constitution by holding him in conditions which are more restrictive than the prison to which he was sentenced. The defendants are also violating his civil rights by failing to follow their own regulations and statutes of Massachusetts. The plaintiff brings this action for damages and injunctive relief for violation of his civil rights pursuant to 42 U.S.C. § 1983.

## JURISDICTION

2. This court has jurisdiction of the subject matter of this case under 28 U.S.C. §§ 1343, and 1367, including pendent and supplemental jurisdiction over claims under the Massachusetts

General Laws, chapter 231A, which claims are so related to the claims under § 1343, that they form part of the same case or controversy.

PARTIES

3. The plaintiff, Joel Pentlarge, is a natural person, who resides at 10 Prospect Street, Ware, Hampshire County, Massachusetts.

4. The defendant, Robert Murphy, is a natural person, who is the Superintendent of the Nemansket Correctional Center at 30 Administration Road, Bridgewater, Plymouth County, Massachusetts. Superintendent Murphy is sued in both his individual and offical capacity.

5. The defendant, Kathleen Dennehy, is a natural person, who is the Commissioner of the Massachusetts Department of Correction, with its principal office at 50 Maple Street, Milford, Worcester County, Massachusetts. Commissioner Dennehy is sued in both her individual and official capacity.

6. The Massachusetts Department of Correction is a department of the Commonwealth of Massachusetts, with it principal place of business at 50 Maple Street in Milford, Worcester County, Massachusetts. The Department is sued in its official capacity only, and the plaintiff seeks only injunctive relief against the Department.

7. All of the defendants have acted at times relevant to this action under color of state law.

STATEMENT OF FACTS

8. On July 31, 2000 the plaintiff pled guilty to five counts of statutory rape on four fifteen year old boys, and was sentenced to prison for three to four years concurrently

3

on four counts and life time probation on the remaining count by the Hampshire Superior Court.

9. The plaintiff served his prison sentence first at M.C.I. Concord for four months and then the remaining three years at M.C.I. Norfolk, a level four medium security prison.

10. On December 9, 2003, the Hampshire County District Attorney filed a petition to have the plaintiff civilly committed as a sexually dangerous person, pursuant to M.G.L. c. 123A, approximately three weeks to one month before the plaintiff would have concluded his prison sentence.

11. After a detention hearing in the Hampshire Superior Court the plaintiff was ordered held and has been held at the Nemanset Correctional Center in Bridgewater since December 24, 2003.

12. On July 19, 2004 after a trial in the Hampshire Superior Court the plaintiff was committed to the Nemansket Correctional Center as a sexually dangerous person for a day to life.

## COUNT I LEAST RESTRICTIVE ALTERNATIVE

13. The defendants are holding the plaintiff in conditions of confinement which far exceed the least restrictive alternative, and which are substantially more restrictive and punitive than the conditions under which the plaintiff was held while in prison. Examples of these more restrictive and unnecessarily restrictive conditions are set forth as follows.

14. The plaintiff is being held in an 80 square foot cell which was designed for one prisoner when the Nemansket Correctional

Center was built in 1985. One other prisoner is being held with the plaintiff in this cell which was designed for one person. At M.C.I. Norfolk the plaintiff was held in a single cell.

15. At Norfolk the plaintiff had two large lockers with approximately 19 cubic feet of storage. At the Nemasket Correctional Center the plaintiff has had between $2\frac{1}{2}$ and 10 cubic feet of storage space. As originally designed for single occupancy the cells at the Nemasket Correctional Center provided over 20 cubic feet of storage for each prisoner.

16. At M.C.I. Norfolk the plaintiff had access the law library seven days per week, morning, noon and night for a total of 48 hours per week. At the Nemasket Correctional Center the law library is only open $16\frac{1}{2}$ hours per week. Because movement is often delayed substantially, and because the library's limited capacity of 23 inmates is often filled before the plaintiff can get in, the actual number of hours the law library is available to the plaintiff is substantially less.

17. At the Nemasket Correctional Center all law books must be signed out individually for use within the library, only one prisoner is allowed in each aisle of books at a time, prisoners are not allowed to scan though books such as the Federal Digest or Shepards Citations at the book shelves, but instead each volume must be checked out individually.

18. At the Nemasket Correctional Center the law library is combined in one single room with the general library. This both limits the number of prisoners who can be accommodated, because the total number of prisoners allowed in the library

is limited to 23, regardless of whether they are there to use the law library or the general collection. There is not adequate space for both the general and law library collections.

19. At Norfolk the plaintiff could obtain copies of relevant legal cases and pleadings and make copies of such materials to share with other prisoners, so long as the plaintiff supplied his own copy paper. At the Nemansket Correctional Center Superintendent Murphy refuses to allow the law library to make copies of case decisions or copies of other prisoners' legal pleadings, in spite of 103 CMR 478.11(4) which provides that:

> "Photocopying services shall be for purpose of duplicating orginal legal documents and for the purpose of increasing access to the legal collection. The superintendent shall designate the staff members responsible for photocopying legal documents and legal reference materials."

The plaintiff is unable to get copies of grievances and personal business correspondence.

20. At Norfolk the plaintiff had access to the yard up to 61 hours per week. At the Nemansket Correctional Center the plaintiff has access to the yard up to $18\frac{1}{2}$ hours per week. (Both figures are the maximum numbers of hours on days when daylight is the longest.)

21. The yard at Norfolk contained two running tracks, a softball field, soccer field, volly ball court, three basket ball courts, three sets of work out bars, and two handball courts. The yard at the Nemansket Correctional Center contains two basket ball courts, one handball court and one track. At Norfolk there are numerous benches and bleachers for the prisoners to sit on and read at, and there are also picnic tables for prisoners to play games at. At the Nemansket Correctional Center

there are no benches, bleachers or picnic tables in the yard and prisoners are prohibited from bringing books, papers or games to the yard.

22. At Norfolk prisoners were allowed to tend and plant extensive flower gardens in the yard and grounds. At the Nemansket Correctional Center there is not a single flower, shrub or tree on the yard or grounds, and prisoners are not even allowed to use snow shovels to shovel the track in the winter time, so it goes unshoveled. At Gardner, a comparable level four prison with a substantial proportion of sex offender prisoners there are prisoner vegetable gardens, and an ice cream shack in the yard which sells ice cream and soft drinks to the prisoners in the summer.

23. At Norfolk prisoners have access to the gym an average of $30\frac{1}{2}$ hours per week. At the Nemansket Correctional Center prisoners have access to the gym $18\frac{1}{2}$ hours per week.

24. At the gym in Norfolk there are extensive free weights, and prisoners can bring walkmans and games to the gym. At the Nemansket Correctional Center there are no free weights in the gym, and prisoners cannot bring walkmans or any games to the gym.

25. At Norfolk prisoners could receive visits 7 days per week for a total of 33 hours per week. At the Nemansket Treatment Center prisoners can receive visits 5 days per week for a total of $28\frac{1}{2}$ hours per week.

26. At the Nemansket Correctional Center there are 5 pages of detailed rules for visitors and prisoners. If a visitor comes after the hourly movement has been completed, the visitor will be made to wait up to 50 minutes before the prisoners is

is allowed to go to the visiting room.  At Norfolk prisoners were allowed to go to visits immediately upon arrival of the visitor in the visiting room.

27.  On a Sunday in March 2004 both the plaintiff's brother and sister drove over an hour and half each to visit the plaintiff. Both visitors came to the Nemansket Correctional Center wearing sneakers, and they were turned away because somewhere in the 5 pages of visiting rules it says that visitors cannot wear sneakers.  Both of the visitors had other shoes in their cars and they told the visiting room staff that they would be happy to change their shoes, but the staff refused to allow them to visit with the plaintiff.  Superintendent Murphy supported this exclusion when the plaintiff questioned him about it several days later.

28.  All prisoners, including the plaintiff, are required to be strip searched after every visit at the Nemansket Correctional Center.

29.  As a result of the restrictive policies and procedures of the defendants, prisoners at the Nemansket Correctional Center receive less visits per prisoner than any other prison of the same security level in Massachusetts.  The plaintiff has received less visits than he got at Norfolk.  It is not unusual to see the visiting room with just three prisoners receiving visits.

30.  The plaintiff is restricted to buying the same food, clothing and appliances at the Nemansket Correctional Center as all prisoners at level four prisons can buy.  At Norfolk the plaintiff could buy hamburger meat, chicken halves, whole onions, green peppers, garlic bulbs, oranges, bananas, apples,

pancake mix, flour, Crisco oil, olive oil, and four flavors of Ben and Jerry's Ice Cream.

31. As with all other level four prisons, the plaintiff and all other prisoners at the Nemansket Correctional Center are restricted to ordering clothing and appliances once every 90 days.

32. At Norfolk the plaintiff had the use on his housing unit of an electric convection oven, hot plates, electric griddles, woks and casseroles, as well as separate refrigerator and freezer storage boxes. At the Nemansket Correctional Center the plaintiff is limited to cooking with a microwave which is shared with all of the other prisoners on the unit. At Norfolk prisoners also had the use of microwave and large serrated knife tethered to the counter in the cooking area.

33. At Norfolk the plaintiff and all other prisoners were allowed to cook hot dogs, hamburgers and chickens on outdoor charcoal grills for picnic lunches for Memorial Day, the Fourth of July and Labor Day. At the Nemansket Treatment Center no cook outs or picnics are allowed for the general population.

34. At Norfolk there were educational programs including: welding Microsoft Office Programs and college classes leading to a bachelor's degree from Boston University. The plaintiff obtained a welders license and completed the Microsoft Office Program training while at Norfolk. At the Nemansket Correctional Center there are no educational programs beyond the GED program.

35. At Norfolk there was a substanial number of prisoners working in prison industries. At the Nemansket Correctional

Center there are only 15 prisoners who are allowed to work in prison industries and they can only earn $2.00 per day. The prisoners at the Nemansket Correctional Center remain "slaves of the state."

36. At Norfolk, while on the Legal Advisory Committee, the plaintiff had the use of a word processor and a typewriter with a memory for doing legal work. At the Nemansket Correctional Center the plaintiff and all new prisoners are limited to using a plain electric typewriter with no memory or spell check. The plaintiff's request to puchase a computer was denied by the Superintendent. Prisoners at Nemansket Correctional Center before 1997 are allowed to keep computers and printers which they had at that time.

37. At Norfolk all of the showers which the plaintiff used had standard shower controls which allowed the plaintiff to adjust the temperature and turn them on for the duration of the shower. At the Nemansket Correctional Center all of the showers have push buttons which leave the water on for 15 seconds at a preset tepid temperature.

38. At norfolk the plaintiff was allowed to purchase either the Boston Globe or the Herald each Sunday morning. At the Nemansket Correctional Center the plaintiff and many other prisoners are not allowed to buy the Sunday paper on Sunday, although approximately a half dozen inmates are allowed to do so, as a special privilege of participation in the sex offender treatment program.

39. At Norfolk the plaintiff could freely exchange newspapers and magazines with other prisoners. At the Nemansket

Correctional Center the plaintiff and other prisoners have been threatened with a disciplinary report for doing so.

40. At Norfolk prisoners were free to visit each other in their cells. At the Nemansket Correctional Center the plaintiff and other prisoners have been forbidden to visit other prisoners in their cells, and prisoners visiting the plaintiff in his cell have been evicted by the guards.

41. At Norfolk there were enough seats and tables to seat all of the prisoners at each meal. At the Nemansket Correctional Center there are not enough seats or tables to accommodate all of the prisoners. The prisoners are herded through the chow hall in successive waves, sometimes so quickly that there are no seats available, and the guards start yelling at the seated prisoners to move on out.

42. The three week menu cycle of food served at the Nemsket Correctional Center is exactly the same menu that is served at all other prisons by the Department of Correction. While the food, if properly prepared would undoubtably be nutritious, the preparation is at best indifferent and worst attrocious and unpaletable. There is no accountability for mistakes in preparation. When chicken, for instance, is overcooked to the consistency of shoe leather or no salt is served with the meal, Superintendent Murphy has greeted complaints about this with complete indifference and the problem continues to reoccur.

43. The same regulations and restrictions apply to the Nemansket Correctional Center as apply to all other prisons operated by the Department of Correction. These regulations are set out in Title 103 of the Code of Massachusetts Regulations.

44. The regulations of the Department of Correction limit all prisoners to keeping one cubic foot of personal papers and one cubic foot of legal papers in their cells. At Norfolk the plaintiff was allowed to keep additional legal papers in locked file cabinet drawers, and the plaintiff could usually get access to stored legal papers the same day. At the Nemansket Correctional Center the property department only allows access to the legal storage once every two weeks.

45. At Norfolk there was an inmate council which was elected by the prisoners. The inmate council at least to a limited extent advocated on behalf of the prisoners with the prison administration. There was also a "lifers" group which advocated on behalf of prisoners serving life sentences. Both the lifers group and the inmate council sponsored substantial activities for the prisoners. No such groups exist at the Nemansket Correctional Center.

46. At the Nemansket Correctional Center the plaintiff and all new prisoners are not allowed to have reading lamps. As pre-trial detainee in the Hampshire County Jail the plaintiff was allowed to have a reading lamp. Prisoners at the Nemansket Correctional Center who had lamps before 1997 are allowed to keep them. The cells at the Nemansket Correctional Center are lit by single four foot florescent fixture mounted on the center of the ceiling, so that the top bunk completely blocks out the light from it. In addition the prisoner in the top bunk has the light glaring into his eyes from three feet away. The existing lighting was not designed for the installation of bunk beds

and is inadequate on the bottom bunk and overwhelming on the top bunk.

### COUNT II TELEPHONES

47. At the Nemansket Correctional Center and all other prisons run by the Department of Correction all telephone calls which the plaintiff and all other prisoners are subject to monitoring and recording. A recorded announcement interrupts the phone call three times to announce that "This phone call is from a correctional facility and is subject to monitoring and recording." The plaintiff and all prisoners are limited to a pre-authorized list of 5 attorneys and 10 other persons to whom phone calls may be made.

48. All phone calls by prisoners at the Nemansket Correctional Center and all other prisons must be made collect using a carrier under contract with the Department of Correction.

49. The rates charged by the carrier selected by the Department of Correction are substantially more expensive than those paid by the general public, particularly compared to rates charged when using pre-paid telephone cards.

50. For each phone call that the plaintiff makes during normal business hours to his own home in area code 413 the cost is $1.67 for the first minute and 11¢ per minute for each additional minute using the D.O.C. carrier. A 30 minute call from the Nemansket Correctional Center to the plaintiff's home cost the plaintiff $5.96. Using a prepaid calling card this call would cost the plaintiff $2.32 if it were allowed.

51. Under the contract with its carrier and the regulations of the D.O.C. the carrier pays a commission on telephone tolls

paid by the plaintiff and all other prisoners directly to the General Fund of the Commonwealth of Massachusetts. 103 CMR 482.07(6).

52. There is no authorization in the General Laws of Massachusetts for the commission to be charged to prisoners for collect calls and to be paid into the General Fund.

53. Limiting to whom phone calls may be made, monitoring those phone calls and recording them is more restrictive than is necessary for the plaintiff and many of the other prisoners held in the Nemansket Correctional Center.

54. In July 2003 the Department of Correction changed telephone carriers for prisoner telephone calls. The new carrier will not allow collect calls from the plaintiff and other prisoners to a number of other carriers, including the carriers used by two of the plaintiff's attorneys: Harry Miles, Esq., and Douglas C. Walker, Esq.

55. The regulations of the Department of Correction provide that:

> "Telephone calls to pre-authorized attorney numbers shall not be suspended or curtailed except in an institutional emergency."

103 CMR 482.08(1).

56. Attorney Miles has provided the plaintiff with his cell telephone number which uses a different telephone carrier. The plaintiff submitted the cell number of Attorney Miles to be put on the plaintiff's list of approved phone numbers. Although there is nothing in the Code of Massachusetts Regulations to prohibit prisoners fron listing cell phones on their list of authorized phone numbers, the defendants have refused to allow the plaintiff to call Attorney Miles at his cell phone number.

57. When the petition to commit the plaintiff to the Nemansket Correctional Center was filed, the plaintiff obtained an order from the Hampshire Superior Court on December 10, 2003:

> "It is hereby ordered that the Department of Correction is to permit Joel Pentlarge to contact the law offices of Harry Miles Essquire, Douglas Walker and John Swomly, Esquire by telephone or otherwise regarding representation of the defendant in the pending petition for commitment of sexually dangerous person and temporary dentention hearing."

Notwithstanding the court's order the defendants have refused to correct the problem with the telephone carrier so that the plaintiff can contact attorneys Miles and Walker at their law offices without be monitored or recorded in his privileged conversations with these attorneys. As a result the plaintiff has been unable to contact both attorneys in a timely manner at several critical points during the last year.

## COUNT III WAIVER OF OF CONFIDENTIALITY

58. The defendants have refused to provide the plaintiff with sex offender treatment, unless the plaintiff agrees to waive his Fifth Amendment right not to incriminate himself and to have his communications with a social worker or psychotherapist remain confidential as provided by M.G.L. c. 112, § 135A and c. 233, § 20B, and the Health Information Privacy Protection Act. Attached as Exhibit A of this complaint is a copy of the waiver of confidentiality that the defendants require the plaintiff to sign as a condition of treatment.

## COUNT IV FAILURE TO PROVIDE TREATMENT

59. To be committed as a sexually dangerous person as defined by M.G.L. c. 123A, § 1, the plaintiff and all other

prisoners committed to the Nemansket Correctional Center must have a mental abnormality or personality disorder which "makes the person likely to engage in sexual offenses if not confined to a secure facility."

60. The defendants are not providing treatment for the plaintiff or any other prisoner at the Nemansket Correctional Center which substantially conforms to accepted professional judgment and practice or standards.

61. There is a clear consensus among professionals involved in the treatment of sex offenders that there is no cure for sexual predation. Brief for the Association for the Treatment of Sexual Abusers, Amicus Curia, in Kansas v. Crane, 534 U.S. 407 (1997).

62. There is no significant correlation between receiving sex offender treatment or the legnth of sex offender treatment in prison and reduced recidivism by sex offenders. Hanson, K.R. & Bussiere, M.T. (1998) Predicting Relasp: A Meta-Analysis of Sexual Offender Recidivism, Journal of Consulting Psychology, 66, 348-362.

63. The sex offender treatment program offered by the defendants to prisoners while still serving their prison term can be completed in 4 years. For prisoners committed to the Nemansket Correctional Center the same treatment becomes in-terminable, with the average legnth of time spent in Nemansket being 17 years, often without the defendants or their agents certifiying that the prisoner has completed treatment.

64. The defendants will not allow the plaintiff to begin treatment at Nemansket unless he repeats the first three phases of treatment which he completed while at Norfolk.

65. On information and belief the defendants have kept no statistics or other evidence, and have not published or otherwise diseminated any statistics or evidence of the effectiveness or lack of effectiveness of the treatment offered and received by the plaintiff while in their custody.

66. The defendants and/or their agents have never disclosed to the plaintiff the risks and benefits of participation in the sex offender treatment program, so that the plaintiff can make an informed decision as to whether to participate in the program.

67. On information and belief many or all of the staff employed by the defendants to provide sex offender treatment to the plaintiff and other prisoners are not professionally qualified and are not competent to do so.

68. The provider of sex offender treatment for the defendants, Forensic Health Services, Inc., has a major conflict of interest in providing sex offender treatment under contract to the defendants on a per capita basis, while at the same time determining which prisoners will be recommended for release from the Nemansket Correctional Center and which prisoners will be committed to it in violation of M.G.L. c. 268A, which prohibits any state contractor from participating in decisions in which the contractor has a financial interest.

## COUNT VI VIOLATION OF THE MINIMUM
## STANDARDS OF FITNESS FOR HUMAN HABITATION

69. The Massachusetts Department of Public Health has promulgated regualtions which prescribe mandatory minimum standards of fitness for human habitation at 105 CMR 410. These minimum standards apply to all dwelling units, unless provided for in the code. Correctional Facilities operated by the Department of Correction are not subject to 105 CMR 410, but are subject to 105 CMR 451. The Supreme Judicial Court has recently reaffirmed that the Nenamsket Correctional Center is a "secure mental health facility" not a "correctional facility." Commonwealth v. Knapp, 441 Mass. 157, 168, 804 N.E.2d 885, 894 (2004), citing Doe v. Gaughan, 808 F.2d 871, 879 (1st Cir. 1986).

70. 105 CMR 410 provides that:

410.440 Minimum Square Footage

(A) Every dwelling unit shall contain at least 150 square feet of floor space for the first occupant, and at least 100 square feet of floor space for each additional occupant the floor space to be calculated on the basis of total habitable room area.

(B) In a dwelling unit, every room occupied for sleeping purposes by one occupant shall contain at least 70 square feet of floor space; every room occupied for sleeping purposes by more than one occupant shall contain at least 50 square feet of floor space for each occupant.

(C) In a rooming unit, every room occupied for sleeping purposes by one occupant shall contain at least 80 square feet of floor space; every room occupied for sleeping purposes by more than one occupant shall contain at least 60 square feet for each occupant.

71. The minimum health and sanitation standards for correctional facilities regarding room size are recommended standards and are not mandatory. 105 CMR 451.011 and 451.012. The recommended standards for room size in a correctional facility are:

<u>451.320 Cell Size: Existing Facilities</u>

    Each cell or sleeping area in an existing facility should contain at least 60 square feet of floor space for each occupant, calculated on the basis of total habital room area, which does not include areas where floor to ceiling height is less than eight feet.

<u>451.321 Cell Size in New or Renovated Facilities</u>

    Each cell in a new facility or a part of a facility constructed after the effective date of 105 CMR 451.000 should contain:

(A) For segregation and special management areas where inmates are ususally locked in for greater than ten hours per day, at least 80 square feet of floor space for a single inmate.

(B) For inmates usually locked in for less than ten hours per day, contain at least 70 square feet of floor space for a single inmate.

    Provided, however, two inmates may occupy a room or cell designed for double occupancy which has floor space of 120 square feet.

72. The cells at the Nemansket Correctional Center contain 80 square feet of total floor space. If one deducts the areas where the floor to ceiling height is less than eight feet due to permanently attached bunk bed, desk, toilet and wash basin, there is 57 square feet of floor space in each cell at the Nemansket Correctional Center.

73. 105 CMR 410.201 requires that heat be provided in every habitable room from September 15 through June 15. 105 CMR 451.330 recommends that correctional facilities should be heated from September 15 to June 15.

74. At Norfolk the defendants provided heat from October 15 to May 15. At the Nemansket Correctional Center the defendants terminated the heat on April 15, 2004.

74. 105 CMR 451.112 provides that:

    Each inmate and each employee shall have access to

to a toilet and handwash sink at all times.

75. The plaintiff and all other prisoners at the Nemansket Correctional Center have no access to a toilet when they are in the yard. The plaintiff has experienced extreme discomfort as a result of the lack of toilet access. Other prisoners simply relieve themselves against the fence.

76. Over five years ago the court in King v. Greenblatt, 53 F. Supp.2d 117, 134, (D. Mass. 1999) noted:

> To be sure, there are issues in the day to day management of the Treatment Center. Funds are being sought from capital planning funds to install toilet facilities accessibble to the yard to attempt to address the residents' complaint about the lack of toilet facilities in the yard.

### COUNT VII CLASSIFICATION

77. Prior to being imprisoned at the Nemansket Correctional Center the plaintiff received a point based score under the the defendants' classification system which would have classified the plaintiff to be placed at a minimum security prison. However, the defendants have arbitrarily determined that no sex offenders shall be placed at minimum security prison or work release program.

78. The Nemansket Correctional Center is the sole institution for persons imprisoned under M.G.L. c. 123A, "and therefore it must encompass all levels of security within one facility." King v. Greenblatt, supra at 28. The plaintiff is imprisoned at the Nemansket Correctional Center, and subject to the same high security prodecures as apply to other prisoners who have long histories of escapes, violence, murder and rape, including rape while in prison or at the Nemansket Correctional Center.

79. Also imprisoned with the plaintiff at the Nemansket Correctional Center are prisoners who are blind, paraplegic,