UNITED STATES DISTRICT COURT
DISTRICT OF MASSACHUSETTS
WESTERN DIVISION

CIVIL ACTION NO. 04-30177 KPN

**JOEL PENTLARGE,**
    **Plaintiff,**

v.

**ROBERT MURPHY, et al.,**
    **Defendants.**

### OPPOSITION OF DEFENDANTS ROBERT MURPHY AND KATHLEEN DENNEHY TO PLAINTIFF'S MOTION FOR A PRELIMINARY INJUNCTION TO ATTEND FUNERAL

### INTRODUCTION

Defendants Robert Murphy and Kathleen Dennehy submit this opposition to the plaintiff's motion for a preliminary injunction ("plaintiff's motion") to permit the plaintiff to attend a memorial service for his late brother.[1] Defendants Murphy and Dennehy submit the affidavits of Robert Murphy, Superintendent, and James Bender, Acting Commissioner, in support of their opposition. For the reasons set forth below, the Court should deny the plaintiff's motion.

### FACTUAL BACKGROUND

The plaintiff has committed and been convicted of multiple counts of rape of a child against multiple boy victims. See Complaint, ¶ 8; Supplemental Complaint, ¶ 116.[2] The District Attorney for Hampshire County filed a petition to commit the plaintiff as a sexually dangerous

---

[1] The plaintiff's supporting memorandum of law will be referred to as the "Plaintiff's Memorandum."
[2] The plaintiff states that his "only criminal record is for the five counts of statutory rape for having consensual sex with four fifteen year old boys." Supplemental Complaint, ¶ 116 (emphasis added). Defendants Murphy and Dennehy do not agree with the plaintiff's self serving characterization of his criminal misconduct.

person pursuant to the provisions of G.L. c.123A. Complaint, ¶ 10. On July 19, 2004, a unanimous jury determined beyond a reasonable doubt that the plaintiff is a sexually dangerous person ("SDP") as that term is defined in G.L. c. 123A, § 1. See Murphy Aff., Exhibit 2; see also Complaint, ¶ 12. See G.L. c. 123A, § 14(d) ("If after the trial, the jury finds unanimously and beyond a reasonable doubt that the person named in the petition is a sexually dangerous person, such person shall be committed to the treatment center . . . ."). The fact that the plaintiff has been found to be a sexually dangerous person means that he has been deemed, beyond a reasonable doubt, to suffer from a "mental abnormality" or a "personality disorder" that makes him "likely to engage in sexual offenses if not confined to a secure facility." G.L. c. 123A, § 1(i).[3] A "mental abnormality" is defined as a "congenital or acquired condition of a person that affects the emotional or volitional capacity of the person in a manner that predisposes that person to the commission of criminal sexual acts to a degree that makes the person a menace to the health and safety of other persons." G.L. c. 123A, § 1. A "personality disorder" is defined as "a congenital or acquired physical or mental condition that results in a general lack of power to control sexual impulses." G.L. c. 123A, § 1.

Following the jury's verdict, the Superior Court, Velis, J., ordered that the plaintiff be civilly committed to the Massachusetts Treatment Center ("Treatment Center") for one day to his

---

Moreover, the plaintiff's insistence that he had "consensual" sex with underage children exemplifies his sexually dangerous disposition.

[3] In considering a challenge that the SDP statute does not provide for a less restrictive alternative such as halfway houses or post release supervision, the Supreme Judicial Court noted that such persons have been found to be likely to engage in sexual offenses if not confined to a secure facility or to have a general lack of power to control their sexual impulses making them likely to attack or otherwise inflict injury on potential victims in the future. Commonwealth v. Bruno, 432 Mass. 489, 502 (2000). The SJC sated, that "because such persons are likely to commit future harm, confined commitment appears to be the only viable form of commitment." Bruno, 432 Mass. at 502.

3

natural life as required by G.L. c. 123A, § 14(d). See Exhibit 1. The plaintiff remains civilly committed to the Treatment Center.[4] See Murphy Aff.

Robert Murphy is the Superintendent of the Treatment Center. Complaint, ¶ 4. Kathleen Dennehy is the Commissioner of the Department of Correction ("DOC"). Complaint, ¶ 5. General Laws c. 123A, § 2 vests the Commissioner of Correction with sole responsibility for the Treatment Center's operation. The statute requires the Commissioner to maintain a treatment center for "the care, custody, treatment and rehabilitation" of sexually dangerous persons. G.L. c. 123A, § 2.

On September 7, 2004, the plaintiff received an emergency furlough to visit his brother, Daniel Pentlarge, who was critically ill. See Murphy Aff.; Bender Aff. John Swomley, an attorney who represents the plaintiff in other matters, wrote to thank Superintendent Murphy for arranging the hospital visit. See Murphy Aff., Exhibit 3.

On or about September 21, 2004, the plaintiff's brother died. See Supplemental Complaint, ¶ 110. On or about September 22, 2004, the plaintiff applied for another emergency furlough, this time to attend his brother's funeral which was scheduled for September 25, 2004. See Murphy Aff. Superintendent Murphy denied this application and, instead, invited the plaintiff to submit a request for a private viewing at the funeral home. See Murphy Aff. The plaintiff declined, stating that "[s]eeing his dead body at a private viewing at the funeral home would not be (sic) add significantly to my last opportunity to see him." See Murphy Aff., Exhibit 4. The plaintiff filed a grievance relating to the denial of the furlough request. See id. That grievance was denied as follows:

---

[4] The Treatment Center is referred to as the Nemansket Correctional Center in G.L. c. 123A, § 2. Throughout the statute, however, the facility is also referred to as the Treatment Center. See, e.g., G.L. c. 123A, §§ 1, 6A, 9, 12, 13. The facility is commonly referred to as the Massachusetts Treatment Center as indicated by its letterhead and other official documents.

4

> Grievant was granted a previous emergency furlough, (Sept. 7, 2004), to visit a critically ill relative. Grievant may file a request with the Superintendent, for a private viewing of relative at the funneral (sic) home. Due to security concerns, grievant is unable to attend the funneral (sic) service.

See id. Superintendent Murphy denied the plaintiff's appeal from his grievance stating, "Appeal denied. Resident was advised to request viewing of brother's remains at the funeral home. He declined to submit a request for a private viewing. The Department views the private viewing as comparable to a funeral." See id.

On October 25, 2004, the plaintiff wrote to Superintendent Murphy to request to attend "an additional funeral service" for his brother to be held on Sunday, November 7, 2004. See Murphy Aff., Exhibit 5.[5] The plaintiff has described this as a "memorial service" for his brother. Supplemental Complaint, § 118. An emergency furlough request form was completed. On October 29, 2004, Superintendent Murphy denied the furlough request because it was not compliant with the furlough policy. See Murphy Aff.

## ARGUMENT

The plaintiff seeks a preliminary injunction to be given an emergency furlough to attend an "additional funeral service" or a "memorial service" for his late brother. See Plaintiff's Motion, p. 1; Supplemental Complaint, ¶ 118. In ruling on a motion for a preliminary injunction, the court must consider

> (1) the likelihood of success on the merits; (2) the potential for irreparable harm if the injunction is denied; (3) the balance of relevant impositions, i.e., the hardship to the nonmovant if enjoined as contrasted with the hardship to the movant if no injunction issues; and (4) the effect (if any) of the court's ruling on the public interest.

*Ross-Simons of Warwick, Inc. v. Baccarat, Inc.*, 102 F.3d 12, 15 (1st Cir. 1996); *see Langlois v. Abington Housing Auth.*, 207 F.3d 43, 47 (1st Cir. 2000) (same).

5

"Likelihood of success on the merits is the main bearing wall of the four-factor framework." *Ross-Simons*, 102 F.3d at 16. While the plaintiff claims that he is "entitled to an escorted furlough," he is wrong as a matter of law. The plaintiff has no likelihood of success on the merits because (1) this service does not fall within the meaning of a funeral; and (2) he has no constitutional, statutory or regulatory entitlement to such a furlough. As an initial matter, it is clear that this service is not going to be a funeral but, rather, a memorial service. A funeral is defined as "[t]he ceremonies held in connection with the burial or cremation of the dead." The American Heritage Dictionary, Second Edition. The funeral was apparently held in September, 2004, according to the plaintiff's earlier furlough application. Thus, the service is not a "funeral" and is not within one of the designated purposes for which a furlough may be granted.

Even if this service could be construed to be a "funeral," however, the plaintiff's claim still fails. The denial of a furlough does not implicate an inherent liberty interest within the meaning of the Due Process Clause. *See Bowser v. Vose*, 968 F.2d 105, 107-109 (1st Cir. 1992) (denial of furlough implicates no liberty interest). As for a liberty interest created by state law, due process rights are violated when the conditions of confinement impose "an atypical and significant hardship on the inmate in relation to the ordinary incidents of prison life." *Sandin v. Connor*, 515 U.S. 472, 484 (1995). Denial of a furlough request is not an atypical or significant hardship on the inmate in relation to ordinary incidents of prison life. *See Dominique v. Weld*, 73 F.3d 1156 (1st Cir. 1996) (removal of prisoner's work release privilege, despite his good standing, did not affect any state-created liberty interest within the meaning of *Sandin*). While the plaintiff is civilly committed as a SDP, for these purposes, that is a distinction without a difference. SDP's are committed indefinitely because they are likely to commit future sexual

---

[5] On October 22, 2004 – three days earlier – the plaintiff signed his supplemental affidavit in support of his motion for a preliminary injunction.

6

harm. *See* G.L. c. 123A, § 1. Denial of a furlough request is not an atypical and significant hardship in relation to the ordinary incidents of life at the Treatment Center.

DOC regulations permit, but do not require, certain DOC officials to grant a furlough to inmates under certain circumstances. 103 CMR 463, <u>Furloughs</u>. See Murphy Aff. These regulations apply to civilly committed sexually dangerous persons. See Murphy Aff. The furlough regulations provide that

> Whenever an inmate indicates to the furlough coordinator, or other staff are notified that an emergency exists and said emergency satisfies a purpose outlined in 1033 CMR 463.07(2), the inmate **may** be granted an emergency furlough, or an emergency furlough under escort, provided said emergency is verified by the designated staff member.

103 CMR 463.11(1) (emphasis added). The furlough regulations limit the possible award of a furlough to certain specified reasons including to attend the funeral of a relative or to visit a critically ill relative. 103 CMR 463.07(2). A brother is considered a "relative" under these regulations. 103 CMR 463.06. The Superintendent reviews the furlough request and may "approve, modify or deny" the request. 103 CMR 463.11(2). If the Superintendent approves the furlough application, the Commissioner then reviews the application and may approve it. 103 CMR 463.11(2).

Nothing in the regulations limits the Superintendent's or the Commissioner's discretion. Rather, the decision whether to grant an emergency furlough is left to the sound discretion of the Superintendent and the Commissioner. Consequently, an inmate may meet the conditions for a furlough and yet not be granted a furlough. *See Bowser*, 968 F.2d at 107. Entirely absent from these regulations is any mandatory language directing that a furlough must be granted to any incarcerated person who satisfies the eligibility requirements. *See Bowser*, 968 F.2d at 108. Moreover, "eligibility is not the same as entitlement." *Id.* at 109. The regulations give the

Superintendent and Commissioner total discretion in granting or denying the furlough application.

The plaintiff suggests that DOC's decision to decline to grant furloughs for funerals violates the furlough regulations. See Plaintiff's Motion, p. 5. This argument entirely misses the mark. The furlough regulations do not require DOC to grant a single furlough ever. Rather, the furlough regulations merely permit DOC to grant furloughs for certain limited purposes. It is entirely within the Commissioner's and Superintendent's discretion to determine that attendance at a funeral poses a significant risk to public safety under any circumstances. It is well within the Commissioner's and the Superintendent's discretion to consider that permitting SDP's (who have been found beyond a reasonable doubt to be likely to reoffend sexually and committed for an indeterminate day to life civil commitment) to attend funerals in public settings where they will have potential access to contraband or to escape. See Bell v. Wolfish, 441 U.S. 520, 551 n. 32 (1979) ("Responsible prison officials must be permitted to take reasonable steps to forestall . . . [threats to security], and they must be permitted to act before the time when they can compile a dossier on the eve of a riot.'") (citation omitted). See Murphy Aff.; Bender Aff.

The plaintiff's reliance on *Haverty v. Commissioner of Correction*, 437 Mass. 737 (2002), therefore, is misplaced. The regulations at issue in *Haverty* required that procedural protections be afforded before placement of inmates into administrative segregation for nondisciplinary reasons. See *Haverty*, 437 Mass. at 740. Nothing in the furlough regulations, however, limits the Superintendent's or the Commissioner's discretion to deny a furlough request. See *Marshall v. Vose*, 1986 U.S. Dist. Lexis 23275 (U.S.D.C. 1986) *13 ("A careful reading of the statutory and regulatory provisions governing the granting of furloughs reveals that the decision whether or not to grant them is in the sole discretion of the superintendent or

8

commissioner. The law places no substantive limitations on his or her exercise of discretion.")· In *Marshall*, an inmate challenged the superintendent's refusal to grant a furlough to any inmate housed in medium security. *See id.* at * 15. Judge Mazzone noted that, since the commissioner has broad authority in the area of furloughs, "it may indeed be 'reasonable' for him to assume that no prisoner in a medium security facility can be deemed trustworthy enough to return to the facility at the time set and to not commit any criminal violations while on furlough." *Id.* at *16 n. 3. Judge Mazzone did not address this question because no constitutional rights are implicated by the commissioner's exercise of his discretion. *Id.*

Superintendent Murphy exercised his sound discretion to deny the plaintiff's furlough application. It is not for the plaintiff or even this Court to second guess the Superintendent's exercise of his discretion in this area. As the United States Supreme Court has admonished:

> '[Central] to all other correctional goals is the institutional consideration of internal security within the corrections facilities themselves.' . . . . Prison officials must be free to take appropriate action to ensure the safety of inmates and corrections personnel and to prevent escape or unauthorized entry. Accordingly, we have held that even when an institutional restriction infringes a specific constitutional guarantee, such as the First Amendment, the practice must be evaluated in the light of the central objective of prison administration, safeguarding institutional security. . . .
>
> [T]he problems that arise in the day-to-day operation of correctional facilities are not susceptible of easy solutions. Prison administrators therefore should be accorded wide-ranging deference in the adoption and execution of policies and practices that in their judgment are needed to preserve internal order and discipline and to maintain institutional security. . . . Such considerations are peculiarly within the province and professional expertise of corrections officials, and . . . courts should ordinarily defer to their expert judgment in these matters.

*Bell v. Wolfish*, 441 U.S. at 546-548 (1979) (citations omitted) (applying same analysis to pretrial detainees and convicted prisoners).

This Court should defer to the expert judgment of Superintendent Murphy and Acting Commissioner Bender. Such deference is particularly appropriate in a correctional decision as

sensitive as this one, involving as it does the release (even a temporary, escorted one) of a multiply convicted child rapist and civilly committed SDP to the community. Because the plaintiff is not likely to succeed on the merits, this Court should deny the plaintiff's motion.

Turning to the remaining factors, the plaintiff also has failed to show irreparable harm. If the plaintiff does not attend the memorial service, he has had and will continue to have the opportunity to share his memories of his brother with friends and family members through other means, such as telephone calls, letters and visits, that do not jeopardize public safety as this furlough would. Likewise, the plaintiff has the ability to practice his religion and to pray at the Treatment Center.

The third and fourth factors weigh against granting the preliminary injunction. Attendance at a funeral poses a significant security risk under any circumstances. According to the plaintiff, the funeral is scheduled to be held at the Unitarian Universalist Church in Wakefield, Massachusetts. This church, like most places of public accommodation, likely has multiple entrances and exits. From the plaintiff's description, the service will likely be attended by a large number of people, including members of the plaintiff's family and close friends. The church is not a secure location. Correctional staff would not have the right or the ability to search the participants or the church for potential weapons or other contraband that poses a security risk. The plaintiff would likely come into contact with members of the public, including his friends and family. This contact offers the possibility that the plaintiff could obtain weapons or other contraband. Granting a furlough to attend this type of funeral or memorial service would pose a significant risk to the safety of the public and the correctional staff. See Murphy Aff. James Bender, who is serving as Acting Commissioner, shares these concerns. See Bender Aff. This Court should defer to these security concerns. See *Cameron v. Tomes*, 990 F.2d 14, 21 (1st

10

Cir. 1993) ("In matters of security, as opposed to administrative convenience, the administrators' discretion is at its zenith. . . .").

The plaintiff has only recently been civilly committed for one day to life. See Murphy Aff., Exhibit 2. He has rejected sex offender treatment since his SDP commitment. See Murphy Aff. Facing an indeterminate SDP commitment, the plaintiff now has an incentive to escape greater than when he was serving the short sentence he received as a result of his plea bargain. See Murphy Aff. Further, the plaintiff appears to be a person of considerable financial means, a situation that further heightens his security risk.[6] See Murphy Aff.

The Superintendent and Acting Commissioner are also entitled to consider certain other circumstances surrounding this furlough request. The plaintiff rejected the suggestion that he apply for a private viewing at the funeral home. See Murphy Aff, Exhibit 4. This rejection raises a real concern that the plaintiff is not merely interested in paying his respects to his brother, but rather interested in gaining access to a public setting on his terms. Further, the date for this service has apparently been changed from Columbus Day weekend to November 7, 2004. Compare Plaintiff's Motion, p. 1 to Supplemental Complaint, ¶ 118.

In addition to the significant public safety concerns raised by such a furlough, this furlough would cause DOC considerable expense. Under DOC's transportation procedures, a minimum of two correction officers must accompany an individual on furlough. In circumstances such as this, the furlough would require at least four and likely more correctional staff. See Murphy Aff.; Bender Aff. The diversion of staff for this furlough would require the removal of officers from posts inside the Treatment Center and/or would require DOC to pay staff overtime in order to provide adequate security. See Murphy Aff. The DOC has already

---

[6] According to data contained in Treatment Center records, the plaintiff owns real estate and currently owns or has owned a plane that he has piloted. See Murphy Aff.

11

incurred 15 hours of overtime to pay for the plaintiff's furlough to visit his brother on September 7, 2004. See Murphy Aff. The additional expense associated with a second furlough is clearly an unwarranted imposition on DOC under all the facts and circumstances.

The security risks and financial burden associated with such a furlough would harm the public interest. Thus, the injunction is contrary to the public interest. Moreover, the balance of the equities weighs against granting the preliminary injunction. This Court should, therefore, deny the plaintiff's motion.

## CONCLUSION

For the foregoing reasons, defendants Robert Murphy and Kathleen Dennehy respectfully request that this Court deny the plaintiff's motion for a preliminary injunction.

Defendants Robert Murphy and
Kathleen Dennehy,
NANCY ANKERS WHITE
Special Assistant Attorney General

By: *Mary P. Murray* 
Mary P. Murray, Counsel (BBO # 555215)
Department of Correction
Massachusetts Treatment Center
30 Administration Road
Bridgewater, Massachusetts 02324
(508) 279-8184

Dated: November 4, 2004

### Certificate of Service

I hereby certify that I caused a copy of the within document to be served on the *pro se* plaintiff, Joel Pentlarge, by hand at the Massachusetts Treatment Center, 30 Administration Road, Bridgewater, MA 02324.

*Mary P. Murray*
Mary P. Murray

Dated: November 4, 2004

UNITED STATES DISTRICT COURT
DISTRICT OF MASSACHUSETTS
WESTERN DIVISION

CIVIL ACTION NO. 04-30177 KPN

JOEL PENTLARGE,
    Plaintiff,

v.

ROBERT MURPHY, et al.,
    Defendants.

### AFFIDAVIT OF JAMES R. BENDER

I, James R. Bender, being sworn and deposed, state the following:

1. I am the Acting Deputy Commissioner for the Massachusetts Department of Correction (the "Department" or "DOC"), where I have been employed for more than 25 years. In the absence of Commissioner Kathleen Dennehy from the Commonwealth at this time, I am also serving as the Acting Commissioner of Correction. Prior to my appointment as Acting Deputy Commissioner, I was an Assistant Deputy Commissioner beginning in 1991. I served as the Assistant Deputy Commissioner of Community Corrections and the Assistant Deputy Commissioner of Secure Facilities. Immediately prior to that, I was Superintendent at the North Central Correctional Institution at Gardner, Massachusetts, for six years. Except as otherwise noted, I have personal knowledge of the facts contained herein.

2. While serving as the Assistant Deputy Commissioner for Community Corrections, I was a senior level manager responsible for the overall operations of Community Corrections. While serving as the Assistant Deputy Commissioner of Secure Facilities, I was responsible for seven maximum and medium security level correctional institutions in the Commonwealth of Massachusetts.

3. I am aware of the circumstances surrounding the plaintiff's request for a furlough to attend a funeral or memorial service for his late brother at a church on Sunday, November 7, 2004. I fully support Superintendent Murphy's decision to deny this furlough request.

4. The Massachusetts Treatment Center is a level 4, medium security facility operated by DOC. There are always security concerns attendant to the transportation of prisoners or civilly committed persons outside of a DOC facility. For purposes of this affidavit, I will refer to both groups as "inmates." In my opinion, these concerns are especially heightened in this case because the plaintiff has been adjudicated to be a sexually dangerous person and civilly committed for an indeterminate term of one day to his natural life. Accordingly, there is a strong incentive for him to flee.

5. In addition, I am concerned about the plaintiff's contact in a public setting with a potentially large number of friends and family members. The DOC correctional staff will not have the ability to search either the members of the public who may attend or the church itself. Likewise, the correctional staff will not be able to secure the church. The plaintiff's contact with friends and family members raises the risk that the plaintiff could obtain access to weapons or other contraband which would jeopardize the safety of the public and DOC correctional staff.

6. DOC policy requires that a level 4 security inmate be transported wearing waist chains, handcuffs and leg irons and that such restraints remain in place throughout the furlough. Further, when an inmate is permitted to attend a private viewing at a funeral home or to visit a relative in the hospital, the visit is typically made during hours other than normal visiting hours. Other family members and members of the public are not permitted to present in the room during such visits. In this way, correctional staff are able to minimize the possibility of an escape attempt or the passing of contraband to the inmate.

7. DOC policy requires that a minimum of two correctional officers escort the inmate on an emergency furlough. In my opinion, a furlough to the type of service that the plaintiff has requested would require the assignment of at least two to four additional correctional staff for a total of four to six correctional staff. This assignment, occurring on a Sunday, would impose an unreasonable financial burden on the Department, especially since the plaintiff has already been granted a furlough to visit his brother before his death.

Signed under the pains and penalties of perjury this 4th day of November, 2004.

James R. Bender

UNITED STATES DISTRICT COURT
DISTRICT OF MASSACHUSETTS
WESTERN DIVISION

CIVIL ACTION NO. 04-30177 KPN

JOEL PENTLARGE,
Plaintiff,

v.

ROBERT MURPHY, et al.,
Defendants.

### AFFIDAVIT OF ROBERT MURPHY

I, Robert Murphy, first having been duly sworn, upon oath do depose and say the following:

1. Since November 1997, I have been the Superintendent of the Massachusetts Treatment Center ("Treatment Center"). Except as otherwise noted, I have personal knowledge of the facts set forth herein.

2. I have been an employee of the Department of Correction ("DOC"), since I received my Bachelor of Science in Criminal Justice from Northeastern University in 1976. At that time, I was a Correctional Social Worker at MCI Cedar Junction. In 1979, I became a Correction Counselor at MCI Norfolk and the next year I became a Supervising Counselor at MCI Concord. I held that position until 1985, when I became the Director of Treatment at MCI Plymouth. Later that same year I was appointed to be the Director of Classification at MCI Shirley. In 1987, I was promoted to the position of Deputy Director of Classification Services for the entire Department. The next year, I was appointed to be the Deputy Superintendent of Patient Services at the Bridgewater State Hospital ("BSH"). Four years later, in 1992, I became the Deputy Superintendent of Treatment at MCI Framingham. While in that position at MCI Framingham, I received my Masters of Arts in Business Administration from Framingham State College. Subsequently, in 1996, I became the Deputy Superintendent of Treatment at MCI Concord, a position I held until I was promoted to my present position as Treatment Center Superintendent.

3. During my career in the DOC, I have specialized in the development and implementation of treatment programs for distinct offender groups who possess unique mental health, emotional, personality, and characterological problems and/or disorders. My experience at BSH included successfully transforming that facility from a primarily correctional environment with a mental health component into a forensic and psychiatric treatment

- 2 -

facility. Also, I developed considerable experience at BSH dealing with mental health issues in a correctional environment. As such, I also became very familiar with the civil commitment provisions of G.L. c. 123 which permit commitment for forensic evaluations and the involuntary treatment of those individuals who are dangerous to themselves or others because of their mental incapacities. Similarly, while at MCI Framingham, I successfully developed and implemented cognitive-based substance abuse treatment programs for women involuntarily, civilly committed pursuant to G.L. c. 123, § 35.

4. DOC has enacted furlough regulations, 103 CMR 463, Furloughs, a copy of which is attached as Exhibit 1.

5. Joel Pentlarge is civilly committed as a sexually dangerous person to the Massachusetts Treatment Center. A true and accurate copy of the order of commitment is attached hereto as Exhibit 2. According to his treatment records as of the end of October, 2004, Mr. Pentlarge was not participating in the sex offender treatment program at the Treatment Center.

6. On September 7, 2004, Mr. Pentlarge was permitted to participate in an escorted furlough to visit his brother, Daniel Pentlarge, who was then critically ill. Attached as Exhibit 3 hereto is a copy of a letter that I received from John Swomley, one of Mr. Pentlarge's attorneys, regarding this furlough. DOC incurred expenses for 15 hours of overtime in connection with this furlough.

7. Following his brother's death, the plaintiff applied for an emergency furlough to attend his brother's funeral which was scheduled for September 25, 2004. See Exhibit 4. I denied this application and invited the plaintiff to submit a request for a private viewing at the funeral home. See Exhibit 4. Mr. Pentlarge rejected this suggestion. See Exhibit 4. Mr. Pentlarge filed a grievance that was denied because of security concerns. See Exhibit 4. I then affirmed the denial of the grievance. See Exhibit 4.

8. On October 25, 2004, Mr. Pentlarge wrote to me to request to "attend an additional funeral service" for his brother to be held on Sunday, November 7, 2004. See Exhibit 5. I am aware that Mr. Pentlarge has also described this service as a "memorial service." I denied the emergency furlough request because the request is not in compliance with the furlough policy.

9. In my professional judgment, permitting a civilly committed sexually dangerous person ("SDP") or inmate to attend a funeral service in a public forum poses a significant security threat to the public and the correctional staff. This risk is significantly greater than that posed by a private viewing at a funeral home or a visit to a hospital to visit a critically ill relative. In those cases, the correctional staff have greater control over the environment and other family members and members of the public are not permitted to be present. In my experience, churches, like other places of public accommodation, typically have multiple entrances and exits. Funeral and memorial type services typically attract a large number of people and would likely include the SDP's or the inmate's family members and friends. A church is not a secure location. The correctional staff will not be able to search the participants or the church for potential weapons or other contraband that poses a security

- 3 -

risk. A SDP or inmate attending such a service will likely come into contact with members of the public, including his family members and friends. This contact offers the possibility that the SDP or inmate could obtain weapons or other contraband or try to escape.

10. With respect to Mr. Pentlarge, he has only recently been committed as a sexually dangerous person. In my professional judgment, he now has an incentive to escape greater than when he was serving the relatively short prison sentence he received in connection with his guilty plea to charges of rape of a child. Based upon a review of data in Mr. Pentlarge's Treatment Center records, Mr. Pentlarge appears to have considerable financial means. By his report, Mr. Pentlarge owns real estate and at one time owned or had access to a plane that he piloted.

11. DOC transportation procedures require that a minimum of two correctional officers must accompany a SDP on a furlough. In circumstances such as this, the furlough would require at least four to six correctional staff. The diversion of this staff would require removal of correctional officers from their Treatment Center posts and/or would require DOC to pay staff overtime in order to provide adequate security.

SIGNED UNDER THE PENALTIES OF PERJURY THIS 4th DAY OF NOVEMBER, 2004.

_____
Robert Murphy