UNITED STATES DISTRICT COURT
DISTRICT OF MASSACHUSETTS
EASTERN DIVISION

CIVIL ACTION NO. 04-30177-PBS

JOEL PENTLARGE,
    Plaintiff,

v.

ROBERT MURPHY, *et al.*,
    Defendants.

**OPPOSITION OF DEFENDANTS THE MASSACUSETTS
DEPARTMENT OF CORRECTION, ROBERT MURPHY AND
KATHLEEN DENNEHY TO PLAINTIFF'S MOTION FOR A
PRELIMINARY INJUCTION TO REPAIR ROOF AND HEAT**

**INTRODUCTION**

Defendants the Massachusetts Department of Correction ("DOC"), Robert Murphy and Kathleen Dennehy (collectively, the "DOC Defendants") submit this opposition to the plaintiff's motion for a preliminary injunction to require the DOC Defendants to repair the heat and leaking roof ("Plaintiff's Motion"), dated November 30, 2004.[1]

The plaintiff seeks enforcement of the Department of Public Health ("DPH") regulations and, alternatively, claims that these conditions of his confinement violate his right to substantive due process under the Fourteenth Amendment to the United States Constitution. For the reasons set forth below, the Court should deny the Plaintiff's Motion.

---

[1] This opposition addresses only the plaintiff's request for a preliminary injunction. The DOC Defendants reserve their defenses to the plaintiff's claims for money damages for their response to the Second Supplemental Complaint.

**FACTUAL BACKGROUND**

The plaintiff has been civilly committed as a sexually dangerous person ("SDP") to the Massachusetts Treatment Center ("Treatment Center") for one day to his natural life.[2] Complaint, ¶ 1. *See* G.L. c. 123A, § 1 (defining "sexually dangerous person"), §§ 12-14 (detailing SDP commitment process); *Commonwealth v. Bruno*, 432 Mass. 489, 494-497 (2000) (explaining SDP commitment process under 1999 statutory amendments to G.L. c. 123A).

Robert Murphy is the Superintendent of the Treatment Center. Complaint, ¶ 4. Kathleen Dennehy is the Commissioner of DOC. Complaint, ¶ 5. General Laws c. 123A, § 2 vests the Commissioner of Correction with sole responsibility for the Treatment Center's operation. The statute requires the Commissioner to maintain a treatment center for "the care, custody, treatment and rehabilitation" of sexually dangerous persons. G.L. c. 123A, § 2.

On November 17, 2004, the plaintiff was moved to cell 4 on the A-2 housing unit at the Treatment Center. Second Supplemental Complaint**,** ¶ 139.

On November 15, 2004, two inspectors from the Department of Public Health ("DPH") conducted an inspection of the Treatment Center. Affidavit of Daniel Quinn, Exhibit A, ¶ 3.[3] DPH evaluates the Treatment Center under the standards applicable to correctional facilities, 105 CMR 451.00, <u>Minimum Health and Sanitation Standards and Inspection Procedures for Correctional Facilities</u> ("DPH Regulations"). *See* 105 CMR 451.001 (DPH is required to inspect each correctional facility twice annually and to report on its findings and recommendations).

---

[2]  The Treatment Center is referred to as the Nemansket Correctional Center in G.L. c. 123A, § 2. Throughout the statute, however, the facility is also referred to as the Treatment Center. *See, e.g.*, G.L. c. 123A, §§ 1, 6A, 9, 12, 13. The facility is commonly referred to as the Massachusetts Treatment Center as indicated by its letterhead and other official documents.
[3]  Because scanning equipment is not functioning at this time, the exhibits to this motion are being forwarded under separate cover to the Court.

During the November, 2004 inspection, the heat was found to be within the recommended guidelines in all areas of the facility. Exhibit A, ¶ 4. *See* 105 CMR 451.330 (providing recommended temperature guidelines).[4]

At some points in November and December, 2004, the heating system on the A-2 housing unit required repairs. Exhibit A, ¶ 7. Repairs were made in December, 2004, and January, 2005. Exhibit A, ¶ 7. The heating system is currently operational and maintaining acceptable temperatures. Exhibit A, ¶ 7. Daniel Quinn, Director of Engineering for the Treatment Center, has received no further complaints from the plaintiff or any other resident of the A-2 housing unit with respect to the heat on that unit and has not learned about any such complaints made to other Treatment Center staff. Exhibit A, ¶ 8.

The roof on the A-2 housing unit typically leaks during and after precipitation. Exhibit A, ¶ 5. The November, 2004 DPH inspection noted that the roof in the A-2 housing unit leaks water during hard driving rain and that the ceiling is blistering. Exhibit A, ¶ 5. The November, 2004 DPH inspection also noted that water drips out of a light fixture on that unit. Exhibit A, ¶ 5. The lighting fixtures affected by leaks have been disconnected to avoid an electrical hazard. Exhibit A, ¶ 9.[5] When the roof leaks, receptacles are used in the common areas of the A-2 housing unit to collect the rain and to prevent hazardous floor conditions. Exhibit A, ¶ 10.

Neither DPH nor the Attorney General has initiated an action to order DOC to repair the leaking roof on the A-2 housing unit. Exhibit A, ¶ 6.

---

[4] Notably, the plaintiff does not allege that the temperature ever fell below the recommended guidelines. See Second Supplemental Complaint, ¶¶ 145-146. The plaintiff also does not claim that the November, 2004 DPH inspection showed any deviation from the recommended guidelines. See id.

[5] Sufficient working lights remain operational on the A-2 housing unit. The November, 2004 DPH inspection did not indicate any deficiencies with respect to the adequacy of lighting on the A-2 housing unit. Exhibit A, ¶ 9.

The cost to replace the A unit roof exceeds $100,000. Affidavit of Jeffrey Quick, Exhibit B, ¶ 4. A project of this magnitude is considered to a capital expenditure. DOC has included roof repair on its list of urgent capital requests in 2004. Exhibit B, ¶ 4. DOC provides requests to the Division of Capital Asset Management ("DCAM"), a separate state agency. Exhibit B, ¶ 6. State law generally requires that DCAM approve and oversee all phases of a major renovation of this type. *See generally,* G.L. c. 7, § 38A1/2, *et seq*; G.L. c. 29, § 7A, *et seq*. The funds awarded to DOC in 2004 were not sufficient to undertake this project. Exhibit B, ¶ 5. Further, a major renovation of this type must be designed and then submitted for a competitive bidding process. This process cannot typically be accomplished within 30 days. Exhibit B, ¶ 7.

Jeffrey Quick, DOC's Director of the Division of Resource Management, will inspect the A unit roof within the next thirty (30) days to determine if any interim repairs to the A unit roof are feasible. Exhibit B, ¶ 8.

## **ARGUMENT**

### I. THE PLAINTIFF FAILS TO MEET THE REQUIREMENTS FOR A PRELIMINARY INJUNCTION.

In ruling on a motion for a preliminary injunction, the court must consider

> (1) the likelihood of success on the merits; (2) the potential for irreparable harm if the injunction is denied; (3) the balance of relevant impositions, i.e., the hardship to the nonmovant if enjoined as contrasted with the hardship to the movant if no injunction issues; and (4) the effect (if any) of the court's ruling on the public interest.

*Ross-Simons of Warwick, Inc. v. Baccarat, Inc.,* 102 F.3d 12, 15 (1st Cir. 1996); *see Langlois v. Abington Housing Auth.*, 207 F.3d 43, 47 (1st Cir. 2000) (same).

"Likelihood of success on the merits is the main bearing wall of the four-factor framework." *Ross-Simons*, 102 F.3d at 16. The plaintiff has no likelihood of success on the merits because (1) his claim with respect to the heat is now moot because the heating system has

already been repaired; (2) he has no private right of action under the DPH regulations or the State Sanitation Code; and (3) he has failed to state a claim for violation of his right to substantive due process under the Fourteenth Amendment of the United States Constitution.

Accordingly, this Court should deny the Plaintiff's Motion.

## II. BECAUSE THE HEAT HAS BEEN REPAIRED, THE PLAINTIFF'S MOTION IS MOOT WITH RESPECT TO THAT CLAIM.

"The doctrine of mootness enforces the constitutional mandate that an actual controversy must exist at all stages of the review, not merely at the time the complaint is filed." *Mendez Soto v. Hon. Anabelle Rodriguez*, 306 F.Supp.2d 120, 123 (D.P.R. 2004). A case becomes moot when "the issues presented are no longer 'live' or the parties lack a legally cognizable interest in the outcome of the controversy, thus rendering the relief academic." *Id.*

The heat on the plaintiff's housing unit has been repaired. There have been no further complaints with respect to the heat on that unit.[6] Accordingly, there is no longer a live controversy and the Plaintiff's Motion is moot.[7]

## III. THE PLAINTIFF HAS NO LIKELIHOOD OF SUCCESS ON HIS CLAIM TO ENFORCE THE DPH REGULATIONS OR THE STATE SANITARY CODE.

### A. The Plaintiff Has No Private Right of Action To Enforce DPH Regulations.

The DPH Regulations, set forth at 105 CMR 451.00, <u>Minimum Health and Sanitation Standards and Inspection Procedures for Correctional Facilities</u>, apply to the Treatment Center. The DPH Regulations define a "correctional facility" in relevant part as "any building, enclosure, space or structure used for the custody, and rehabilitation of committed offenders and of such

---

[6] The plaintiff made no showing that the temperature on his housing unit fell below the recommended standards contained in 105 CMR 451.330.

[7] While the "mootness exception" doctrine permits a plaintiff to overcome the mootness hurdle in some cases, the circumstances here do not warrant application of that doctrine. *See Mendez Soto*, 306 F.Supp.2d at 123-124. This situation is not of the type that is capable of repetition yet evading review. Further, the mootness exception only applies if "there is a reasonable expectation or a demonstrated probability that the same controversy will recur involving the same complaining party." *Id.* at 124 (internal citation and quotation marks omitted).

other persons as may be placed in custody therein in accordance with law, as defined by M.G.L. c. 125, § 1. 105 CMR 451.020. *See* G.L. c. 125, § 1(d) (defining a "correctional facility" as "any building, enclosure, space or structure used for the custody, control and rehabilitation of committed offenders and of such other persons as may be placed in custody therein in accordance with law"); *see also* G.L. c. 125, § 1(n) (defining a "state correctional facility" as "any correctional facility owned, operated, administered or subject to the control of the department of correction, including but not limited to . . . .").

The DPH Regulations define a "committed offender" as "a person convicted of a crime and committed under sentence to a correctional facility." *Id.* *See* G.L. c. 125, § 1(c) (same). The DPH Regulations define an "inmate" as a "committed offender, detainee or such other person as is placed in custody in a correctional facility." *Id.* *See* G.L. c. 125, § 1(i) (defining an "inmate" as "a committed offender or such other person as is placed in custody in a correctional facility in accordance with law."). Thus, the plaintiff and other civilly committed SDP's are "inmates" for purposes of the DPH Regulations.

The plaintiff seeks recovery for the DOC Defendants' alleged violation of the DPH Regulations. The plaintiff's claim fails because the plaintiff lacks standing to enforce the DPH Regulations. In the absence of any indication that the Legislature intended a statute to create a private right of action, none should be inferred by the Court. *Loffredo v. Center for Addictive Behaviors*, 426 Mass. 541, 545-547 (1998). The Legislature has charged the DPH with promulgating regulations governing minimum health and sanitation standards at correctional facilities. G.L. c. 111, § 21. The DPH Commissioner has been delegated overall responsibility of administering the Commonwealth's sanitation laws. G.L. c. 17, § 2. In *Attorney General v. Sheriff of Worcester County*, the Supreme Judicial Court held that it is the duty of the sheriff

[here, the Superintendent] to ensure compliance with health and sanitation regulations [105 C.M.R. § 451.000, *et seq*.] at correctional facilities and detention centers, and that the Attorney General may maintain a civil action to establish that duty. 382 Mass. 57, 58, 59 (1980). *See* G.L. c. 111, § 21.

This comprehensive grant of authority and responsibility displaces any private right of action. Specifically:

> [A] reading of 105 CMR 451.00, et seq., makes it clear that broad discretion is left to the Commissioner of the Department of Public Health in regulating the health standards at correctional facilities. If the Commissioner believes that there are conditions which are dangerous to the public health constituting an emergency, the Commissioner shall notify the Commissioner of Corrections, the Secretary of Human Services and the Governor, and request that the Governor declare that an emergency exists which is detrimental to the public health. This authority vested in the Department of Public Health Commissioner carries with it, by inference, the right to seek judicial relief through declaratory judgment. Such a right is shared by the Attorney General of the Commonwealth as the chief law officer of the Commonwealth. **Nowhere in c. 111, § 21 is there a private cause of action. Nor does 105 CMR 451.00 et seq. provide for a private cause of action.** Rather, the provisions provide for the minimum health and sanitation standards at correctional facilities. **The proper party to address public health issues therefore is the Attorney General or the Commissioner of Public Health.**

*O'Brien v. DuBois, et. al.,* Worcester Superior Court, Civil Action No. 94-2170 (1995) (Carhart, J.), Exhibit C (emphasis added). *See also Alexander, et. al. v. DuBois, et. al.*, Middlesex Superior Court, Civil Action No. 94-6486 (1997) (Gershengorn, J.), Exhibit D. The plaintiff has no ability to bring a private right of action under the General Laws to enforce his civil rights or due process concerns relating to public health standards. The plaintiff, therefore, has no likelihood of success on the merits. This Court should deny the Plaintiff's Motion.

      B.      **The Plaintiff Fails to State a Claim for Violation of the State Sanitary Code.**

The plaintiff argues that the State Sanitary Code, promulgated pursuant to G.L. c. 111, § 127A and contained at 105 CMR 410*, et seq.,* applies to the Treatment Center. The plaintiff is

incorrect. The Commonwealth and its agencies are exempt from G.L. c. 111, § 127A, the statute authorizing DPH to promulgate the State Sanitary Code. *See* Opinion of the Attorney General (00/01 Op AG No. 2 (2001), 2001 Mass. AG Lexis 1 (April 25, 2001) and cases cited therein. The Department of Correction falls under the purview of the Executive Office of Public Safety, an agency of the Commonwealth. G.L. c. 6A, §§ 2[8] and 18.[9] Accordingly, the State Sanitary Code does not apply to the Treatment Center.

Further, neither G.L. c. 111, § 127A nor the resulting regulations, 105 CMR 410, provides for a private right of action. Rather, G.L. c. 111, § 127A provides that local boards of health shall enforce the State Sanitation Code "in the same manner in which local health rules and regulations are enforced." DPH may "in like manner enforce" the State Sanitation Code if local boards "fail after the lapse of a reasonable length of time to enforce the same." *Id.* For the same reasons why there is no private right of action under the DPH Regulations, there is no private right of action under the State Sanitation Code. Accordingly, the plaintiff cannot maintain an action for enforcement of the State Sanitation Code.

Even if there were, the plaintiff could not maintain an action in this Court. General Laws c. 111, § 127A specifically provides that the Superior Court "shall have jurisdiction" over actions to enforce the State Sanitary Code. G.L. c. 111, § 127A. Thus, even if the statute could be read as providing a private right of action against the Commonwealth, which it cannot, suit in this Court would be barred by the Eleventh Amendment. The Eleventh Amendment to the United States Constitution bars suit against a state by its own citizens unless the state has waived its sovereign

---

[8]     "There are hereby established the following executive offices, each of which shall serve directly under the governor: . . . public safety . . . ." G.L. c. 6A, § 2.

[9]     "The following state agencies are hereby declared to be within the executive office of public safety: . . . the department of correction, including the parole board and all other agencies within said department . . . ." G.L. c. 6A, § 18.

immunity. *Will v. Michigan Dep't of State Police*, 491 U.S. 58, 66 (1989); *see Edelman v. Jordan*, 415 U.S. 651, 662-63 (1974) (while the Eleventh Amendment does not expressly bar suits against a state by its own citizens, the United States Supreme Court has consistently held that the Eleventh Amendment precludes such suits in the absence of the state's consent to suit). Because the statute limits jurisdiction to the Superior Court, there has been no waiver of sovereign immunity.

Because the plaintiff has no likelihood of success on the merits, this Court should deny the Plaintiff's Motion.

### III.  THE PLAINTIFF HAS FAILED TO STATE A CLAIM FOR VIOLATION OF HIS RIGHT TO SUBSTANTIVE DUE PROCESS UNDER THE FOURTEENTH AMENDMENT OF THE UNITED STATES CONSTITUTION.

The plaintiff asks that this Court "enforce[] the plaintiff's right to substantive due process under the Fourteenth Amendment to the United States Constitution to be treated more considerately than prisoners. . . ." Plaintiff's Memorandum in Support of Plaintiff's Motion for a Preliminary Injunction to Order the Defendants to Repair the Heat and Leaking Roof, p. 5. Presumably, the plaintiff is asserting a claim under 42 U.S.C. § 1983.

To state a civil rights claim under 42 U.S.C. § 1983, the plaintiff must allege that the defendants, acting under color of state law, committed some conduct which deprived him of a right, privilege, or immunity secured by the Constitution or laws of the United States. *West v. Atkins*, 487 U.S. 42, 48 (1988); *Johnson v. Summers*, 411 Mass. 82, 86 (1991). This statute, 42 U.S.C. § 1983, in and of itself does not offer the plaintiff any substantive ground for relief. It is well established that § 1983 is not a source of substantive rights, but merely provides a method for vindicating <u>federal</u> rights conferred under the United States Constitution or federal law. *Chapman v. Houston Welfare Rights, Org.*, 441 U.S. 600, 615-618 (1978).

In addition, rights that arise only from state law are not enforceable by § 1983. Since § 1983 requires violation of a federal constitutional or statutory right, the mere failure to properly follow state law or regulations cannot provide the basis for a § 1983 claim. *See Pennhurst State School & Hosp. v. Halderman*, 465 U.S. 89, 106 (1984); *Quintero de Quintero v. Aponte-Roque*, 974 F.2d 226, 230 (1st Cir. 1992); *Coyne v. City of Somerville*, 972 F.2d 440, 444 (1st Cir. 1992) ("It is bedrock law in this circuit, . . . that violations of state law -- even where arbitrary, capricious, or undertaken in bad faith -- do not, without more, give rise to a denial of substantive due process under the U.S. Constitution"). In particular, § 1983 does not provide a statutory vehicle for the enforcement of state constitutional rights. *Phillips v. Youth Dev. Program, Inc.*, 390 Mass. 652, 658 n. 4 (1983). Further, "[t]he mere failure to conform to State minimum standards does not *per se* establish a constitutional violation." *Richardson v. Sheriff of Middlesex County*, 407 Mass. 455, 460 (1990) (internal quotations omitted).

The plaintiff asserts that the leaking roof violates his right to substantive due process under the Fourteenth Amendment. Substantive due process prevents the government from engaging in conduct that "'shocks the conscience'" or interferes with rights "'implicit in the concept of ordered liberty,'" *Bruno*, 432 Mass. at 503 (citations omitted).

The plaintiff has not demonstrated how his substantive due process rights are being violated by the leaking roof. In the context of claims under § 1983, it has repeatedly been held that in actions for alleged constitutional violations, "conclusionary allegations will not suffice." *Wise v. Bravo*, 666 F.2d 1328, 1333 (10th Cir. 1981); *Kearson v. Southern Bell Telephone & Telegraph Co.,* 763 F.2d 405, 407 (11th Cir. 1985). The complaint must at least set forth minimal facts, not subjective characterizations, as to who did what to whom and why. *Dewey v. University of New Hampshire*, 694 F.2d 1, 3 (1st Cir. 1982). Even a pro se complaint must ". . .

be backed up with enough supportive facts to outline the elements of the pleader's claim . . ." and courts "need not conjure up unpleaded facts to support conclusionary [allegations]." *Hurney v. Carver*, 602 F.2d 993, 995 (1st Cir. 1979). "To state a constitutional claim, a plaintiff must do more than simply state a conclusion or engage in `artful pleading' . . . . A plaintiff must state a compensable claim for relief that details the facts forming the basis for the claim." *Blinder, Robinson & Co. v. U.S.S.E.C.,* 748 F.2d 1415, 1419 (10th Cir. 1984). Therefore, as a matter of law, the plaintiff's claim of a violation of his Fourteenth Amendment rights under § 1983 fails.

The conditions allegedly resulting from the leaking roof, as set forth by the plaintiff, do not "shock the conscience." He has alleged that:

> The roof over Unit A-2 leaks. Four trash barrels are permanently deployed to catch the leaks in the common area. Four light fixtures are out [of] service and show substantial rusting from the constant leakage. The water runs down a pipe chase between cells 3 and 4 and then seeps out over the floor, blistering the paint on the wall, rusting the bottom of the steel door casings and loosening the linoleum.

Second Supplemental Complaint, ¶ 141. He claims that the roof has been leaking for some period of time. See, e.g., Second Supplemental Complaint, ¶ 142. The plaintiff claims that this condition violates the DPH Regulations, 105 CMR 451.350. This provision provides that

> The foundations, floors, walls, doors, windows, ceilings, roofs, staircases, porches, chimneys, and other structural elements of the facility **should** be maintained so that the facility excludes wind, rain, and snow, and is rodent-proof, watertight and free from chronic dampness, weather tight, in good repair, and in every way fit for the use intended. Further, every interior structural element should be maintained free from holes, cracks, loose plaster, or other defect which renders the area difficult to keep clean, or which constitutes an accident hazard or provides insect or rodent harborage.

105 CMR 451.350 (emphasis added). Notably, that provision is not contained within the "Required Standards" but, instead, is contained in the "Recommended Standards." *See* 105 CMR 451.011 (defining the "Required Standards (.100 and .200 Series)" and requiring each

correctional facility to comply with "<u>Required Minimum Health and Sanitation Standards</u> set forth in 105 CMR 451.101 through 105 CMR 451.214 (.100 and .200 Series)); 105 CMR 451.012 (defining "Recommended Standards (.300 Series)" and stating that DPH recommends that each correctional facility comply with the "<u>Recommended Minimum Health and Sanitation Standards</u> set forth in 105 CMR 451.320 through 105 CMR 451.390 (.300 Series)" in order to "provide physical living conditions adequate to maintain the health and safety of **inmates** of correctional facilties") (emphasis added).[10] The fact that the provision is a recommended but not a required standard supports the conclusion that a leaking roof does not in and of itself "shock the conscience." Likewise, the fact that neither DPH nor the Attorney General has elected to initiate an action indicates that the particular conditions described by the plaintiff do not present an unacceptable risk to health or safety.[11]

## **CONCLUSION**

For the foregoing reasons, the DOC Defendants respectfully request that this Court deny the Plaintiff's Motion. Alternatively, the DOC Defendants respectfully request that this Court schedule this matter for a hearing.

---

[10] As noted above, the plaintiff falls within the definition of an "inmate" for purposes of the DPH Regulations. Thus, his reliance on *Youngberg v. Romeo*, 457 U.S. 307, 102 S.Ct. 2452 (1982), to suggest that he is entitled to "more considerate treatment" because he is a civilly committed SDP and no longer serving a criminal sentence, is entirely misplaced.

[11] Further, an inspection of this roof will be conducted within the next 30 days. Thus, at this juncture, the Court's intervention is not required. It is widely accepted that the task of prison administration is best left to those professionals who are trained and most knowledgeable about the proper operation of such facilities. *See, e.g., Turner v. Safley*, 482 U.S. 78 (1987) (recognizing that the problems of prison administration are complex and not susceptible to resolution through judicial decree). Prison officials "should be accorded wide-ranging deference in the adoption and execution of policies and practices that in their judgment are needed to preserve internal order and discipline and to maintain institutional security." *Bell v. Wolfish*, 441 U.S. 520, 547 (1979).

        Defendants Massachusetts Department of Correction, Robert Murphy and Kathleen Dennehy,

        NANCY ANKERS WHITE
        Special Assistant Attorney General

        /s/ Mary P. Murray
By:  Mary P. Murray, Counsel  (BBO # 555215)
        Department of Correction
        Massachusetts Treatment Center
        30 Administration Road
        Bridgewater, Massachusetts 02324
        (508) 279-8184
        (508) 279-8181 (fax)
        MPMurray@DOC.state.ma.us

Dated:  February 11, 2005

## Certificate of Service

     I hereby certify that I caused a copy of the within document to be served as follows:
(1) *Pro Se* Plaintiff Joel Pentlarge, by intra-facility mail, Massachusetts Treatment Center 30 Administration Road, Bridgewater, MA  02324
&
(2) Defendants Natalyia Pushkina and Debra O'Donnell, by first class mail, postage pre-paid upon their counsel of record, Kevin Mulvey, Esquire, Mulvey & Sneider, LLP, 1622A Beacon Street, Brookline, MA  02446-2201.

        /s/ Mary P. Murray
        Mary P. Murray

Dated:  February 11, 2005