UNITED STATES DISTRICT COURT
DISTRICT OF MASSACHUSETTS
EASTERN DIVISION

CIVIL ACTION NO. 04-30177-PBS

JOEL PENTLARGE,
        Plaintiff,

v.

ROBERT MURPHY, *et al.,*
        Defendants.

MEMORANDUM OF LAW IN SUPPORT OF MOTION OF
DEFENDANTS ROBERT MURPHY, KATHLEEN DENNEHY AND
MASSACHUSETTS DEPARTMENT OF CORRECTION TO DISMISS
THE COMPLAINT, SUPPLEMENTAL COMPLAINT AND
AND SECOND SUPPLEMENTAL COMPLAINT

## INTRODUCTION

Defendants the Massachusetts Department of Correction ("DOC"), Robert Murphy and

Kathleen Dennehy (collectively, the "DOC Defendants") submit this memorandum in support of

their motion to dismiss the Complaint, Supplemental Complaint and Second Supplemental

Complaint. For the reasons set forth below, the Court should grant this motion.

On September 8, 2004, the plaintiff initiated this action by filing his original Complaint,

raising various claims related to his confinement as a civilly committed sexually dangerous

person ("SDP") at the Massachusetts Treatment Center ("Treatment Center") against Kathleen

Dennehy, Commissioner of Correction, Robert Murphy, Superintendent of the Treatment Center

and DOC. On September 30, 2004, the plaintiff filed his Amended Complaint, raising claims

against two non-DOC employees, Natalya Pushkina and Debra O'Donnell.[1]  On October 15,

2004, the plaintiff filed his Supplemental Complaint. On January 25, 2005, the plaintiff's Second

Supplemental Complaint was filed.  The plaintiff seeks only injunctive relief against DOC.

Complaint, ¶ 6.  He seeks monetary, injunctive and declaratory relief against Commissioner

Dennehy and Superintendent Murphy.

## FACTUAL ALLEGATIONS

On July 31, 2000, the plaintiff pled guilty to five counts of rape, involving four boys.

Complaint, ¶ 8.  Near the end of the plaintiff's prison sentence, the District Attorney for

Hampshire County filed a petition to civilly commit the plaintiff as a sexually dangerous person.

Complaint, ¶ 10.  *See* G.L. c. 123A, § 12.  On July 19, 2004, the plaintiff was adjudicated a SDP

and was been civilly committed to the Treatment Center for one day to his natural life.[2]

Complaint, ¶¶ 1, 12.  *See* G.L. c. 123A, § 1 (defining "sexually dangerous person"), §§ 12-14

(detailing SDP commitment process); *Commonwealth v. Bruno*, 432 Mass. 489, 494-497 (2000)

(explaining SDP commitment process under 1999 statutory amendments to G.L. c. 123A).

Robert Murphy is the Superintendent of the Treatment Center.  Complaint, ¶ 4.  Kathleen

Dennehy is the Commissioner of DOC. Complaint, ¶ 5. General Laws c. 123A, § 2 vests the

Commissioner of Correction with sole responsibility for the Treatment Center's operation.  The

statute requires the Commissioner to maintain a treatment center for "the care, custody, treatment

and rehabilitation" of sexually dangerous persons.  G.L. c. 123A, § 2.

## B.    The History of the Treatment Center and the Federal Consent Decree Litigation.

---

[1]      Defendants Pushkina and O'Donnell have filed a separate answer and motion to dismiss the Amended Complaint.  The Amended Complaint contains no factual allegations or legal claims against the DOC Defendants and, thus, no response by the DOC Defendants is required.

[2]      The Treatment Center is referred to as the Nemansket Correctional Center in G.L. c. 123A, § 2. Throughout the statute, however, the facility is also referred to as the Treatment Center.  *See, e.g.*, G.L. c. 123A, §§ 1, 6A, 9, 12, 13.  The facility is commonly referred to as the Massachusetts Treatment Center as indicated by its letterhead and other official documents.

The Treatment Center has previously been under dual management.  G.L. c. 123A, § 2 mandated that the Department of Mental Health ("DMH"), had responsibility for the care, treatment and rehabilitation of SDP's with custodial personnel provided by DOC.  St. 1959, c. 615, as appearing in G.L. c. 123A, § 2.  The United States District Court for the District of Massachusetts had previously entered consent decrees governing certain aspects of the operation of the Treatment Center that incorporated this dual management scheme.  *See King v. Greenblatt* ("*King I*"), 52 F.3d 1, 2-3 (1st Cir.), *cert. denied*, 516 U.S. 863 (1995).  Among other things, the consent decrees mandated that Treatment Center residents "have the least restrictive conditions necessary to achieve the purpose of commitment."  *Id.;  see also King v. Greenblatt ("King II"),* 127 F.3d 190, 192 (1st Cir. 1997); *King v. Greenblatt*, 149 F.3d 9 (1st Cir. 1998) *("King III*"); *King v. Greenblatt*, 53 F.Supp.2d 117, 118-20 (D. Mass. 1999) (detailing changes in conditions at Treatment Center from 1972 to 1992). "General Laws c. 123A is a comprehensive legislative program designed to identify and treat sexually dangerous persons. The statute was enacted 'with the dual aims of protecting the public against future antisocial behavior by the offender, and of doing all that can be done to rehabilitate him.'" *Commonwealth v. Barboza*, 387 Mass. 105, 111 (1981), *cert. denied*, 459 U.S. 1020 (1982) (citations omitted).

On January 14, 1994, the Legislature enacted St. 1993, c. 489, § 2, which amended G.L. c. 123A, § 2 by placing sole authority and responsibility over the Treatment Center with DOC. St. 1993, c. 489, § 2, as appearing in G.L. c. 123A, § 2.  *See King III*, 149 F.3d at 11-12; *King*, 53 F.Supp.2d at 121.

As a result of this legislative change, in 1994 the Court (Mazzone, J.), began overseeing what ultimately became the final phase of the federal consent decree litigation.  In 1994, the Court appointed the law firm of Hale and Dorr to represent forty-nine SDP's who called

themselves the "Class of 48 + 1" and alleged a number of violations of their state and federal constitutional rights. *King*, 53 F.Supp.2d at 121.

The Court reopened another consent decree case concerning the Treatment Center, Harold G. Williams, et al. v. Michael Lesiak, et al., U.S.D.C. C.A. No. 72-571-ADM, and consolidated it with Mitchell G. King, et al. v. Milton Greenblatt, M.D., et al., U.S.D.C. C.A. No. 72-788-ADM, the case involving the Class of 48 + 1 (together "the federal consent decree litigation"). *King*, 53 F. Supp.2d at 121.

Following the enactment of St. 1993, c. 489, § 2, the Commonwealth moved to vacate or in the alternative to modify the consent decrees by substituting DOC for DMH as the agency designated to have primary responsibility and control for the facility. *King I*, 52 F.3d at 3. DOC submitted to the Court an extensive Management Plan for the administration of the Treatment Center. *King II,* 127 F.3d at 193. The Management Plan encompassed in detail almost every aspect of life at the Treatment Center including policies, regulations, and rules governing staffing, clinical treatment, educational and vocational treatment, a community access program, behavior management, and resident management operations. *Id.; King III*, 149 F.3d at 15. The Court permitted DOC to implement its plan and modified the consent decrees to place responsibility for and control of the Treatment Center in DOC. *King II*, 127 F.3d at 194.

The Court, however, did not vacate the consent decrees. *King III*, 149 F.3d at 16. Instead, the Court elected to exercise close judicial oversight of DOC's compliance with the consent decrees. *Id*. at 122-23; *King,* 53 F.Supp.2d at 122-23. Additionally, the Court ordered the DOC to submit an amended plan addressing issues raised by the parties. The Amended Plan was filed on November 29, 1996. *King*, 53 F.Supp. 2d at 122.

C.    __Termination of the Federal Consent Decrees.__

From 1994 to June, 1999, the Court approved, oversaw, and monitored DOC's assumption of sole control over the Treatment Center, including DOC's expansion of sex offender treatment services at the Treatment Center to non-civilly committed state prison inmates ("SPI's"). *See, e.g., King*, 53 F.Supp.2d at 121-23. Throughout that period, the SDP's continued to assert that the DOC's policies and procedures and its introduction of the SPI's into the facility "essentially turned the Treatment Center into a prison and fundamentally altered the therapeutic community." *King III*, 149 F.3d at 16. They also complained that DOC's new rules and regulations and the additional SPI population impaired or affected treatment so as to render it ineffective and in violation of G.L. c. 123A and the consent decrees. *King*, 53 F.Supp.2d at 123, 135.

This final phase of the consent decree litigation culminated in an evidentiary hearing before the Court in March, 1999. *King*, 53 F.Supp.2d at 124. At the hearing, SDP's reiterated their numerous complaints about DOC's operation of the Treatment Center. *See King*, 53 F.Supp.2d at 129-31, 134-35. After the hearing, the Court terminated the consent decrees. *King*, 53 F.Supp.2d at 136, 139. In doing so, the Court determined that the SDP's complaints about DOC's policies, procedures, rules, and regulations as well as their complaints about the presence of the SPI's in the Treatment Center, taken as whole, did not render treatment ineffective, did not violate G.L. c. 123A, and did not violate the consent decrees and, by implication, did not violate any state or federal rights. *King*, 53 F.Supp.2d at 135, 137. *See King III*, 149 F.3d at 19.

## ARGUMENT

A motion to dismiss for failure to state a claim under Fed R. Civ. P. 12(b)(6) will be granted if it appears to a certainty that the plaintiff would be unable to recover under any set of

facts.  *Gonzalez-Bernal v. United States*, 907 F.2d 246, 258 (1st Cir. 1990).  A court ruling on a

motion to dismiss must accept the factual allegations of the Complaint as true and draw all

reasonable inferences in the non-moving party's favor.  *Feinstein v. Resolution Trust Corp.,* 942

F.2d 34, 37 (1st Cir. 1991).[3]

I.     **THE PLAINTIFF HAS FAILED TO STATE A CLAIM FOR VIOLATION OF
       HIS RIGHT TO BE HELD IN CONDITIONS THAT ARE THE LEAST
       <u>RESTRICTIVE ALTERNATIVE.</u>**

The plaintiff asserts that he is being held in conditions that exceed the "least restrictive

alternative" and which are "substantially more restrictive and punitive than the conditions under

which the plaintiff was held while in prison."  Complaint, § 13.  The plaintiff lists ways in which

his confinement as a SDP at the Treatment Center allegedly differs from his incarceration as an

ordinary SPI at MCI-Norfolk, a level four security prison.  See Complaint, §§ 3, 14-46.  The

plaintiff claims that the DOC Defendants have violated his right to substantive due process under

the Fourteenth Amendment and his rights under G.L. c. 123A, § 6A.  He seeks injunctive,

monetary and declaratory relief.  Complaint, § 82.[4]  His claim fails.

A.     **The Alleged Differences Between Conditions at the Treatment Center
       <u>and MCI-Norfolk Do Not Violate Substantive Due Process.</u>**

Substantive due process "'prevents the government from engaging in conduct that shocks

the conscience, or . . . .interferes with rights implicit in the concept of ordered liberty." *Dutil,*

*petitioner,* 437 Mass. 9, 13 (2002), *citing Aime v. Commonwealth*, 414 Mass. 667, 673 (1993)

_____

[3]      Count VIII in the Supplemental Complaint relates to the denial of a furlough.  On November 5, 2004, after
a hearing, the Court, Ponsor, J., denied the plaintiff's motion for a preliminary injunction, finding that the plaintiff
has no likelihood of success on the merits.  The DOC Defendants rely on and incorporate by reference the
opposition filed by Commissioner Dennehy and Superintendent Murphy.  Docket No. 14.  For the reasons set forth
in that opposition, the plaintiff has failed to state a claim upon which relief may be granted.  Count VIII must,
therefore, be dismissed.

[4]      In the alternative, the plaintiff requests to be transferred to MCI-Norfolk and to be held under the same
conditions that he was held in immediately prior to his transfer to the Treatment Center.  Complaint, Relief, ¶ 3(a),
p. 25.  Chapter 123A, however, requires that SDP's be housed at the Treatment Center except under certain limited
circumstances not applicable here.  *See* G.L. c. 123A, §§ 2, 2A.

and *United States v. Salerno*, 481 U.S. 739, 746, 107 S.Ct. 2095 (1987) (internal quotations omitted).

The alleged differences in the conditions of confinement at the Treatment Center and MCI-Norfolk do not shock the conscience or interfere with rights implicit in the concept of ordered liberty.   MCI-Norfolk houses SPI's serving criminal sentences who share in common a need for classification to a particular security level. In contrast, SDP's are committed to the Treatment Center they have a mental condition that renders them likely to engage in future sexual misconduct. *See* G.L. c. 123A, § 1 (defining SDP).

Notably, there are significant differences in DOC's ability to manage SPI's and SDP's. State law requires that SDP's be housed at the Treatment Center except in limited circumstances. *See* G.L. c. 123A, §§ 2, 2A; 103 CMR 460, <u>Transfer Procedures for the Massachusetts Treatment Center</u>.[5] The Commissioner, therefore, has a limited ability to transfer certain SDP's.  In contrast, the Commissioner has virtually unfettered discretion to classify SPI's subject only to the requirements of DOC's classification regulations.  *See* G.L. c. 127, § 97; 103 CMR 420, <u>Classification</u>.  If a SPI violates institutional rules, he can be placed in segregation within the institution, he can be transferred to higher custody or, for certain serious infractions, he may be placed in the Departmental Disciplinary Unit for up to ten years.  *See, e.g.*, 103 CMR 430, <u>Disciplinary Proceedings</u> ("disciplinary regulations"), specifically, 103 CMR 430.25(3)(d). The disciplinary regulations do not apply to SDP's.  Rather, 103 CMR 431, <u>Observation of Behavior Reports</u> ("OBR regulations"), applies to SDP's.  The range of sanctions contained in the OBR regulations is dramatically compressed compared to that available in the disciplinary regulations.

---

[5]    A SDP may be transferred to another facility only if he continues to serve a prison sentence.  Because the plaintiff is not presently serving a criminal sentence, the plaintiff may not be transferred from the Treatment Center to another DOC facility.

Different conditions of confinement for different populations that have different needs do not, therefore, amount to government conduct that shocks the conscience. Indeed, even the plaintiff is not in the same situation as he was when confined as a SPI at MCI-Norfolk. In July, 2004, there was an adjudication, beyond a reasonable doubt, that the plaintiff's present mental condition renders him likely to sexually reoffend if he is not confined to a secure facility. *See* G.L. c. 123A, §§ 1, 14(d).

Due process requires that the conditions and duration of civil confinement bear some reasonable relation to the purpose for which persons are committed. *Seling v. Young*, 531 U.S. 250, 121 S.Ct. 727, 736 (2001). The plaintiff is housed at a Treatment Center where he is kept segregated from SPI's. He has a statutory right to treatment. G.L. c.123A, § 2.

As discussed above, the federal courts, in the context of the consent decree litigation, have already concluded that the conditions of confinement at the Treatment Center comport with constitutional requirements. This Court and the First Circuit have already examined complaints about SDP's about limitations on the amount of clothing, room visits, funds, telephone calls, etc. The First Circuit held that "'the Plan justifies some reduction in these privileges because of past experiences with security, assault, gambling, coercion and interruptions in treatment," and `[n]o reduction rises to the level of a constitutional infraction.'" *King*, 53 F.Supp.2d at 134, *quoting King III*, 149 F.3d at 19. Likewise, none of the conditions complained of here rises to the level of a constitutional violation.

Further, the plaintiff is barred from relitigating this issue by the doctrines of *res judicata* and collateral estoppel. The doctrine of *res judicata* "bars all parties and their privies from relitigating issues where were raised or *could have been raised* in a previous action, once a court has entered a final judgment on the merits in the previous action." *Aunyx Corp. v. Canon U.S.A.,*

*Inc.,* 978 F.2d 3, 6 (1st Cir. 1992) (emphasis in original), *cert. denied*, 507 U.S. 973 (1993).

To promote judicial economy, the doctrine of claim preclusion makes a valid, final judgement conclusive on the parties and their privies and bars further litigation of all matters that were or should have been adjudicated in the action. *Heacock v. Heacock*, 402 Mass. 21, 23 (1988); *Boyd v. Jamaica Plain Co-Op. Bank*, 7 Mass. App. Ct. 153, 163 (1979). The essential elements of *res judicata* are:  (1) a final judgment on the merits in an earlier action; (2) an identity of parties or privies in the two suits; and (3) an identity of the cause of action in both the earlier and the later suits. *Aunyx Corp.,* 978 F.2d at 6; *see Grella v. Salem Five Cent Savings Bank*, 42 F.3d 26, 30 (1st Cir. 1994). The doctrine is also "based on the idea that the party to be precluded has had the incentive and opportunity to litigate the matter fully in the first law suit." *Heacock*, 402 Mass. at 24.

In this case, the first two elements are satisfied. Although the plaintiff was not a party to the consent decree litigation, he, and every other SDP, should be barred from relitigating these claims. There is a very close relationship between this plaintiff and the plaintiffs in the consent decree litigation. First, the consent decrees and the consent decree litigation encompassed and applied to all SDP's at the Treatment Center. Although this plaintiff was committed to the Treatment Center after the termination of the consent decree litigation, he and every other new SDP committed after the reinstatement of SDP commitments, *see* G.L. c. 123A, §§ 12-15, benefits from the consent decree litigation. The intent of the consent decree litigation was to resolve "systematic" issues concerning DOC's takeover of the Treatment Center, its management of the entire facility, and the conditions it imposed on the entire population of SDP residents. *King III*, 149 F.3d at 11-12;  *see King*, 53 F.Supp. at 137. This is a unique population. Only individuals adjudicated SDP and committed to the Treatment Center pursuant to G.L. c. 123A

benefitted, and continue to benefit, from the consent decree litigation.  The interests of the named plaintiffs in the consent decree litigation were identical to the interests of this plaintiff.

The Court held that its "decision does not preclude [SDP's] from challenging events on the basis of constitutional or other protected rights." *King*, 53 F.Supp. 2d at 137. Clearly, an SDP is not precluded from challenging a specific event or wrong that occurred to him. *See, e.g. Cameron v Tomes*, 990 F.2d 14 (1st Cir. 1993).  Likewise, the Court did not preclude SDP's from challenging constitutional wrongs committed after the termination of the consent decrees. *King*, 53 F.Supp.2d at 137.  The plaintiff, however, has broadly challenged DOC's operation of the Treatment Center. His claims do not raise discreet violations arising from a single event. The plaintiffs' allegations in Count I largely do not represent new post-termination claims.

Further, the defendants are entitled to use claim preclusion even though they were not named defendants in the federal consent decree litigation.  The Court acted as if the Commonwealth were the defendant in the federal consent decree litigation.  <u>See</u> <u>King</u>, 53 F.Supp.2d at 122.  The present plaintiff has filed this action against DOC, an agency of the Commonwealth, and Commissioner Dennehy and Superintendent Murphy, in part, in their capacities as officials of an agency of the Commonwealth.  Thus, there is privity between the present and prior defendants for claim preclusion purposes.  *See generally, Cohen v. Shea*, 788 F.Supp. 66, 68 (D.Mass. 1992); *Trustees of Stigmatine Fathers, Inc. v. Secretary of Admin. & Fin.,* 369 Mass. 562, 566-67 (1976).

With respect to the identity of the cause of action, the First Circuit Court of Appeals has adopted a "transactional" definition of *res judicata* from the *Restatement (Second) of Judgments* § 24, which provides that "[w]hen a valid and final judgment rendered in an action extinguishes the plaintiff's claim pursuant to the rules of merger or bar . . . , the claim extinguished includes

all rights of the plaintiff to remedies against the defendant with respect to all or any part of the transaction, or series of transactions out of which the action arose." *Aunyx Corp.*, 978 F.2d at 6-7. It does not matter if the two cases advance different legal theories. Indeed, "[t]he fact that different legal theories are presented in each case does not mean that the same transaction is not behind each. . . . '[S]o long as different theories of recovery, however prolific, derive from the same cause of action, the requisite identity is achieved if, and to the extent that, all such theories concern the 'same operative nucleus of fact.''" *Aunyx Corp.*, 978 F.2d at 7 (citations omitted).

In the consent decree litigation, the federal courts ruled on the constitutionality of the Legislature's transfer of sole control of the Treatment Center to DOC. *See King I*, 52 F.3d at 4. In addition, the SDP's alleged that DOC's new regime of rules and regulations coupled with the introduction of over 300 SPI's was unlawful and unconstitutional. *See King*, 53 F.Supp.2d at 122. The Court ruled that these complaints, taken as whole, did not render treatment ineffective, did not violate G.L. c. 123A, and did not violate the consent decrees. *King*, 53 F.Supp.2d at 135. The Court concluded that the plan itself did not violate the federal consent decrees and permitted DOC to implement all aspects of its plan. *King*, 53 Supp.2d at 121-22. The Court considered and reviewed the identical claims the plaintiff wishes to relitigate here. The plaintiff is, therefore, barred from relitigating these issues.

The doctrine of issue preclusion is equally applicable and bars the plaintiff's present claims before this Court. "'When an issue of fact or law is actually litigated and determined by a valid and final judgment, and the determination is essential to the judgment, the determination is conclusive in a subsequent action between the parties, whether on the same or a different claim.' . . . 'In certain circumstances, mutuality of the parties is not required. A nonparty may use [issue preclusion] defensively against a party to the original action who had a full and fair opportunity

to litigate the issues in question.'" *Fay v. Federal Nat'l Mortgage Ass'n*, 419 Mass. 782, 789

(1995) (citations omitted). *See Keystone Shipping Co. v. New England Power Co.,* 109 F.3d 46,

51 (1st Cir. 1997) (noting that Massachusetts applies doctrine of issue preclusion in same

traditional manner as federal court).

      As discussed above, the plaintiff's constitutional challenges were actually litigated or

could have been litigated in the federal consent decree litigation.  Moreover, the determination of

these issues was essential to the Court's decision to terminate the consent decrees.  The Court

could not lawfully terminate the consent decrees that were created to remedy past violations of

statutory and constitutional rights if there were ongoing violations.  *See King*, 53 F.Supp.2d at

124.  Indeed, the plaintiffs alleged that past statutory and constitutional wrongs had not been

remedied and DOC's management of the Treatment Center had unlawfully and unconstitutionally

transformed it into a penal environment no different from any other prison.  *See King*, 53

F.Supp.2d at 123, 135. Ultimately, the Court properly concluded that DOC's management of the

Treatment Center did not violate any statutory or constitutional rights and, therefore, terminated

the consent decrees.  *King,* 53 F.Supp.2d at 135, 137, 139.  *See Bruno*, 432 Mass. at 514 (noting

that the Court determined that DOC's management plan comports with constitutional

requirements).  Because there was a full and fair opportunity to litigate these issues in the consent

decree litigation, this Court should dismiss Count I.

      To the extent that the plaintiff relies on post-termination events, his claim also fails.  The

plaintiff has not alleged that there have been systematic changes since the time of the consent

decree litigation that were not covered by the Management Plan or Amended Plan.  For example,

the plaintiff challenges the practice of double bunking and alleges overcrowding.  The plaintiff

makes no allegation, however, that the DOC Defendants are not following the double bunking

procedures established in the Management Plan and incorporated by reference into the Amended Plan.[6] Regardless, double bunking, in and of itself, is not a *per se* constitutional violation. *See Doe v. Gaughan*, 808 F.2d 871, 885 (1st Cir. 1996) (overcrowding, without more, does not amount to a constitutional violation); *Bell v. Wolfish*, 441 U.S. 520, 541 (1979) (there is no "one man, one cell" principle lurking in the Due Process Claus; rather, the Due Process Clause is only implicated if detainees are confined in such a manner as to cause them to endure genuine privations and hardship over an extended period of time). Likewise, the plaintiff's other allegations relating to the number of hours of access to the law library, the amenities in the gym and the like do not amount to constitutional violations.[7]

This Court, therefore, should dismiss Count I of the Complaint.

**B.     The Conditions of the Plaintiff's Confinement Do Not Violate His Rights Under G.L. c. 123A, § 6A.**

To state a civil rights claim under 42 U.S.C. § 1983, the plaintiff must allege that the defendants, acting under color of state law, committed some conduct which deprived him of a right, privilege, or immunity secured by the Constitution or laws of the United States. *West v. Atkins*, 487 U.S. 42, 48 (1988); *Johnson v. Summers*, 411 Mass. 82, 86 (1991). This statute, 42 U.S.C. § 1983, in and of itself does not offer the plaintiff any substantive ground for relief. It is well established that § 1983 is not a source of substantive rights, but merely provides a method for vindicating <u>federal</u> rights conferred under the United States Constitution or federal law. *Chapman v. Houston Welfare Rights, Org.*, 441 U.S. 600, 615-618 (1978).

---

[6]     Judge Mazzone, of course, did not have occasion to consider the impact that adoption of new commitment procedures and the addition of new SDP's would have on the Treatment Center. The consent decrees were terminated in June, 1999. The new commitment provisions of G.L. c. 123A were added to the statute in September, 1999. *See* St. 1999, c. 74, §§ 3-8.

[7]     Given the number of filings that the plaintiff has made in this case alone, he would be challenged to show that any limitation on the number of hours in the law library has caused him an actual injury.

In addition, rights that arise only from state law are not enforceable by § 1983. Since § 1983 requires violation of a federal constitutional or statutory right, the mere failure to properly follow state law or regulations cannot provide the basis for a § 1983 claim. *See Pennhurst State School & Hosp. v. Halderman*, 465 U.S. 89, 106 (1984); *Quintero de Quintero v. Aponte-Roque*, 974 F.2d 226, 230 (1st Cir. 1992); *Coyne v. City of Somerville*, 972 F.2d 440, 444 (1st Cir. 1992) ("It is bedrock law in this circuit, . . . that violations of state law -- even where arbitrary, capricious, or undertaken in bad faith -- do not, without more, give rise to a denial of substantive due process under the U.S. Constitution").

General Laws, c. 123A, § 6A provides that the "[a]ny person committed as a sexually dangerous person to the treatment center or branch thereof under the provisions of this chapter shall be held in the most appropriate level of security required to ensure the protection of the public, correctional staff, himself and others." Even if a violation of this provision of state law occurred, this violation would not give rise to a claim under § 1983.

Further, to the extent that the plaintiff's claim rests in state law, his claim is barred by the provisions of G.L. c. 127, §§ 38E, 38F, because he has not alleged that he has exhausted the administrative remedies available to him as required under state law. General Laws c. 127, § 38F provides that:

> An inmate shall not file any claim that may be the subject of a grievance under section 38E unless the inmate has exhausted the administrative remedy established pursuant to said section 38E; but the court may consider such claim if a final administrative resolution of a grievance filed pursuant to said section 38E has not been decided within 180 days from the date of filing such a grievance, or if the inmate can demonstrate to the court that exigent circumstances exist which, if delayed pursuant to the requirements of this section, would jeopardize the life or seriously impair the health of the inmate, or, for actions seeking equitable relief.

General Laws c. 127, § 38E(a) provides, in relevant part, that the Commissioner "shall promulgate regulations to establish a fair, impartial, speedy and effective system for the resolution of grievances filed against the department, its officers or employees, by inmates who are committed to, held by or in the custody of the department in a state, county, or federal correctional facility, or the Massachusetts treatment center." (Emphasis added). DOC has adopted grievance procedures, 103 CMR 491, Inmate Grievances. This statute further provides that:

> (c) Grievances that may be brought by inmates subject to the provisions of subsections (a) and (b) shall include all grievances arising out of or resulting from a condition of or occurrence during confinement, whether or not said grievance is presented in the form of petition for a writ of habeas corpus. A petition for a writ of habeas corpus seeking only release from unlawful imprisonment or restraint and no other relief shall not be subject to the provisions of this section. All applicable statute of limitations and presentment periods shall be tolled from the date of the filing of a grievance pursuant to this section until the final administrative resolution of the grievance

The statute, by its, terms includes the Treatment Center. Further, the term "inmate" is not specifically defined in G.L. c. 127. Thus, the definition contained in G.L. , c. 125, § 1 provides that:

> As used in this chapter and elsewhere in the general laws, unless the context otherwise requires, the following words shall have the following meanings: . . .
>
> (i) ""inmate", a committed offender or such other person as is placed in custody in a correctional facility in accordance with law . . . .

(Emphasis added). The plaintiff makes no claim that he has exhausted the grievance procedures available to him for his state law claims. Accordingly, the Court should dismiss this claim as well as any other state law claim for which he has failed to allege exhaustion of the grievance procedures.

Regardless, the Treatment Center has already been found to provide differing levels of security in the course of the consent decree litigation. In the consent decree litigation, the Court stated that "[e]ffective treatment is offered; physical conditions have improved greatly; there are <u>differing levels of security</u>; meaningful work, education and avocational programs; and discipline, including sequestration, conforms to acceptable standards of due process; <u>all under the least restrictive conditions</u> necessary to achieve the purposes of commitment, namely, the care, treatment, rehabilitation, and custody of sexually dangerous persons." *King*, 53 F.Supp.2d at 137 (emphasis added). Further, the Treatment Center has several levels of security. The Treatment Center has a main facility. *King*, 53 F.Supp.2d at 125. The Treatment Center has a Minimum Privilege Unit ("MPU") where SDP's who have been found guilty of violating certain institutional rules may be placed pursuant to 103 CMR 431, <u>Observation of Behavior Reports</u>. *See King III*, 149 F.3d at 21. The Treatment Center also has the Community Access Program, discussed below, and the Community Transition House ("CTH") which is also less restrictive than the main facility. *See King III*, 149 F.3d at 17.[8]

This Court should, therefore, dismiss Count I of the Complaint.

## II.    THE PLAINTIFF HAS FAILED TO STATE A CLAIM REGARDING HIS ACCESS TO TELEPHONES.

In Count II of the Complaint, the plaintiff challenges various aspects of DOC's telephone access and use regulations, 103 CMR §§ 482.00 <u>et seq</u>. He alleges that his rights under the Sixth Amendment, Article 12 of the Massachusetts Declaration of Rights and 103 CMR 482 have been violated. He also seeks enforcement of an order of the Hampshire Superior Court. His claims are without merit and should be dismissed.

---

[8]    The CTH has been temporarily closed following the escape of a SDP. That temporary closure, however, has had no impact on the plaintiff who has no alleged that he has applied for the CTH or that he meets the eligibility requirements for placement in the CTH.

Although "[p]rison walls do not form a barrier separating prison inmates from the protections of the Constitution," *Turner v. Safley,* 482 U.S. 78, 84 (1987), prison regulations infringing on constitutional rights will be sustained if "reasonably related to legitimate penological interest." *Id.* at 89. *Turner* sets forth four factors to be considered in determining the reasonableness of a prison regulation. First, "there must be a 'valid, rational connection' between the prison regulation and the legitimate governmental interest put forward to justify it." *Id.* at 89, *quoting Block v. Rutherford*, 468 U.S. 576 (1984). Second, "whether there are alternative means of exercising the right that remain open to the prison inmate." *Id.* at 90. Third, whether accommodating the challenged rights have a significant "ripple effect" on guards, other inmates, and the allocation of prison resources in general. *Id.* Fourth, whether there are "ready alternatives" that "fully accommodates the prisoner's rights at *de minimis* cost to valid penological interest." *Id.* at 90-91.  The Massachusetts Supreme Judicial Court has applied the analysis set forth in *Turner* and held that, on its face, the inmate telephone system at issue here did not violate federal constitutional rights.  *Cacicio v. Secretary of Pub. Safety*, 422 Mass. 764, 770-72 (1996).

Moreover, the telephone regulations are not unconstitutional as applied to SDP's at the Treatment Center. While DOC's rules, regulations, policies, and procedures are more restrictive than those instituted during a "more permissive atmosphere" prior to DOC assuming full administration of the Treatment Center, *King III,*, 149 F.3d at 16, the rules do not violate any of the plaintiff's constitutional rights.  None of the reduction of privileges in property, clothing, funds, visits, telephone calls, etc. under DOC "rises to the level of a constitutional infraction." *Id.* at 19.

The plaintiff, however, alleges that his Sixth Amendment rights have been violated because of the cost of his telephone calls and because he has had some difficulty reaching two of his attorneys by telephone. As an initial matter, the Sixth Amendment right to effective assistance of counsel in criminal cases attaches only when there are "pending" criminal charges against an accused. *Maine v. Moulton*, 474 U.S. 159, 179-80 (1985). That right has no application to the facts of this case, as there were no pending criminal charges against the plaintiff at any time since his admission to the Treatment Center. Indeed, the legal proceeding that was pending, and which the plaintiff references in his Complaint, was his civil commitment as a SDP. Complaint, ¶ 57. Proceedings for the civil commitment of SDP's, as governed by G.L. c. 123A, are not criminal prosecutions. *See Sheridan, petitioner*, 412 Mass. 599, 605 (1992). Therefore, the Sixth Amendment right to assistance of counsel does not apply to the plaintiff in this case.[9]

Regardless, the plaintiff has failed to show how the issues with the telephones affected his right to effective assistance of counsel. He first alleges that the telephone calls he makes using the Treatment Center's telephone system are more expensive than they would be were he allowed to use a private calling card. He also claims there is no authority for the telephone contractor to pay a commission to the DOC on every call placed by an inmate. However, he makes no claim that the cost of the telephone calls, which, as he concedes, are made collect, Complaint, ¶ 48, prevented him from contacting anyone. Nor does he allege how his Sixth Amendment rights have been prejudiced by the cost of the calls. The Court of Appeals for the Seventh Circuit has rejected an inmate's claim that the high cost of inmate collect calls, due in

---

[9] While an individual subject to G.L. c. 123A proceedings is entitled to assistance of counsel, that right is provided for by statute, not by the Sixth Amendment. *See* G.l.c. 123A, §§ 12-14.

part to a commission paid by the telephone company to the state on every call made, violated any constitutional rights. *Arsberry v. Illinois*, 244 F.3d 558, 564-67 (2001).

The plaintiff further alleges that, because of the telephone system in use at the Treatment Center, he has had difficulties communicating via telephone with two of his lawyers, attorneys Miles and Walker. Complaint, ¶¶ 54, 56, 57. However, he has an unhindered ability to communicate with either attorney in person, through the mail, or through another attorney. Indeed, he does not allege difficulty communicating by telephone with a third lawyer, John Swomley. *See* Complaint, ¶ 57. Nothing prevented the plaintiff from contacting attorneys Miles and Walker through attorney Swomley.

Furthermore, the inability to contact attorneys Miles and Walker by a non-cellular telephone is not the result of any affirmative action by the DOC defendants. Rather, the problem results from contractual issues between the company contracting to provide the service for DOC and the attorneys' telephone carrier. Complaint, ¶ 54. The plaintiff makes no allegations that either he or the attorneys attempted to work the problem out with the telephone companies. Nor does he allege that the DOC defendants prevented him from doing so.

The plaintiff further alleges that he provided the DOC defendants with attorney Miles' cellular telephone number, but has been prohibited from adding the number to his authorized telephone list. Complaint, ¶ 56. Even assuming the plaintiff correctly characterizes the limitations placed on calling cellular telephones, his claim still fails. A number of legitimate issues may exist to justify any such limitations imposed. Cellular telephones, by their nature, potentially present a number of security issues. Among other concerns, it is more difficult to confirm that the telephones actually belong to an attorney or are actually in the attorney's possession, as they are easily transferable from one person to another. Thus, the defendants may

lawfully exercise their discretion, in the interest of security, on placing limitations on telephone

usage. It is a well settled proposition that courts should give deference to prison officials making

legitimate security decisions. An inmate's right to communicate with and have access to counsel

must be balanced against the security needs of the prison. *Procunier v. Martinez*, 416 U.S. 396,

419-420 (1974). Indeed,

> In balancing a prisoner's First Amendment rights against the broad deference that
> is awarded to prison administrators in upholding the safety and security of the
> prisons, the First Circuit limited a court's review of prison administrators'
> decisions to: whether the prison officials were acting in a good faith and
> reasonable belief that the restrictions they were imposing were necessary. The
> concept of reasonableness, however, must be applied so as to give, in the words of
> the *Wolfish* Court, "wide- ranging deference" to prison security and discipline.
> *Bell v. Wolfish*, 441 U.S. 520 (1979). " A court should not give 'reasonable' such
> a constricted meaning that it includes only the measures the court would take
> were it running the prison itself. Even if the prison official's evaluation of an
> incident is significantly different from the court's, their view is entitled to prevail
> so long as honestly held and within rational boundaries."

*Scarpa v. Ponte*, 638 F.Supp. 1019, 1027 (D. Mass. 1986) *quoting Gomes v. Fair*, 738 F.2d 517,

525 (1st Cir. 1984).

Finally, the plaintiff has not alleged that he suffered actual injury as a result of his

inability to reach two of his attorneys by telephone. "[I]n Sixth Amendment cases, relief is

granted only where 'the constitutional infringement identified has had or threatens some adverse

effect upon the effectiveness of counsel's representation or has produced some prejudice to the

defense.'" *United States v. The LaRouche Campaign*, 682 F. Supp. 627, 632 (D.Mass. 1987),

*quoting United States v. Morrison*, 449 U.S. 361, 364 (1981). Because the plaintiff has made no

showing that he was in any way prejudiced, his claim must fail.

The plaintiff's claims that his rights under 103 CMR 482, Article 12 of the Massachusetts

Declaration of Rights, and the order of the Hampshire Superior Court are meritless. Rights which

arise only from state law are not enforceable by ' 1983.  Since ' 1983 requires violation of a

federal constitutional or statutory right, the mere failure to follow state law or regulations cannot provide the basis for a ' 1983 claim. *See, e.g., Pennhurst State School & Hosp.,* 465 U.S. at 106 In particular, ' 1983 does not provide a statutory vehicle for the enforcement of state constitutional rights. *Phillips v. Youth Dev. Program, Inc.,* 390 Mass. 652, 658 n. 4 (1983). To the extent that the plaintiff is seeking to recover under ' 1983 for violations of state law, his claims fail.[10]

Accordingly, this Court should dismiss Count II of the plaintiff's complaint.

## III.    THE DOC DEFENDANTS HAVE NOT VIOLATED THE PLAINTIFF'S FIFTH AMENDMENT RIGHT AGAINST SELF INCRIMINATION OR ANY STATUTORY RIGHT TO CONFIDENTIAL TREATMENT.

The plaintiff claims that the DOC Defendants have refused to provide him with sex offender treatment unless he waives his Fifth Amendment right not to incriminate himself and his statutory right to keep patient-psychotherapist communications confidential. Complaint, Count III, ¶ 58. To support his claim, the plaintiff relies on an Informed Consent for Treatment (Consent"), attached as Exhibit A, to the Complaint. The plaintiff's claim fails.

The plaintiff asserts that the Consent requires that he surrender his Fifth Amendment right not to incriminate himself. The plain language of the Consent shows that this is not the case. The Consent does not condition participation in the sex offender treatment program on a participant's admission to sexual misconduct, charged or uncharged. Rather, the Consent merely informs the participant that any disclosure he makes is not confidential. Signing the Consent is an acknowledgement that the participant has been notified about the limits of confidentiality. The participant then has a choice – he may participate fully and make admissions about any uncharged sexual offenses; he may participate and address only those sex offenses for which he

---

[10] Moreover, the DOC telephone regulations expressly do not convey a private cause of action. 103 CMR 482.01 Additionally, to the extent that the DOC defendants violated any order of the Hampshire Superior Court, the plaintiff

has already been convicted; he may participate and deny his guilt for any sexual offense; or he may decline to participate in the sex offender treatment program.[11]

Further, the Consent does not violate any statutory privilege to a patient-psychotherapist communication, because none exists for communications made in sex offender treatment at the Treatment Center. State law, not the DOC Defendants, dictates that a SDP's sex offender treatment records are not confidential for proceedings under G.L. c. 123A. For SDP's seeking their discharge from the Treatment Center, G.L. c. 123A, § 9 requires that two qualified examiners must evaluate the SDP.[12] Section 9 mandates that the qualified examiners "shall have access to all records of the person being examined." Further, § 9 provides that "[e]vidence of the person's . . . psychiatric and psychological records. . . shall be admissible in a hearing under this section." Likewise, § 6A mandates that the Community Access Board ("CAB") evaluate SDP's annually. Section 6A requires that the CAB "shall have access to all records of the person being evaluated."[13] The qualified examiners' and the CAB's reports "shall be admissible" in a § 9 petition for discharge. *See* G.L. c. 123A, §§ 6A, 9. Thus, state law specifically provides that there is no confidentiality in the SDP's sex offender treatment at the Treatment Center.

This, of course, makes sense. The entire SDP statutory scheme is predicated on the evaluation of the SDP's current mental state at the time of the initial commitment and periodically thereafter. *See* G.L. c. 123A, §§ 1, 6A, 9, 12-14. This assessment necessarily

---

should seek enforcement in that court.

[11]     The plaintiff has already pled guilty to five counts of rape of a child, involving four boy victims. Complaint, ¶ 8. Since he has already admitted his guilt, it is unclear how the plaintiff can claim that admitting these crimes violates his Fifth Amendment right against self incrimination.

[12]     As defined in G.L. c. 123A, § 1, qualified examiners must either be physicians, licensed and certified in either psychiatry or neurology or licensed psychologists, with at least two years experience with the diagnosis or treatment of sexually aggressive offenders, and be appointed by the Commissioner of Correction. A qualified examiner need not be a DOC employee. G.L. c. 123A, § 1.

[13]     The CAB is a five-member board that consists of three DOC employees and two non-DOC employees. G.L. c. 123A, §§ 1, 6A. Both of the non-DOC employees are psychiatrists or psychologists. *See* G.L. c. 123A, § 6A.

requires consideration of the effect, if any, of treatment on the SDP's mental condition.  It is nonsensical to conduct an inquiry into the effectiveness of treatment without allowing access to the treatment history of the person being evaluated.  The Consent simply informs SDP's so that they may decide whether, and to what extent, to participate in the sex offender treatment program.[14]  To the extent that the plaintiff has a quarrel, it is with the Legislature and the statute, not the DOC Defendants.

Regardless, G.L. c. 123A does not infringe the plaintiff's Fifth Amendment rights.  First, the plaintiff is not required to participate in the sex offender treatment program. Second, the plaintiff may not be transferred out of the Treatment Center if he refuses to participate in the sex offender treatment program.  *See* G.L. c. 123A, § 2A.  Third, participation in sex offender treatment is not a prerequisite for petitioning for discharge under G.L. c. 123A, § 9.

 While the petitioner may speculate that his refusal to participate in sex offender treatment may harm his chances of securing his release under G.L. c. 123A, § 9, that fact – even if true -- does not violate the plaintiff's Fifth Amendment right against self incrimination.  The Fifth Amendment, which applies to the States via the Fourteenth Amendment, provides that "no person shall be compelled in any criminal case to be a witness against himself."  The "`Amendment speaks of compulsion.'"  *McKune v. Lile*, 536 U.S. 24, 122 S.Ct. 2017  (2002) (citation omitted).

In *McKune*, the Supreme Court held that conditioning an inmate's participation in a sex offender treatment program upon admission of all sexual misconduct, charged or uncharged, did not violate the inmate's Fifth Amendment rights, even though his failure to admit his guilt would result in his removal from the program and placement in a maximum security prison with fewer

---

[14]     DOC is not a covered entity under  the provisions of the Health Information Privacy Protection Act ("HIPPA").  Even if DOC were a covered entity, however, state law requires the disclosure of the sex offender

privileges.  *Id.* at 35, 38-40.  In reaching its decision, the Court stated that "[i]t is well settled that the government need not make the exercise of the Fifth Amendment cost free."  *Id.* at 42

The Supreme Court relied on *Minnesota v. Murphy*, 465 U.S. 420 (1984).  In *Murphy*, a defendant feared the possibility of additional incarceration if he did not disclose an uncharged rape and murder to his probation officer when asked because his conditions of probation required him to be truthful with the probation officer in all matters.  *McKune,* 536 U.S. at 43, *citing Murphy*, 465 U.S. at 422, 438.  Despite the fact that the defendant feared being returned to prison for 16 months if he remained silent, the Court found no Fifth Amendment violation.  *McKune*, 536 U.S. at 43, *citing Murphy*, 465 U.S. at 422, 438. The Court also relied on its recent decision in *Ohio Adult Parole Auth. v. Woodward*, 523 U.S. 272, 118 S.Ct. 1244 (1998).  *McKune*, 536 U.S. at 43.  In *Woodward*, the Court held that a death row inmate could be made to choose between incriminating himself at his clemency interview and having an adverse inference drawn from his silence.  *McKune*, 536 U.S. at 43; *Woodward*, 465 U.S. at 286-288.  The "pressure that the inmate felt to speak to improve his chances of clemency did not constitute unconstitutional compulsion."  *McKune*, 536 U.S. at 43.  If there was no compulsion in *Woodward*, certainly none exists here.

"Sex offenders are a serious threat in this Nation."  *McKune*, 536 U.S. at 32.  Thus, there can be no doubt that the Commonwealth has a legitimate interest in rehabilitating SDP's who have been determined beyond a reasonable doubt to be likely to reoffend sexually if not confined.  Moreover, unlike Kansas' sex offender treatment program, participation in the SDP treatment program is not conditioned upon full disclosure.  The plaintiff has simply been informed that any disclosure he makes is not confidential.  To the extent that the plaintiff

---

treatment records described above.  Accordingly, this disclosure is permitted by HIPPA.  *See* 45 CFR 164.512(a).

believes that he must make a full disclosure to secure his release, that is a choice permitted by the Constitution.

Asking a SDP to acknowledge that his participation in a SDP treatment program is not confidential does not violate the plaintiff's Fifth Amendment right against self incrimination or any statutory right to confidential treatment. Accordingly, this Court should dismiss Count III of the Complaint.

## IV.    THE PLAINTIFF HAS FAILED TO STATE A CLAIM RELATED TO THE ADEQUACY OF THE SEX OFFENDER TREATMENT PROGRAM.

In Count IV of the Complaint, the plaintiff identifies what he perceives as deficiencies in the sex offender treatment available to him. Complaint, ¶¶ 59-68.

As an initial matter, the plaintiff does not have a constitutional right to treatment while at the Treatment Center. The First Circuit has explicitly declined to find that a constitutional right to treatment exists at the Treatment Center. *Langton v. Johnston*, 928 F.2d 1206, 1217 (1st Cir. 1991). In *Langton*, the First Circuit found it unnecessary to reach the constitutional inquiry because the consent decree "set a higher standard than the Constitution" in affording treatment for Treatment Center residents. *Langton*, 928 F.2d at 1217. Two years later, the First Circuit again declined to reach this issue, concluding that state law provided a right to treatment at the Treatment Center that "equals or exceeds anything that the Supreme Court would likely impose under the due process clause." *Cameron v. Tomes*, 990 F.2d 14, 19 (1st Cir. 1993).

State law continues to provide the plaintiff with a statutory right to treatment. *See* G.L. c. 123A, § 2. Accordingly, this Court should refrain from addressing the constitutional issue raised by the plaintiff. *See Langton*, 928 F.2d at 1217 ("It has long been settled that if a court can resolve a dispute without confronting an unsettled constitutional issue, it should proceed in that fashion.").

The plaintiff raises – at best – a claim arising under state law.  This claim is not enforceable under § 1983.  *See Martinez v. Colon*, 54 F.3d 980, 989 (1st Cir. 1995) (stating that "It is established beyond peradventure that a state actor's failure to observe a duty imposed by state law, standing alone, is not a sufficient foundation on which to erect a section 1983 claim."); *accord Roy v. Augusta*, 712 F.2d 1517, 1522 (1st Cir. 1983) ("Mere violations of state law do not, of course, create constitutional claims.").

Because the plaintiff presents no other viable federal claim, this Court should dismiss this action and refuse to exercise pendent jurisdiction over this state law claim.  A district court may decline to exercise supplemental jurisdiction if it dismisses all claims under which it has original jurisdiction.  28 U.S.C. § 1367(c); *Gonzalez-De Blasnini v. Family Dep't*, 377 F.3d 81, 89 (1st Cir. 2004).  As a general rule, the unfavorable disposition of a plaintiff's federal claims at the early stages of a suit will trigger the dismissal without prejudice of any supplemental state law claims.  *Id., citing Rodriguez v. Doral Mortgage Corp.*, 57 F.3d 1168, 1177 (1st Cir. 1995).

Even if the Court were to consider the plaintiff's allegations, however, his claim fails.  The plaintiff claims that the sex offender treatment program does not conform to accepted professional judgment, practice or standards and that the treatment staff are not professionally qualified. Complaint, ¶¶ 60, 67. States enjoy "wide latitude in developing treatment regimens." *Hendricks*, 521 U.S. at 368 n. 4.  Further, the "'State serves its purpose of treating rather than punishing sexually dangerous persons by committing them to an institution expressly designed to provide psychiatric care and treatment.'"  *Id*. at n. 4 (citation omitted).  The Treatment Center is just such a facility.  The DOC Defendants have discretion in structuring a treatment program.  As the plaintiff notes, DOC contracts with a vendor for the provision of sex offender treatment to SDP's.  See Complaint, ¶ 68.  The DOC Defendants are entitled to rely on the professional

judgment of the provider in determining an appropriate treatment program.  *See generally, Rosen v. Chang*, 811 F.Supp. 754, 761 (D.R.I. 1993) (prison administrator entitled to qualified immunity when he relied upon licensed medical providers "to exercise informed medical judgment and to provide adequate health care" to a prisoner).  The plaintiff, however, has refused to participate in the program, perhaps as a result of his refusal to sign the Informed Consent for Treatment or, perhaps, for other reasons of his own. The plaintiff has not and cannot claim that the treatment program is inadequate to address the mental condition which renders him likely to reoffend sexually if not confined to a secure facility. The plaintiff is estopped from challenging wholesale the adequacy of the program.

The plaintiff complains that there is no significant correlation between receiving treatment and reducing recidivism.  Complaint, ¶ 62.  Even assuming that this allegation is true, that raises no claim against the DOC Defendants.  The Legislature has determined how to manage those sex offenders who pose a risk of future sexual harm to the community.  The management and treatment of sex offenders is an area of considerable debate within the professional community.  The fact that there may not be complete agreement among the relevant professional community, however, does not preclude a State from acting.  "In fact, it is precisely where such disagreement exists that legislatures have been afforded the widest latitude in drafting such statutes."  *Hendricks*, 521 U.S. at 360 n. 3.  Moreover, civil commitment is constitutional even if the mental condition is untreatable.  *Hendricks*, 521 U.S. at 365-366 ("under the appropriate circumstances and when accompanied by proper procedures, incapacitation may be a legitimate end of the civil law").

The plaintiff also complains that the average length of commitment to the Treatment Center is 17 years while the sex offender treatment program offered to SPI's can be completed in

four years. Complaint, ¶ 63.  Even if that is true, however, it raises no claim against the DOC

Defendants.  Unlike SPI's, SDP's have been determined beyond a reasonable doubt to be likely

to reoffend sexually if not confined.  Unlike a SPI whose release date is definite, a SDP's

commitment is indefinite.  The SDP commitment terminates when the Commonwealth can no

longer prove beyond a reasonable doubt that the SDP remains sexually dangerous.  *See* G.L. c.

123A, § 9; *Hill, petitioner*, 422 Mass. 147, 156, *cert. denied*, 519 U.s. 867 (1996)

(Commonwealth bears burden of proving beyond a reasonable doubt that the petitioner

"continues to be an SDP" at the time of the § 9 hearing).  The provisions of G.L. c.  123A govern

the release of a SDP.  Further, the fact that SDP's may take longer to progress in treatment may

simply reflect the intractable nature of the underlying mental condition.  Further, as noted by the

First Circuit, some SDP's simply refuse to participate in treatment.  *King III***,** 149 F.3d at 16**.**

Regardless, the plaintiff has failed to allege how this affects him since he has been civilly

committed for only about seven months.  See Complaint, ¶ 12.  Moreover, G.L. c. 123A does not

condition discharge upon completion of treatment.  *See* G.L. c. 123A, § 9.

    The plaintiff complains that he will be required to repeat aspects of sex offender

treatment that he has already completed while incarcerated at MCI-Norfolk.  Complaint, ¶ 64.

The plaintiff fails to allege how this will harm him.  Further, since he was adjudicated sexually

dangerous after he allegedly completed this treatment, it may reasonably be concluded that the

treatment he had received up to that point had not had the intended effect of reducing his risk of

reoffending.[15]

---

[15]     Indeed, the plaintiff's continued insistence that he had "consensual" sex with boys demonstrates that he does not yet appreciate either the wrongfulness of his conduct or the harm he caused his victims.  See Supplemental Complaint, ¶ 116 (stating that the plaintiff's "only criminal record is for the five counts of statutory rape for having consensual sex with four fifteen year old boys.").

The plaintiff complains that the DOC Defendants have not studied the effectiveness of the sex offender treatment program "offered and received by the plaintiff while in their custody." Complaint, ¶ 65. There is no legal obligation on the DOC Defendants to conduct such a study.

The plaintiff complains that the DOC Defendants or their agents have not disclosed the risks and benefits of participating in the sex offender treatment program. The plaintiff makes no allegation that he has ever asked for such information and certainly not from the DOC Defendants.

Lastly, the plaintiff complains that the vendor for sex offender treatment services has a conflict of interest in violation of G.L. c. 268A. FHS is not a party to this lawsuit. Moreover, the plaintiff has no private right of action under a criminal statute. *See generally, Contemporary Mission, Inc. v. United States Postal Service*, 648 F.2d 97, 103 n. 7 (2nd Cir. 1981) (relating to federal postal regulations). Lastly, this Court lacks subject matter jurisdiction to enforce state criminal statutes in a civil case such as this.

Accordingly, this Court should dismiss Count IV of the Complaint.

**V.    THE PLAINTIFF FAILS TO STATE A CLAIM FOR VIOLATION OF THE STATE SANITATION CODE OR DPH REGULATIONS.**

The plaintiff asserts that certain conditions at the Treatment Center violate the State Sanitation Code, 105 CMR 410.00, or Department of Public Health regulations relating to correctional facilities, 105 CMR 451.00 ("DPH Regulations"). See Complaint, Count VI. The plaintiff has failed to state a claim. Accordingly, this Court should dismiss these claims.

**A.    <u>The Plaintiff Has No Private Right of Action To Enforce DPH Regulations.</u>**

The DPH Regulations, set forth at 105 CMR 451.00, <u>Minimum Health and Sanitation Standards and Inspection Procedures for Correctional Facilities</u>, apply to the Treatment Center. DPH evaluates the Treatment Center under the standards applicable to correctional facilities, 105

CMR 451.00, <u>Minimum Health and Sanitation Standards and Inspection Procedures for</u>
<u>Correctional Facilities</u> ("DPH Regulations"). *See* 105 CMR 451.001 (DPH is required to inspect
each correctional facility twice annually and to report on its findings and recommendations).
The DPH Regulations define a "correctional facility" in relevant part as "any building, enclosure,
space or structure used for the custody, and rehabilitation of committed offenders and of such
other persons as may be placed in custody therein in accordance with law, as defined by M.G.L.
c. 125, § 1. 105 CMR 451.020. *See* G.L. c. 125, § 1(d) (defining a "correctional facility" as
"any building, enclosure, space or structure used for the custody, control and rehabilitation of
committed offenders and of such other persons as may be placed in custody therein in
accordance with law"); *see also* G.L. c. 125, § 1(n) (defining a "state correctional facility" as
"any correctional facility owned, operated, administered or subject to the control of the
department of correction, including but not limited to . . . .").

        The DPH Regulations define a "committed offender" as "a person convicted of a crime
and committed under sentence to a correctional facility." *Id.  See* G.L. c. 125, § 1(c) (same). The
DPH Regulations define an "inmate" as a "committed offender, detainee or such other person as
is placed in custody in a correctional facility." *Id.  See* G.L. c. 125, § 1(i) (defining an "inmate"
as "a committed offender or such other person as is placed in custody in a correctional facility in
accordance with law."). Thus, the plaintiff and other civilly committed SDP's are "inmates" for
purposes of the DPH Regulations.

        The plaintiff seeks recovery for the DOC Defendants' alleged violation of the DPH
Regulations. The plaintiff's claim fails because the plaintiff lacks standing to enforce the DPH
Regulations. In the absence of any indication that the Legislature intended a statute to create a
private right of action, none should be inferred by the Court. *Loffredo v. Center for Addictive*

*Behaviors*, 426 Mass. 541, 545-547 (1998).  The Legislature has charged the DPH with

promulgating regulations governing minimum health and sanitation standards at correctional

facilities.  G.L. c. 111, § 21.  The DPH Commissioner has been delegated overall responsibility

of administering the Commonwealth's sanitation laws.  G.L. c. 17, § 2.  In *Attorney General v.*

*Sheriff of Worcester County*, the Supreme Judicial Court held that it is the duty of the sheriff

[here, the Superintendent] to ensure compliance with health and sanitation regulations [105

C.M.R. § 451.000, *et seq.*] at correctional facilities and detention centers, and that the Attorney

General may maintain a civil action to establish that duty.  382 Mass. 57, 58, 59 (1980).  *See*

G.L. c. 111, § 21.

This comprehensive grant of authority and responsibility displaces any private right of

action.  Specifically:

> [A] reading of 105 CMR 451.00, <u>et</u> <u>seq.</u>, makes it clear that broad discretion is
> left to the Commissioner of the Department of Public Health in regulating the
> health standards at correctional facilities.  If the Commissioner believes that there
> are conditions which are dangerous to the public health constituting an
> emergency, the Commissioner shall notify the Commissioner of Corrections, the
> Secretary of Human Services and the Governor, and request that the Governor
> declare that an emergency exists which is detrimental to the public health.  This
> authority vested in the Department of Public Health Commissioner carries with it,
> by inference, the right to seek judicial relief through declaratory judgment.  Such
> a right is shared by the Attorney General of the Commonwealth as the chief law
> officer of the Commonwealth.  **Nowhere in c. 111, § 21 is there a  private cause**
> **of action.  Nor does 105 CMR 451.00 <u>et</u> <u>seq.</u>  provide for a private cause of**
> **action.**  Rather, the provisions provide for the minimum health and sanitation
> standards at correctional facilities.  **The proper party to address public health**
> **issues therefore is the Attorney General or the Commissioner of Public**
> **Health.**

*O'Brien v. DuBois, et. al.,* Worcester Superior Court, Civil Action No. 94-2170 (1995) (Carhart,

J.).  *See also  Alexander, et. al. v. DuBois, et. al.*, Middlesex Superior Court, Civil Action No.

94-6486 (1997) (Gershengorn, J.).[16]  The plaintiff has no ability to bring a private right of action

under the General Laws to enforce his civil rights or due process concerns relating to public

health standards.[17]  This Court should dismiss Count VI of the Plaintiff's Complaint.

## B.    The Plaintiff Fails to State a Claim for Violation of the State Sanitary Code.

The plaintiff argues that the State Sanitary Code, promulgated pursuant to G.L. c. 111, §

127A and contained at 105 CMR 410, *et seq.,* applies to the Treatment Center.  The plaintiff is

incorrect.  The Commonwealth and its agencies are exempt from G.L. c. 111, § 127A, the statute

authorizing DPH to promulgate the State Sanitary Code.  *See* Opinion of the Attorney General

(00/01 Op AG No. 2 (2001), 2001 Mass. AG Lexis 1 (April 25, 2001) and cases cited therein.

The Department of Correction falls under the purview of the Executive Office of Public Safety,

an agency of the Commonwealth. G.L. c. 6A, §§ 2[18] and 18.[19]  Accordingly, the State Sanitary

Code does not apply to the Treatment Center.

Further, neither G.L. c. 111, § 127A nor the resulting regulations, 105 CMR 410,

provides for a private right of action.  Rather, G.L. c. 111, § 127A provides that local boards of

health shall enforce the State Sanitation Code "in the same manner in which local health rules

and regulations are enforced."  DPH may "in like manner enforce" the State Sanitation Code if

local boards "fail after the lapse of a reasonable length of time to enforce the same." *Id.*  For the

---

[16]      Copies of these decisions are contained in the Appendix filed by the DOC Defendants in connection with their opposition to the plaintiff's motion for a preliminary injunction to repair the heat and roof.  See Docket Nos. 47, 49.

[17]      Further, "[t]he mere failure to conform to State minimum standards does not *per se* establish a constitutional violation." *Richardson v. Sheriff of Middlesex County,* 407 Mass. 455, 460 (1990) (internal quotations omitted).

[18]      "There are hereby established the following executive offices, each of which shall serve directly under the governor: . . . public safety . . . ."  G.L. c. 6A, § 2.

[19]      "The following state agencies are hereby declared to be within the executive office of public safety: . . . the department of correction, including the parole board and all other agencies within said department . . . ."  G.L. c. 6A, § 18.

same reasons why there is no private right of action under the DPH Regulations, there is no private right of action under the State Sanitation Code. Accordingly, the plaintiff cannot maintain an action for enforcement of the State Sanitation Code.

Even if there were, the plaintiff could not maintain an action in this Court. General Laws c. 111, § 127A specifically provides that the Superior Court "shall have jurisdiction" over actions to enforce the State Sanitary Code. G.L. c. 111, § 127A. Thus, even if the statute could be read as providing a private right of action against the Commonwealth, which it cannot, suit in this Court would be barred by the Eleventh Amendment. The Eleventh Amendment to the United States Constitution bars suit against a state by its own citizens unless the state has waived its sovereign immunity. *Will v. Michigan Dep't of State Police*, 491 U.S. 58, 66 (1989); *see Edelman v. Jordan*, 415 U.S. 651, 662-63 (1974) (while the Eleventh Amendment does not expressly bar suits against a state by its own citizens, the United States Supreme Court has consistently held that the Eleventh Amendment precludes such suits in the absence of the state's consent to suit). Because the statute limits jurisdiction to the Superior Court, there has been no waiver of sovereign immunity.

**C.    <u>The Plaintiff Fails to State a Claim for Denial of Equal Protection.</u>**

The plaintiff asserts that if the State Sanitation Code, 105 CMR 410.00, does not apply to SDP's, then the DOC Defendants are depriving the plaintiff and other SDP's are deprived of equal protection of the laws under the Fourteenth Amendment to the United States Constitution. Complaint, ¶ 85. The DOC Defendants do not control which DPH standards govern the Treatment Center. That is a matter of state statute and regulation. The plaintiff, therefore, has failed to state a claim against the DOC Defendants.

There is no denial of equal protection in any event.  The Equal Protection Clause

provides that similarly-situated persons should be accorded similar governmental treatment.  *See*

*City of Cleburne v. Cleburne Living Ctr.*, 473 U.S. 432, 439-440 (1985).  To establish an Equal

Protection claim, a party must allege facts indicating that, compared to others similarly-situated,

he was selectively treated based on impermissible considerations such as race, religion, intent to

inhibit or punish the exercise of constitutional rights or malicious or bad faith intent to injure a

person.  *Barrington Cove Ltd. Partnership v. Rhode Island Hous. & Mort. Fin. Corp.*, 246 F.3d

1, 7 (1st Cir. 2001) (citation omitted).  The plaintiff has failed to demonstrate that he is similarly

situated to those to whom the State Sanitation Code applies.  Those persons are not committed to

a state institution.  That fact alone defeats his claim.

This Court should, therefore, dismiss Count VI of the Plaintiff's Complaint.[20]

## VI.   THE PLAINTIFF HAS FAILED TO STATE A CLAIM REGARDING CLASSIFICATION.

### A.   The Treatment Center Provides Different Levels of Security.

In Count VII, the plaintiff asserts that there is no classification system at the Treatment

Center.  Complaint, ¶¶ 77-79.[21]  As discussed above, however, the Treatment Center provides

different levels of security such as the main facility, the MPU, the CTH and the CAP.  The

plaintiff has, therefore, failed to state a claim.  Moreover, even if the DOC Defendants were not

complying with the requirements of G.L. c. 123A, § 6A, however, this is a state law claim and,

---

[20]      The plaintiff has raised additional allegations about the State Sanitation Code and the DPH Regulations in Count X of the Second Supplemental Complaint.  He also seeks a preliminary injunction with respect to the repair of the heat and roof on his unit.  The DOC Defendants filed an opposition to the plaintiff's motion for a preliminary injunction which is incorporated herein by reference.  See Docket Nos. 47, 49.  For the reasons stated in the DOC Defendants' opposition and above, Count X must be dismissed.

[21]      DOC's classification regulations, 103 CMR 420, Classification, on their face do not apply to SDP's. *See* 103 CMR 420.04 is applicable to all Department employees and to all inmates at state, county and federal correctional institutions who are serving a sentence imposed by the state of Massachusetts.

thus, is not enforceable under § 1983.  As discussed above, this Court should decline to exercise supplemental jurisdiction over this claim.

### B.     State Law Precludes Plaintiff's Placement in a Work Release Program.

The plaintiff baldly asserts that, while he was serving a prison sentence, he would have been entitled to placement in a minimum security prison but the "defendants have arbitrarily determined that no sex offenders shall be placed at [a] minimum security prison or [in a] work release program." Complaint, ¶ 77.  The plaintiff no longer continues to serve a prison sentence. See Complaint, ¶ 9.  Accordingly, his claim in this regard is moot. The doctrine of mootness enforces the constitutional mandate that an actual controversy must exist at all stages of the review, not merely at the time the complaint is filed." *Mendez Soto v. Hon. Anabelle Rodriguez*, 306 F.Supp.2d 120, 123 (D.P.R. 2004).  A case becomes moot when "the issues presented are no longer 'live' or the parties lack a legally cognizable interest in the outcome of the controversy, thus rendering the relief academic." *Id.*

Regardless, state law – not the DOC Defendants -- precludes the plaintiff's placement in a work release program.  General Laws c. 127, § 49 provides, in relevant part, that:

> No sex offender in the custody of the department of correction shall be eligible to participate in any program outside a correctional facility established under section forty-eight unless he has completed the department's voluntary sex offender treatment program. The voluntary sex offender treatment program shall be administered pursuant to the rules and regulations of the department. No sex offender, or sexually dangerous person as defined in section 1 of chapter 123A, or any person who commits a sexual offense as defined in said section 1, or any person who violates section 24B of chapter 265 shall be eligible for any program outside a correctional facility authorized under section 48 or any other work release program authorized by law.

The plaintiff is convicted of a multiple sexual offenses.  As a result, he is not eligible to participate in a work release program.

In any event, while serving his sentence, the plaintiff had no constitutionally cognizable liberty interest in placement in a work release program or in a minimum security facility. The First Circuit Court of Appeals held that an inmate has no liberty interest in continued participation in a work release program. *Dominique v. Weld*, 73 F.3d 1156, 1158-1161 (1st Cir. 1996). "A prisoner cannot harbor a reasonable expectation of remaining at a particular prison, or in a particular custodial setting, so long as prison officials retain discretion to transfer him 'for whatever reason or for no reason at all.'" *Hastings v. Commissioner of Correction*, 424 Mass. 46, 50 (1997), *quoting Meachum v. Fano*, 427 U.S. 215, 228, 96 S.Ct. 2532, 2540 (1976).

### C.     The Federal Courts Have Upheld the Community Access Program.

The plaintiff complains that there is no community access program ("CAP") at the Treatment Center. Complaint, ¶¶ 81-82. The plaintiff's claim, however, fails.

Notably, the plaintiff makes no claim that he has applied for the CAP. His claim fails in any event because both the First Circuit Court of Appeals and this Court have held that the CAP is acceptable. *King III*, 149 F.3d at 16; *see King*, 53 F.Supp.2d at 132. While there are stringent requirements for participation, the First Circuit stated "[i]n this most sensitive area of tension between safety and treatment, and between the individual and the community, we cannot say that CAP is not the least restrictive feasible response." *King, III*, 149 F.2d at 16; *see King*, 53 F.Supp.2d at 131-32. The First Circuit further noted that the decline in participation in light of, among other things, the fact that many SDP's refuse to apply for treatment programs, "does not . . . point to any obvious constitutional failure." *King III*, 149 F.3d at 16-17; *see King*, 53 F.Supp.2d at 136 ("The CAP policies set forth an adequate means for providing community access"); *see also Martel v. Fridovich*, 14 F.3d 1, 3 & n.4 (1st Cir. 1993) (revision to Treatment

Center's transition program rules does not violate ex post facto clause or double jeopardy because rules are not punitive).

Nor has the CAP been affected by virtue of G.L. c. 127, § 49, which applies to sex offenders' participation in "any program outside a correctional facility authorized under section 48 or any other work program authorized by law."   The CAP is not a program authorized pursuant to G.L. c. 127, § 48.  Rather, as defined by G.L. c. 123A, § 1, the CAP is "a program established pursuant to section six A [of G.L. c. 123A] that provides for a person's reintegration into the community."   The CAP, therefore, remains in existence and constitutionally sound.


## VII.    THE PLAINTIFF HAS FAILED TO STATE A CLAIM THAT G.L. C. 123A IS UNCONSTITUIONAL "AS APPLIED" TO HIM.

The plaintiff asserts that, as a result of his conditions of confinement, G.L. c. 123A is unconstitutional as applied to him (and all SDP's).  He seeks declaratory, injunctive and monetary relief.  He also seeks his immediate release as well as monetary and injunctive relief.  Complaint, Relief, ¶ 5, p. 26 & ¶ 86.  His claim fails.

Both the United States Supreme Court and the Supreme Judicial Court have already rejected "as applied" challenges to civil commitment schemes.  In 2001, the United States Supreme Court rejected a claim that the Washington statute for civil commitment of sexually violent predators was punitive "as applied" to a particular individual.  *See Seling v. Young*, 531 U.S. 250, 121 U.S. 727, 735 (2001).  In *Seling*, the Supreme Court held that an "'as applied' analysis would prove unworkable."  *Id.*   The Court rejected the argument that a civil commitment statute can be punitive as applied to a particular person when the highest State court has already definitively construed the statute as civil.  *Id.* at 733-735.  Applying *Seling*, the Supreme Judicial Court held that because G.L. c. 123A is civil in nature, the specific conditions

of a SDP's confinement do not transform the statute from civil to punitive. *Dutil, petitioner*, 437

Mass. 9, 20 (2002); *see also Commonwealth v. Bruno*, 432 Mass. 489, 500-502 (2000) (declaring

that current and former version of G.L. c. 123A is civil and not punitive).

      To the extent that the plaintiff claims that G.L. c. 123A violates substantive due process

because it is not narrowly tailored to further a legitimate and compelling interest, his claim is

meritless. In upholding Kansas' similar Sexually Violent Predator Act ("SVP Act"), the Supreme

Court held that, although freedom from physical restraint is a fundamental right, a state may, in

certain narrow circumstances, provide for "the forcible civil detainment of people who are

unable to control their behavior and who thereby pose a danger to the public." *Id.* at 2079. The

Court held that Kansas' SVP Act comports with substantive due process by requiring proof of

past sexually violent behavior coupled with a present mental condition that creates a likelihood

of such conduct in the future if the person is not incapacitated. *Kansas v. Hendricks*, 521 U.S.

346, 117 S.Ct. 2072, 2080 (1997). The commitment provisions of G.L. c. 123A, as amended by

St. 1999, c. 74, are similar to those of the Kansas SVP Act and, for the same reasons, comport

with substantive due process requirements.

      Under the version applicable to the plaintiff, G.L. c. 123A permits civil commitment of a

person who, in relevant part, has been convicted of a statutorily enumerated sexual offense and

"who suffers from a mental abnormality or personality disorder which makes the person likely to

engage in sexual offenses if not confined to a secure facility."[22] G.L. c. 123A, § 1; *see also*

*Dutil,* 437 Mass. at 13-19 (holding that pre-1990 version of G.L. c. 123A comports with

substantive due process standards articulated in *Hendricks*). General Laws c. 123A, therefore,

---

[22]    A "mental abnormality" is defined as "a congenital or acquired condition of a person that affects the
emotional or volitional capacity of the person in a manner that predisposes that person to the commission of criminal
sexual acts to a degree that makes the person a menace to the health and safety of other persons." A "personality

satisfies the *Hendricks* requirement of past sexually violent behavior coupled with proof of a current mental condition rendering the person likely to engage in future sexual misconduct unless confined.  The statute is thus narrowly tailored to serve a compelling state interest in protecting the public from sexually dangerous persons.  *See Bruno,* 432 Mass. at 500; St. 1999, c. 74, emergency preamble (statute's stated purpose is "to protect forthwith the vulnerable members of our communities from sexual offenders").[23]

 Accordingly, the plaintiff's claim fails.

## VIII. THE PLAINTIFF HAS FAILED TO STATE A CLAIM AGAINST COMMISSIONER DENNEHY AND SUPERINTENDENT MURPY FOR INTERFERENCE WITH HIS MAIL.

### A.     The Plaintiff Has Failed to Show that Commissioner Dennehy or Superintendent Murphy Interfered with his Mail.

In Count IX of his Supplemental Complaint, the plaintiff asserts that certain of his outgoing mail was delayed on two occasions. Supplemental Complaint, ¶¶ 119-125.[24]  He also claims that certain incoming mail was deemed contraband. Supplemental Complaint, ¶¶ 126-132. He asserts that the alleged interference with his incoming and outgoing mail violates various constitutional rights and state regulations. Supplemental Complaint, ¶¶ 135-136.

 To establish liability under 42 U.S.C. ' 1983, a party must prove that the challenged conduct is "attributable to a person acting under color of state law" and that the conduct "worked a denial of rights secured by the Constitution or federal law."  *Soto v. Flores*, 103 F.3d 1056, 1061 (1st Cir.), *cert. denied*, 522 U.S. 819 (1997). The plaintiff does not allege that Commissioner Dennehy or Superintendent Murphy defendants directly deprived him of a

---

disorder" is defined as "congenital or acquired physical or mental condition that results in a general lack of power to control sexual impulses."

[23] Even if a SDP could prove that he was not receiving adequate treatment or the conditions of his confinement were unlawful, his remedy would be revised conditions, not immediate release.  *See Dutil, petitioner*, 437 Mass. 9, 22 (2002).

constitutional right.[25]  That is, he does not claim that these defendants personally participated in the delay of his outgoing mail or the interception of his incoming mail.[26]  Accordingly, he has failed to state a claim against Commissioner Dennehy or Superintendent Murphy.[27]

Nor can the plaintiff prevail against these defendants under a theory of respondeat superior.  Supervisory liability under ' 1983 cannot be predicated only on a theory of respondeat superior.  *See Maldonado-Denis v. Castillo-Rodriguez*, 23 F.3d 576, 581 (1st Cir. 1994); *Gutierrez-Rodriguez v. Cartagena*, 882 F.2d 553, 562 (1st Cir. 1989).  Rather, a supervisor may be deemed liable Aonly on the basis of his own acts or omissions.@ *Febus-Rodriguez v. Betancourt-Lebron*, 14 F.3d 87, 91-92 (1st Cir. 1994); *see Bowen v. City of Manchester*, 966 F.2d 13, 20 (1st Cir. 1992).  Mere negligence by the supervisor is not enough to create liability.  See *Maldonado-Denis*, 23 F.3d at 582; *Febus-Rodriguez*, 14 F.3d at 92; *Manarite v. City of Springfield,* 957 F.2d 953, 956 (1st Cir.), *cert. denied*, 506 U.S. 837 (1992); *see also Monell v. Department of Social Servs.,* 436 U.S. 658, 692-94 & n. 58 (1978).  Nor can liability be imposed for simple failure to exercise proper supervisory control.  *Stoute v. Berman*, 555 F.Supp. 507, 511 (D.Mass. 1976).

---

[24]     The plaintiff alleges no harm flowing from the alleged delay in sending out this mail.

[25]     While the plaintiff states that he filed an appeal relating to the delivery of his outgoing mail, that appeal is dated April 21, 2004.  See Supplemental Complaint, Exhibit G.  It is not related to the two incidents in September, 2004, that give rise to Count IX.  See Supplemental Complaint, ¶¶ 119-123.

[26]     The plaintiff incorrectly states that DOC regulations contain no restriction on receiving material from the internet.  In fact, 103 CMR 403, Inmate Property Policy, provides that "Authorized inmates may possess a maximum of ten books, magazines and newspapers.  All publications must come directly from the publisher or a pre-approved distributor or book club."  103 CMR 403.10(7)(d) (emphasis added). The policy applies to "inmates."  103 CMR 403.01.  As discussed above, the term "inmates" includes civilly committed SDP's.  G.L. c. 125, § 1.  Further, allowing five pages of the internet material gave the plaintiff more than that to which he was entitled under the applicable regulations.  He cannot, therefore, claim harm.

[27]     The plaintiff claims that he had to agree to have certain contrabanded material sent from his brother destroyed in order to obtain incoming property.  Supplemental Complaint, ¶ 132.  Pursuant to the property regulations, however, the plaintiff could have had the property retrieved by a visitor, had the property mailed out to a specific destination or had the property disposed of as seen fit the by the Treatment Center.  103 CMR 403.14(1).  The plaintiff had a choice.  This Court should not intervene in what amounts to his personal decision.

The plaintiff has failed to allege that Commissioner Dennehy or Superintendent Murphy played a role in the delay in his outgoing mail or the interception of his incoming mail. Accordingly, the plaintiff has failed to state a claim against these defendants under § 1983.[28] Count IX must be dismissed.

### B. The Plaintiff Has Failed to State a Claim for Exclusion of a Publication Containing Nudity.

The plaintiff claims that the November 1 issue of the <u>New Yorker</u> magazine was deemed contraband by the Treatment Center's Deputy Superintendent. Second Supplemental Complaint, Count XI, ¶¶ 147-153. The plaintiff states that he appealed this issue to Superintendent Murphy, who affirmed the Deputy Superintendent's decision and that he sent a copy of his appeal to Commissioner Dennehy. Second Supplemental Complaint, ¶ 151.

The plaintiff basically asserts that the mail regulations do not apply to SDP's. He is mistaken. The regulations, 103 CMR 481, <u>Inmate Mail</u>, apply to "inmates confined in state correctional institutions." As discussed above, the term "inmate" includes SDP's. *See* G.L. c. 125, § 1. Further, the mail regulations specifically provides that "[p]ublications may be excluded solely because they contain sexually explicit material or feature nudity as defined in 103 CMR 481.06." 103 CMR 481.15(3)(c); *see also* 103 CMR 481.06 (defining "nudity" as a "pictorial depiction where genitalia, buttocks or female breasts are exposed. . . ."); 103 CMR 481.15(1)(g). The plaintiff concedes that the magazine contained nudity. Second Supplemental Complaint, ¶ 150. Notably, the regulations give added authority to the Deputy Superintendent of the Treatment Center to exclude, with the Commissioner's approval, "additional types of material that may interfere with the treatment and rehabilitation process at that institution." 103 CMR 481.15(3)(c). It cannot reasonably be argued that possession of sexually explicit material within

---

[28]     As discussed above, the mere failure to follow state regulations is not enforceable under § 1983.

the Treatment Center does not interfere with both the rehabilitative needs of the SDP's and the security needs of the Treatment Center. The exclusion of the magazine serves a valid, and indeed compelling, state interest of rehabilitating SDP's and protecting the staff, the SDP's and the public. Moreover, there is no legal requirement that DOC personnel must examine each such publication and excise the precluded material. *See Thornburgh v. Abbott*, 490 U.S. 401, 418 (1989) (applying *Turner v. Safley* analysis to uphold prison policy of excluding entire publication that contained some impermissible material on grounds that prison officials had determined that tearing out rejected portions would create more discontent than practice of excluding entire publication and noting that administrative inconvenience is a factor to be considered).

The exclusion of the magazine was proper under the applicable mail regulations. Accordingly, the plaintiff's claim fails.

## IX.    THE PLAINITFF FAILS TO STATE A CLAIM FOR INTERFERENCE WITH THE APPEAL PROCESS.

In Count XII, the plaintiff claims that he was not allowed to receive new incoming property due to the fact that he had contraband property in temporary storage at the Treatment Center. Second Supplemental Complaint, ¶¶ 154-159. The plaintiff claims that the property regulations do not apply to SDP's. As discussed above, however, the property regulations do apply to SDP's.

The plaintiff has failed to state a claim for violation of any federally protected right. First, he has alleged at best a delay in receiving his incoming property. He has not alleged any harm flowing from this delay. Notably, he has withdrawn his motion for a preliminary injunction because he received the typewriter ribbons. See Docket Entry No. 43 and entry dated February 3, 2005. Second, the facts as alleged by the plaintiff do not support a conclusion that he was prevented from receiving incoming property because he had appealed the exclusion of

certain incoming materials.  Rather, he was denied the incoming property because he had not disposed of the contraband materials.  *See* 103 CMR 403.13(5) ("Permission slips shall not be approved for inmates who have documented contraband in temporary storage at any institution.").  The plaintiff does not dispute that he had material designated as contraband in temporary storage at the Treatment Center.  The plaintiff had several ways to dispose of this material, as discussed above.  He eventually selected one of those methods and received his property.  Second Supplemental Complaint, ¶ 157 (indicating that he mailed the contraband materials out of the Treatment Center through the property office).  It was the existence of the contraband and not the pendency of the appeals that led to the delay in the plaintiff's receipt of the other incoming property.

Lastly, requiring the plaintiff to mail out contraband material did not infringe on the plaintiff's ability to appeal the exclusion of the material.  Had he prevailed in his appeal, he could have had the material sent to him at the Treatment Center.

Because the plaintiff has failed to state a claim, this Court should dismiss Count XII of the Second Supplemental Complaint.

## X.    THE PLAINTIFF CANNOT RECOVER MONEY DAMAGES AGAINST THE DEFENDANTS IN THEIR OFFICIAL CAPACITIES UNDER 42 U.S.C. ' 1983.

To the extent that the plaintiff seeks to recover monetary damages under 42 U.S.C. ' 1983 against Commissioner Dennehy and Superintendent Murphy in their official capacities, his claims are barred.

To state a claim for monetary damages under 42 U.S.C. ' 1983, a plaintiff must allege that a "person" acting under color of law deprived him of a federal statutory or constitutional right.  *See* 42 U.S.C. ' 1983.  State officials acting in their official capacities are not "persons" within the meaning of ' 1983 for purposes of monetary damages.  *See Will v. Michigan Dep't of*

*State Police*, 491 U.S. 58, 71 (1989) ("a suit against a state official in his or her official capacity

is not a suit against the official but rather is a suit against the official's office . . . As such, it is not

different from a suit against the State itself"); *Kentucky v. Graham*, 473 U.S. 159, 165-66 (1985);

*O'Malley v. Sheriff of Worcester County,* 415 Mass. 132, 141 n. 13 (1993) (same). The plaintiff's

claims for money damages against Commissioner Dennehy and Superintendent Murphy in their

official capacities fail as a matter of law.  This Court should, therefore, dismiss these claims.

## XI.    EACH INDIVIDUAL DOC DEFENDANT IS ENTITLED TO THE PROTECTION OF QUALIFIED IMMUNITY.

As public officers in their roles as DOC employees, Commissioner Dennehy and

Superintendent Murphy are entitled to qualified immunity from a suit for damages in their

individual capacities on the plaintiff's claims against them.

In *Harlow v. Fitzgerald*, 457 U.S. 800, 818 (1982), the Supreme Court held that

"government officials performing discretionary functions generally are shielded from liability for

civil damages insofar as their conduct does not violate clearly established statutory or

constitutional rights of which a reasonable person would have known."  Subsequently, the

Supreme Court refined the qualified immunity inquiry, writing:

> The contours of the right [allegedly violated] must be sufficiently
> clear that a reasonable official would understand that what he was
> doing violates that right.  This is not to say that an official action is
> protected by qualified immunity unless the very action in question
> has previously been held unlawful, . . . but it is to say that in light
> of pre-existing law the unlawfulness must be apparent.

*Anderson v. Creighton*, 483 U.S. 635, 640 (1987) (citation omitted); *see Souza v. Pina*, 53 F.3d

423, 425 (1st Cir. 1995); *Horta v. Sullivan*, 4 F.3d 2, 13 (1st Cir. 1993).

The central purpose of affording government officials qualified immunity from suit is to

protect them "`from undue interference with their duties and from potentially disabling threats of

liability.'" *Elder v. Holloway*, 510 U.S. 510, 514 (1994), *citing Harlow*, 457 U.S. at 806. Qualified immunity plays a critical role in striking the "balance...between the interests in vindication of citizens' constitutional rights and in public officials' effective performance of their duties." *Davis v. Scherer*, 468 U.S. 183, 195 (1984). The Supreme Judicial Court has recognized that "[i]f State officials were held personally liable for <u>damages</u> every time regulations that they issued or enforced pursuant to statute were found to violate the Federal Constitution, only the most fearless among them would dare to fulfill their duties." *O'Malley v. Sheriff of Worcester County*, 415 Mass. 132, 144 (1993) (emphasis added).

Once a defendant raises a qualified immunity defense, the burden is on the plaintiff to show that the law was clearly established at the time of the alleged violation. *Dixon v. Richter*, 922 F.2d 1456, 1460 (10th Cir. 1991). If the plaintiff does not meet this initial burden, "the government official is properly spared the burden and expense of proceeding any further." *Powell v. Mikulecky*, 891 F.2d 1454, 1457 (10th Cir. 1989). "Unless the plaintiff's allegations state a claim of violation of clearly established law, a defendant pleading qualified immunity is entitled to dismissal before the commencement of discovery." *Mitchell v. Forsyth*, 472 U.S. 511, 526 (1985) ("The entitlement is an immunity from suit rather than a mere defense to liability;...it is effectively lost if a case is erroneously permitted to go to trial."); *see Harlow*, 457 U.S. at 818 (until the "threshold immunity question is resolved, discovery should not be allowed"). Thus, qualified immunity questions should be resolved at the earliest possible stage of the litigation. *Anderson*, 483 U.S. at 646 n. 6; *Harlow*, 457 U.S. at 817; *see Singer v. Maine*, 49 F.3d 837, 844 (1st Cir. 1995) (where a qualified immunity defense is asserted by pre-trial motion, usual summary judgment standard applies regarding existence of genuine issue of material fact and moving party's entitlement to judgment as a matter of law).

Qualified immunity is a powerful defense. "[Q]ualified immunity sweeps so broadly that 'all but the plainly incompetent or those who knowingly violate the law' are protected from civil

_____

rights suits for money damages." *Hegarty v. Somerset County*, 53 F.3d 1367, 1373 (1st Cir.),

*cert. denied*, 516 U.S. 1029 (1995) (citation omitted*); see Hunter v. Bryant*, 502 U.S. 224, 229

(1991); *Malley v. Briggs*, 475 U.S. 335, 343 (1986).  Qualified immunity protects law

enforcement officers from "bad guesses and gray areas" and ensures that they are liable only "for

transgressing the bright lines."  *Wilson v. Layne*, 141 F.3d 111, 114 (4th Cir. 1998), *quoting*

*Maciariello v. Sumner*, 973 F.2d 295, 298 (4th Cir. 1992), *cert. denied*, 506 U.S. 1080 (1993).

Courts have noted that qualified immunity gives police and correctional officers a wide zone of

latitude in determining the proper action to take in circumstances (such as in the present case)

that are sudden, tense, uncertain and rapidly evolving. *See, e.g., Roy v. City of Lewiston*, 42 F.3d

691, 695 (1st Cir. 1994) ("the Supreme Court's standard of reasonableness is comparatively

generous to the police where potential danger, emergency conditions or other exigent

circumstances are present."); *Foster v. McGrail*, 844 F.Supp. 16, 24 (D. Mass. 1994) (qualified

immunity protects a correction officer from §1983 liability when making quick decisions about

how much force to use).

The First Circuit has established a two-part inquiry for qualified immunity analysis:

> First, the court must establish whether the constitutional right
> asserted by the plaintiff was 'clearly established' at the time of the
> alleged violation. . . .Second, the court must ask whether a
> 'reasonable official situated in the same circumstances should have
> understood that the challenged conduct violated that established
> right.'

*St. Hilaire v. City of Laconia*, 71 F.3d 20, 24 (1st Cir. 1995), *cert. denied*, 518 U.S. 1017 (1996),

*citing Hegarty*, 53 F.3d at 1371 & *Burns v. Loranger*, 907 F.2d 233, 235-36 (1990).  Qualified

immunity, therefore, does not turn on the government official's state of mind.  Rather, it turns on

the "objective legal reasonableness " of the official's action, in light of legal rules that were

"clearly established" at the time the action was taken.  *Anderson*, 483 U.S. at 639; *see Wood v.*

*Clemons*, 89 F.3d 922, 927 (1st Cir. 1996) ("The 'touchstone' of the qualified immunity question

is the concept of 'objective legal reasonableness.'") (citation omitted).  The inquiry becomes whether the official acted as a reasonable official might in light of the information that the official possessed at the time of the challenged conduct.  *Wood*, 89 F.3d at 929-30.

As the Supreme Court has stated, a "necessary concomitant to the determination of whether the constitutional right asserted by a plaintiff is 'clearly established' at the time the defendant acted is the determination of whether the plaintiff has asserted a violation of a constitutional right at all."  *Siegert v. Gilley*, 500 U.S. 226, 232 (1991).  As a predicate to the "objective reasonableness" inquiry, therefore, "a plaintiff must establish that a particular defendant violated the plaintiff's federally protected rights."  *Singer*, 49 F.3d at 844 (citation and internal quotation omitted); *see Brown v. Hot, Sexy and Safer Productions, Inc.*, 68 F.3d 525, 531 (1st Cir. 1995), *cert. denied*, 516 U.S. 1159 (1996).

Whether an asserted federal right was clearly established at a particular time so that a public official who allegedly violated the right has qualified immunity is a question of law, not one of legal facts.  *Elder*, 510 U.S. at 516; *see Hegarty*, 53 F.3d at 1373.  Accordingly, appellate review of qualified immunity must be conducted in light of all relevant precedents, not simply those cited to or discovered by the parties or the trial court.  *Id.*

> For purposes of determining qualified immunity, the officer's actions are measured by a standard of "objective legal reasonableness...in light of the legal rules that were clearly established at the time [they] were taken," [footnote omitted]. <u>Anderson v. Creighton</u>, 483 U.S.. 635, 639, 107 S.Ct. 3034, 3038, 97 L.Ed. 2d 523 (1987) (internal quotation omitted).

*St. Hilaire*, 71 F.3d at 24.  "It is not enough for the constitutional right to be 'clearly established' at a highly abstract level; what matters is whether in the circumstances faced by the official, he should reasonably have understood that his conduct violated clearly established law."  *Ringuette v. City of Fall River*, 146 F.3d 1, 5 (1st Cir. 1998), *citing Berthiaume v. Caron*, 142 F.3d 12, 15 (1st Cir. 1998).  "This qualified immunity standard leaves 'ample room for mistaken judgments.'"  *Ringuette*, 146 F.3d at 5, *quoting Malley*, 475 U.S. at 343; *see Berthiaume*, 142

F.3d at 15 (the question is whether in the circumstances that confronted the official, a reasonable official would have understood that what he is doing violated that right). Qualified immunity permits some leeway for mistakes, even negligent ones, without the consequence of legal liability. *Foster*, 844 F.Supp. at 24.

While "the exact conduct at issue need not have been held to be unlawful in order for the law governing an officer's actions to be clearly established, the existing authority must be such that the unlawfulness of the conduct is manifest." *Wilson*, 141 F.3d at 114; *see Souza*, 53 F.3d at 425 (right must have been clearly established at time of the challenged conduct). Qualified immunity may exist even though, in hindsight, a court might determine that the action of the official violated the Constitution. *Berthiaume*, 142 F.3d at 15; *see Wood*, 53 F.3d at 1375-76 (inquiry must be made based on information available to the official at the time the challenged conduct occurred without indulging hindsight).

As the First Circuit has noted,

> [t]he Supreme Court, recognizing that the use of summary judgment in qualified immunity cases could be undermined, has held that a very broad articulation of the 'clearly' established law at the time of the alleged violation is inappropriate:
>
> [T]he right the official is alleged to have violated must have been "clearly established" in a more particularized, and hence, more relevant, sense: The contours of the right must be sufficiently clear that a reasonable official would understand that what he is doing violates that right. Anderson, 483 U.S. at 640, 107 S.Ct. 3039.

*St. Hilaire*, 71 F.3d at 24; see Singer, 49 F.3d at 845 (inquiry is "not upon the right at its most general or abstract level, but at the level of its application to the specific conduct being challenged") (citations and internal quotations omitted). If there is a "legitimate question" as to whether an official's conduct rises to a constitutional violation, the official is entitled to qualified immunity. *Singer*, 49 F.3d at 845. For the reasons discussed above, none of the plaintiff's allegations establishes the violation of a clearly established right. Accordingly, Commissioner Dennehy and Superintendent Murphy are entitled to the protection of qualified immunity.

**XII.  THIS COURT SHOULD DENY CLASS CERTIFICATION OR, ALTERNATIVELY, DEFER ACTION ON THE PLAINTIFF'S REQUEST FOR CLASS CERTIFICATION UNTIL AFTER DISPOSITION OF THE PRESENT MOTION.**

The plaintiff seeks class certification.  Complaint, ¶¶ 89-94.  For the reasons discussed above, the plaintiff has failed to set forth a cognizable claim for relief.  This Court should deny the request for class certification on this basis.  Alternatively, the DOC Defendants request that this Court defer action on the class certification until after the resolution of the present motion to dismiss.  Resolution of this motion will likely narrow the issues before the Court.

## CONCLUSION

For the foregoing reasons, the DOC Defendants respectfully request that this Court dismiss the Complaint, the Supplemental Complaint and Second Supplemental Complaint.

Defendants Massachusetts Department of Correction, Robert Murphy and Kathleen Dennehy,

NANCY ANKERS WHITE
Special Assistant Attorney General

/s/ Mary P. Murray
By:    Mary P. Murray, Counsel  (BBO # 555215)
Department of Correction
Massachusetts Treatment Center
30 Administration Road
Bridgewater, Massachusetts 02324
(508) 279-8184
(508) 279-8181 (fax)
MPMurray@DOC.state.ma.us

Dated:  March 1, 2005

<u>Certificate of Service</u>

I hereby certify that I caused a copy of the within document to be served as follows:
(1) *Pro Se* Plaintiff Joel Pentlarge, by intra-facility mail, Massachusetts Treatment Center
30 Administration Road, Bridgewater, MA  02324;
&
(2) Defendants Natalyia Pushkina and Debra O'Donnell, by first class mail, postage pre-paid
upon their counsel of record, Kevin Mulvey, Esquire, Mulvey & Sneider, LLP, 1622A Beacon
Street, Brookline, MA  02446-2201.

<u>/s/ Mary P. Murray</u>
Mary P. Murray

Dated:  March 1, 2005