UNITED STATES DISTRICT COURT
FOR THE
DISTRICT OF MASSCHUSETTS

C.A. No. 04-30177-PBS

JOEL PENTLARGE,

      Plaintiff,

vs.

ROBERT MURPHY, et al,

      Defendants.

PLAINTIFF'S MEMORANDUM OF LAW
IN OPPOSITION TO THE MOTIONS TO DISMISS
OF ALL OF THE DEFENDANTS

INTRODUCTION

      The plaintiff, who is not serving any prison sentence, and
has no history of violence or escape, has been "civilly" committed
due to a "mental abnormality" to the Nemasket Correctional Center
for a day to life. The plaintiff has brought this action because
he is being held in a prison with some 500 prisoners still serving
prison sentences. The conditions in this prison, the Nemasket
Correctional Center, are more restrictive and punitive than the
conditions in the prison where the plaintiff previously completed
his prison sentence. This is not due to some "vagary" in the
implementation of the "civil" commitment statute, G.L. c. 123A.
The punitive nature of c. 123A is a direct and intended result
of the statute, which mandates commitment to this correctional
facility, and this correctional facility only, under the exclusive
control of the Department of Correction. The plaintiff is entitled
to relief under 42 U.S.C. § 1983 for the violation of his Fourteenth
Amendment rights, and under the Americans with Disabilites Act,
either declaring c. 123A unconsitutional and ordering the release
of the plaintiff, or ordering the defendants to provide the least
restrictive conditions of confinement.

STANDARD FOR DECIDING A MOTION TO
DISMISS UNDER RULE 12(b)(6)

The defendants have moved to dismiss the plaintiff's complaint
for failure to state a claim upon which the court can grant
relief pursuant to Rule 12(b)(6) of the Federal Rules of Civil
Procedure.  In deciding this motion the court must take the
allegations in the complaint as true and make all reasonable
inference in favor of the plaintiff.  Rockwell v. Cape Cod Hospital,
26 F.3d 254, 255 (1st Cir. 1994).  The court must liberally
construe the plaintiff's pro se complaint and only dismiss it
if the plaintiff cannot prove any set of facts entitling him
to relief. Id. citing Conley v. Gibson, 355 U.S. 41 (1957);
and Estelle v. Gamble, 429 U.S. 97 (1976).

THE PLAINTIFF'S ALLEGATIONS AND
THE RELIEF TO WHICH HE IS ENTITLED.

PRELIMINARY

The plaintiff pled guilty to five counts of statutory rape,
(meaning that factually the four fifteen year old boys who were
the victims consented, although legally they were incapable
of consent, so no force or violence was involved in these crimes).
The plaintiff received a three to four year sentence with life
time probation.  Complaint, ¶¶ 8 and 9.  After serving his prison
sentence in full at M.C.I. Concord and M.C.I. Norfolk, the plaintiff
was "civilly" committed, because of an alleged mental abnormality
to the Nemansket Correctional Center for a day to life pursuant
to G.L. c. 123A. Complaint, ¶¶ 9-12.

COUNT I LEAST RESTRICTIVE ALTERNATIVE

As a person who has been involuntarily committed due to
a mental abnormality, the plaintiff is entitled to be treated

more considerately than criminals "whose conditions of confine-
ment are designed to punish," and the plaintiff is entitled to
the least restrictive conditions of confinement which will
protect the staff, other inmates  and the public.  Youngberg
v. Romeo, 457 U.S. 307, 324 (1982);  Shelton v. Tucker, 364
U.S. 479, 488 (1960); Seling v. Young, 531 U.S. 250, 265 (2001).
To be "civil" commitment the conditions of confinement should
"essentially [be] the same as conditions for other involuntarily
committed persons in mental hospitals."  Seling v. Young, at
261, citing Kansas v. Hendricks, 521 U.S 346, 363 (1997).

Instead the plaintiff alleges that the conditions of confine-
ment at the Nemansket Correctional Center are substantially
more restrictive than the conditions under which the plaintiff
was held while serving his prison sentence.  Complaint, ¶ 13.
For purposes of this Rule 12(b)(6) motion this allegation is
taken as true.  Lest the allegation be considered "conclusory"
the plaintiff has alleged some 32 specific instances where the
conditions of confinement at the Nemansket Correctional Center
are the same as or more restrictive than prison.  Complaint,
¶¶ 14-46.  Some of these conditions present serious dangers
to the health and safety of the plaintiff, such as overcrowding
the plaintiff by double bunking him in a cell which is only large
enough to hold one prisoner.  Complaint, ¶ 14.  Other restrictions
such as access to the yard and cooking privileges, are more
quality of life issues, but still rankle since these conditions
were substantially less restrictive in prison where the plaintiff
was serving a sentence to be punished.  The  greater restrictions
imposed on him now that he is committed  because of his "mental

abnormality" are clearly excessive, since these greater restrictions were not necessary to protect guards, other prisoners or the public the whole time that the plaintiff was in prison. Taken together, all of the more restrictive conditions at the Nemansket Correctional Center are so repressive, that the plaintiff would prefer to be back in prison. Complaint, prayer for relief, p. 25, ¶ 3(a). Chart 1 gives a condition by condition comparison between the Nemansket Correctional Center and M.C.I. Norfolk. If the defendants applied the same conditions of confinement that the state has mandated by statute for other involuntarily committed mental patients, the issues raised in Count II, Access to Telephones, and Counts IX and XI for Interference with Mail, would be resolved, because G.L. c. 123, § 23(a) and (b) provide that all other mental patients have the right "to reasonable access to a telephone to make and receive confidential telephone calls...." and "to send and receive sealed, unopened, uncensored mail. Similarly, the issue of classification raised in Count VII, is really an issue of providing the least restrictive conditions. The level of restriction necessary to protect the staff, other inmates and the public from a person with no history of violence, no criminal record other than the five counts of statutory rape, and no history of escape, like the plaintiff, should be much less than the level of restriction necessary for a person with a history of violence, both in and out of prison, a lengthy criminal record for violent or lethal crimes, and a past history of escape. Classification requires making a case by case assessment of what level of restriction is necessary for each civilly committed person.

Chart 1

Comparison of the Conditions
of Confinement for the Plaintiff

| CONDITION | Nemansket C.C. | M.C.I. Norfok | ¶ of the Complaint |
|---|---|---|---|
| 1. Amount of square feet of feet per prisoner in each cell | 40 | 80 | 14 |
| 2. Amount of cubic feet of storage space for clothing and personal possessions per prisoner | 10 | 19 | 15 |
| 3. Number of hours of law library access per week | 16½ | 48 | 16 |
| 4. Unrestricted access to law books | No | Yes | 17 |
| 5. Number of prisoners allowed to use the law library and general library at the same time | 23 | 40 | 18 |
| 6. Photocopying used to increase access to the legal collection | No | Yes | 19 |
| 7. Number of hours of access to the yard per week | 18½ | 61 | 20 |
| 8. Ammenities provided in the yard | Asphalt track 2 BasketBallCt. 1 Handball Ct. | 2 clay tracks 3 Basketball CTs. 2 Handball Cts. Softball field Soccer field Volley ball Ct. 3 Sets Work out bars Many benches Bleachers Picnic Tables | 21 |
| 9. Gardening allowed | No | Yes | 22 |
| 10. Number of hours of access to the gym per week | 18⅓ | 30½ | 23 |
| 11. Free weights and walkmans allowed in the gym | No | Yes | 24 |
| 12. Number of days per week that visits are allowed | 5 | 7 | 25 |

Chart 1 continued

Comparison of the Conditions
of Confinement for the Plaintiff

| Condition | Nemansket C.C. | M.C.I. Norfolk | ¶ of the Complaint |
|---|---|---|---|
| 13.  Strip searches required after every visit | Yes | Yes | 28 |
| 14.  Clothing an appliance purchases limited to items approved for a Level 4 prison | Yes | Yes | 30 |
| 15. Restrictions on food purchases | Only items on the DOC canteen list. | DOC canteen list, plus Hamburger, Chicken Halves, Fresh Onions, Green Peppers, Garlic, Oranges, Bananas, Apples, Pancake Mix, Flour, Crisco Oil, Olive Oil, Ice Cream. | 30 |
| 16. Cooking appliances provided on the units | Microwave | Microwave, Hot Plates, Electric Convection Oven Elec. Griddle Elec. Wok Elec. Casserole Serrated Knife | 32 |
| 17. Clothing and appliance orders limited to once every 90 days | Yes | Yes | 31 |
| 18.  Cookouts with charcoal grills on Memorial Day, Fourth of July and Labor Day | No | Yes | 33 |
| 19.  Education Programs | GED | GED B.U. College Welding Lisence Barber Lisence MicroSoft Computer | 34 |
| 20.  Number of prisoners working in prison industries | 15 | 100± | 35 |

Chart 1 continued

Comparison of the Conditions
of Confinement for the Plaintiff

| Condition | Nemansket C.C. | M.C.I. Norfolk | ¶ of the Complaint |
|---|---|---|---|
| 21.  Access to a word processor or typewriter with a memory | No. | Yes | 36 |
| 22.  Adjustable shower controls | No | Yes | 37 |
| 23.  Sunday Boston Globe available on Sunday | No. | Yes | 38 |
| 24.  Prisoners allowed to exchange newspapers and magazines | No | Yes | 39 |
| 25.  Prisoners allowed to visit each other in their rooms or cells | No | Yes | 40 |
| 26.  Sufficient seats in the chow hall | No. | Yes | 41 |
| 27.  Meals on the DOC menu prepared on site by a food director who is accessible to the inmates | No | Yes | 42 |
| 28.  DOC regulations apply to all inmates | Yes | Yes | 43 |
| 29.  Daily access to legal storage | No | Yes | 44 |
| 30.  Inmate Council allowed | No. | Yes | 45 |
| 31.  Lifer's Group allowed | No | Yes | 45 |
| 32.  Reading lights allowed | No | Yes* *Hampshire Co. Jail | 46 |

Least restrictive alternative is a central legal concept to resolv-
in the issues raised by this case.

The Fourteenth Amendment provides in the Due Process Clause
that no state shall "deprive any person of life, liberty, or pro-
perty without due process of law."  This protection was interpreted
to mean that even if the government is pursuing a legitimate
purpose, the government cannot use   means that "broadly stifle
personal liberties, when the end can be more narrowly achieved."
Shelton v. Tucker,  364 U.S. 479, 488 (1960) (This case is said
to be first articulation of the requirement of least restrictive
alternative.)  Due process requires at a minimum some rational
relation between the nature and duration of commitment and its
purpose. Jackson v. Indiana, 406 U.S. 715, 738 (1972) (Therefore
a mentally incompetent pretrial detainee could not be held
indefinitely after being determined incompetent without either
being committed or criminally tried.)  Similarly for pretrial
detainees not yet convicted of the crime charged, restrictions
on liberty that were reasonably related to legitimate government
objectives were upheld, so long as they were not tantamount
to punishment.  Bell v. Wolfish, 441 U.S. 520, 539 (1979).

For an involuntarily committed mentally retarded man the
Court held that under the Due Process Clause the state could
not "restrain residents except when and to the extent professional
judgment deems this necessary to assure"..."reasonable safety
for all residents and personnel with the institution."  Youngberg
v. Romeo, 457 U.S. 307, 324 (1982).  The Court summarized, the
"Respondent thus enjoys constitutionally protected interests

in conditions of reasonable care and saftey, reasonably non-restrictive confinement conditions, and such training as may be required by these interests. Id. "Persons who have been involuntarily committed are entitled to more considerate treatment and conditions of confinement than criminals whose conditions of confinement are designed to punish." Id. at 321-322.

More recently the Court in denying a request to hold that the conditions of confinement under Washington State's civil commitment statute were so punitive "as applied" that the statute violated the double jeopardy clause, noted that:

> "State Courts, in addition to federal courts, remain competent to adjudicate and remedy challenges to civl confinement schemes arising the the Federal Constitution. As noted above, the Washington Supreme Court has already held that the Washington Act is civil in nature, designed to incapacitate and to treat. In re Young, 122 Wash.2d at 18-25, 857 P.2d at 996-1000. Accordingly, due process requires that the conditions and duration of confinement under the Act bear some reasonable relation to the purpose for which persons are committed. Foucha v. Louisiana, 504 U.S. 71, 79 (1992); Youngberg v. Romeo, 457 U.S 307, 324 (1982) Jackson v. Indiana, 406 U.S. 715, 738 (1972)."

Seling v. Young, 531 U.S. 250, 265 (2001). The Court also noted that the State of Washington was operating its civil committment facility under a federal court injunction and cited the most recent opinion in that action, Turay v. Seling, 108 F.Supp.2d

In Turay v. Seling the district court specifically held that the standards of Youngberg apply to civilly committed sex offenders, particularly the right to treatment and the right to be treated more considerately than criminals. Turay, at 1151. With regard to treatment the court made a finding of fact that without less restrictive alternatives "the constitutional requirement of treatment leading, if succesful, to cure and

release, cannot be fully met." Id. at 1156. Other courts that have considered the issue of least restrictive alternatives being required for civilly committed sex offenders have reached the same conclusion. See Atwood v. Vilsack, 338 F.Supp.2d 985, 1003 (S.D. Iowa 2004) (citing Seling and Youngberg); Jones v. Blanas, 393 F.3d 918, 931 (9th Cir. 2004).

The First Circuit has not yet addressed what substantive due process under the Fourteenth Amendment requires for the Nemansket Correctional Center, because it deemed the prior Consent Decrees went beyond the constitutional minima required for a correctional facility for sex offenders, most of whom were still serving their criminal sentences. Langton v. Johnston, 928 F.2d 1206, 1217, (1st Cir. 1991) and Cameron v. Tomes, 990 F.2d 14, 19 (1st Cir. 1993). The Court in both Langton and Cameron approved "the trial judge's skirting to the constitutional thicket" when the issues of adequate treatment and conditions of confinement could be decided on other grounds such as the Consent Decrees. Cameron, at 19. The Consent decree which was entered in 1974 provided in the relevant portion that:

> "5. The Department of Mental Health shall exercise
> responsibility and authority set forth in paragraph 2 [for
> treatment] so tht the patients at the Treatment Center
> should have that least restrictive conditions necessary
> to achieve the purposes of commitment. To implement
> this...the Department of Mental Health shall forthwith
> take steps jointly and in cooperation with the Department
> of Correction including as approptiate, seeking legislative
> funding, to...:
>
> c. Have a system of differing security for different
> categories of patients and modifying the plant if necessary
> to permit less restrictive conditions for those patients
> not requiring maximum security."

Langton v. Johnston, at 1227. The First Circuit considered

the provision that "patients at the Treatment Center should have the least restrictive conditions necessary to achieve the purposes of commitment" to be "the essences of the Original Decree." King v. Greenblatt, 149 F.3d 9, 15 (1st Cir. 1998). When the consent decrees were finally terminated, Judge Mazzone stated that he relied in part on the Management Plan which the DOC had filed to conclude that "the treatment provided is effective and provided under the least restrictive conditions given all the circumstances that exist at the Treatment Center." King v. Greenblatt, 53 F.Supp.2d 117, 135 (D. Mass. 1999). The Mangement plan specified:

> "Continuation of the existing system of differing levels of security and privileges in order that residents can be maintained in the 'least restrictive conditions necessary to achieve the purpose of commitment."

December 10, 1999 version of the Mangement Plan, p. 10, § E; the internal quotation cites King at 53 F.Supp.2d 119-120 and 136-137.

Even though the plaintiff has alleged that the conditions of confinement are more restrictive than necessary and are more restrictive than prison, the defendants claim that they are entitled to qualified immunity, because even if you assume that these allegations are true, as is required under Rule 12(b)(6), these conditions for a "civilly" committed persons with a mental abnormality, do not violate any clearly established cosntitutional or civil right. (Def's Memo, pp. 44-48. It is clearly established that "when the conditions of civil commitment are actually harsher than the conditions the same individuals were subjected to as criminal inmates, it is clear that due process cannot be satisfied."

12

Atwood, at 338 F.Supp.2d 1003; (emphasis added).  The court

explained that "the only legitimate justification for the curtail-

ment of liberty involved here pending  a commitment hearing is

the danger posed by the possibly mentally ill to themselves

or others."  Id. citing Lynch v. Baxley, 744 F.2d 1452, 1458

(11th Cir. 1984).  So, "if a restriction or condition is not

reasonably related to a legitimate goal—if it is arbitrary

or purposeless—a court may infer that the purpose of the govern-

mental action is punishment that may not be inflicted  upon

detainees qua detainees."  Atwood, at 1004, quoting Bell v.

Wolfish, at 441 U.S. 537.  See also Jones v. Blanas, at 393

F.3d 932: "Therefore when a [Sexually Violent Predator Act]

detainee is confined in conditions identical to, similar to,

or more restrictive than those in which his criminal counterparts

are held, we presume that the detainee is being subjected to

"punishment."  This is because:

> "The state cannot have it both ways.  If the confinement
> of a sexually violent predator is civil for purpose of
> evaluation under the Ex Post Facto Clause, that confinement
> is civil for the pruposes of determining the rights to
> which the detainee is entitled while confined.  Civil status
> means civil status, with all the Fourteenth Amendment rights
> that accompany it."

Jones at 932. The court emphasized that "With respect to an

individual confined awaiting adjudication under civil process,

a presumption of punitive conditions arises where the individual

is detained under conditions identical to, similar to, or more

restrictive than those under which pretrial criminal detainees

are held...." Jones at 934.  If the plaintiff could be safely

held at Norfolk prison without the extra harsher restrictions

of the Nemansket Correctional Center, these extra restrictions

are excessive in relation to the purpose of holding the plaintiff safely both while he was detained pending the civil commitment and hearing and now that he has been civilly committed.

Because the plaintiff's right to the least restrictive conditions of confinement is clearly established, the defendants are not entitled to qualified immunity on this issue. The plaintiff is entitled to declaratory and injunctive relief enforcing his right under the Fourteenth Amendment to held in the least restrictive conditions necessary to accomplish the purpose of his "civil" commitment, taking into    consideration the non-violent nature of his crimes, his limited criminal record and his lack of any escape history, as well as his right to be treated more conisiderately than when he was a prisoner.  In addition the plaintiff is entitled to damages under 42 U.S.C. § 1983 for violation of these clearly established rights.

COUNT II ACCESS TO TELEPHONES

The plaintiff has alleged that he is subject to exactly the same restrictions at the Nemasket Correctional Center, as he was subject to while in prison.  Complaint, ¶ 47.  All of his call are subject to recording and monitoring. Id.  All calls must be made collect, and include recorded anouncements, before and interrupting during the call saying, "this phone call is from a correctional facility and is subject to monitoring and recording." Id.  The plaintiff is limited to calling 5 attorneys and 10 other persons on a pre-authorized list. Id.  All of the phone calls which the plaintiff makes, including to his own home and business,  are at collect call rates which substantially exceed direct dial rates and prepaid calling card rates. Complaint,

14

¶¶ 48-50.  The DOC has contracted with one carrier (Verizon)
to provide all telephone service to prisoners.  In return the
carrier pays a commission on the telephone tolls.  The commission
is paid directly to the general fund of the Commonwealth.
Complaint, ¶ 51, and 103 CMR 482.07(6).  There is no authorization
in the General Laws of Massachusetts for this commission or
tax to be assessed on prisoners. Complaint, ¶ 52.

Although the DOC has authorized the plaintiff to call attorneys
Harry Miles and Doublas Walker at their respective offices,
since July of 2003 the carrier for the DOC has blocked collect
call to these two law offices.  Complaint, ¶ 54.  The plaintiff
obtained an order from the Hampshire Superior Court ordering
the DOC "to permit Joel Pentlarge to contact the law offices
of Harry Miles, Esquire, Doublas Walker and John Swomley, Esquire
by telephone or otherwise..." Complaint, ¶ 57.  The defendants
have refused to remedy this situation, so that the plaintiff
can contact these two attorneys at their offices. Id.

Taking the plaintiffs allegations as true the defendants
are violating the plaintiff's clearly established First Amendment
right to communicate with family and friends, as well as with
courts, government agencies and attorneys.  See Morgan v. LaVallee,
526 F.2d 221, 225 (2d Cir. 1975).  A statute or regulations
that :effectively suppress a large amount of speeech that adults
have a constitutional right to receive and to address to one
another...is unacceptable, if less restrictive alternatives
would be at least as effective in achieving the legitimate purpose
that the statute was enacted to serve.  Reno v. American Civil

Liberties Union, 521 U.S. 844, 874 (1997).

In the context of civilly committed inmates in Turay v. Seling, the court ordred that the Commitment Center for Washington State: eliminate the monitoring of residents' telephone calls, eliminate the bar on outgoing calls (other than collect), and allow prompt telephone access to residents in cases of family emergency. Id. at 108 F.Supp.2d 1148, 1156-57. The Ninth Circuit upheld this order reasoning that prisoners have a First Amendment right to telephone access, subject to reasonable security limitations. Young v. Seling, 72 Fed. Appx. 657, 659 (9th Cir. 2003) quoting Keenan v. Hall, 83 F.3d 1083, 1092 (9th Cir. 1996). And, therefore since civil detainees under clearly established law are entitled to "more considerate treatment" than prisoners, they should be subject fewer restrictions on their constitutional right of access to telephones. Id. 72 Fed. Appx. 659-660, citing Youngberg, at 457 U.S. 321-322.

At the very least the plaintiff has stated a claim for the same kind of injunctive relief granted in Turay. The DOC should be ordered to: stop monitoring and recording the plaintiff's phone calls, remove all prior restraints on who the plaintiff can call, refund all illegally collected commissions, and allow the plaintiff to use prepaid calling cards to place phone calls.

With regard to access to attorneys there is no question that the plaintiff is entitled to the effective assistance of an attorney at every phase of civil commitment proceedings. Specht v. Patterson, 386 U.S. 605,610 (1967). Under both the First and Fourteenth Amendment, as well as the order of the Hampshire Superior Court, not to mention the DOC's own regulations

103 CMR 482.08(1) the plaintiff's right to telephone access
to his chosen attorneys is clearly established.

The DOC defendants in their memorandum of law in support
of their motion to dismiss (pp. 16-21) cite prison regulations
103 CMR 480.00 et seq., and court decisions involving the use
of telephones by prisoners.  These cases are not applicable
to the plaintiff, who is no longer a prisoner and is now "civilly"
committed.  The defendants have offered no legitimate governmental
purpose for restricting the plaintiff's access to the telephone,
particularly in light of the statutory right of other mental
patients "to reasonable access to a telephone to make and receive
confidential telephone calls...."  G.L. c. 123A, § 23(a).

### COUNT III RIGHT TO CONFIDENTIALITY IN TREATMENT

The plaintiff has alleged that the defendants refuse to
provide the plaintiff with sex offender treatment, unless the
plaintiff agree to waive all rights to confidentiallity, including
his Fifth Amendment right not to incriminate himself.  Complaint,
¶ 58.  The written waiver of confidentiallity that the defendants
require the plaintiff to sign in order to provide him with treatment
is attached as Exhibit A of the complaint, and it is reproduced
in full on the following page as Chart 2.  It is unequivocal
that "there is no expection of confidentiality," and that treatment
records may "be reviewed by District Attorneys for court proceeedngs
under M.G.L. c. 123A. ¶¶ 4 and 2.

### A.   Violation of the HIPPA Privacy Regulations

Under the Health Insurance Portability Protection Act,
the Department of Health and Human Services is authorized to
make regulations protecting the privacy of health records.

Chart 2

Sex Offender Treatment Program; Orientation



**Forensic
Health
Services
Incorporated**

### Informed Consent for Treatment

I,_____, understand that as a current resident/inmate of the
Massachusetts Treatment Center, I will be given the opportunity to participate in
treatment. I understand that if I choose to participate in treatment, I am aware of the
following:

1. My treatment records may be reviewed by Qualified Examiners and other evaluators
for court proceedings under MGL Chapter 123A to determine whether I am a Sexually
Dangerous Person. The commitment period for Sexually Dangerous Persons is one day
to life.

2. My treatment records may be reviewed by District Attorneys and defense attorneys for
court proceedings under MGL Chapter 123A. FHS will comply with all D.O.C.
regulations, State and Federal laws regarding the release of documents.

3. Therapists from the Massachusetts Treatment Center may be subpoenaed to appear in
court at such hearings to address issues related to my participation in treatment.

4. Anything I say or disclose in treatment or in discussions with a therapist will <u>not</u> be
confidential and could be used to evaluate my status for clinical, classification or
commitment purposes.

5. I understand the above statements and I am choosing to participate in sex offender
treatment voluntarily, knowing that there is no expectation of confidentiality.


_____
Resident/Inmate Signature                    Date


_____
DOC ID #


_____
Staff Signature (Witness)                       Date

See 42 U.S.C. §§ 1320d-1320d-8.  The DOC and its contracted

provider of sex offender treatment are "health care providers"

as defined by 45 CFR 160.103:

> "Health care means care, services or supplies related to
> the health of an inidvidual.  Health care includes, but
> is not limited to, the following:
>
> (1) Preventive, diagnostic, therapeutic, rehabilitative,
> maintenance, or palliative care, and counseling, service,
> assessment, or procedure with respect to the physical or
> mental condition, or functional status, of an individual
> or that affects the structure or function of the body....
>
> Health care provider means a provider of services (as defined
> in section 1861(u) of the Act, 42 U.S.C. 1395x(u), a provider
> of medical or health services as defined in section 1861(s)
> of the Act, 42 U.S.C. 1395x(s), and any other person or
> organization who furnishes, bills or is paid for health
> care in the normal course of business.
>
> Health information means any information, whether oral
> or recorded in any for or medium, that:
>
> (1) Is created or received by health care provider, health
> plan, public health authority, employer, life insurer,
> school or university,  or health care clearing house; and
>
> (2) relates to the past, present, or future physical or
> mental health or conditon of an individual; the provision
> of health care to an individual; or the past, present or
> future payment for the provision of health care to an individual."

As a health care provider, the DOC or its contractor, FHS "may

not disclose health information except" as permitted by the HIPPA

regulations. 45 CFR 164.502(a).  Neither the DOC, nor FHS may

"use or disclose protected health information without an authorization

that is valid."  45 CFR 164.508.  The DOC and FHS "may not con-

dition the provision to an individual of treatment.... on the

provision of an authorization...."  45 CFR 164.5089b)(4).  And

"Any individual may revoke an authorization provided under this

section at any time, provided the revocation is in writing...."

45 CFR 164.508(b)(5).  There are exceptions to each of these

rules but none of the exceptions are relevant to this case.

Any authorization for disclosure must provide notice of the "individual's right to revoke the authorization in writing." 45 CFR 164.508(c)(2)(i).  These regulations preempt the provisions of State law.  45 CFR 160.203.

The plaintiff is entitled to declaratory and injunctive relief declaring the DOC and FHS are violating the HIPPA regulations by:

1.  Conditioning treatment on the signing of an authorization to release health care information;

2.  Failing to include in any authorizations for the release of information a statement that the individual has the right to revoke the authorization in writing at any time.

B. <u>Right to Confidentiality under State Law</u>.

The plaintiff has   state rights to confidentiality in his communications with social workers and psychotherapists under G.L. c. 112, § 135A and c. 233, § 20B.  These statutory rights are supplemented by regulations codifying the ethical rules for licensed social workers and psychologists.  An example of these regulations are the "Ethical Standards for Psychologists," at 251 CMR 1.11, which includes an ethical duty to maintain the confidences of patients.  See also the American Psychiatric Associations's <u>Principles of Medical Ethics</u>, p. 7, "Confidentiality is essential to psychialtric treatment." The Massachusetts courts have also recognized a common law patient-therapist privilege to maintain confidentiality.  <u>Commonwealth v. Callahan</u>, 440 Mass. 436, 441  (2003).

The DOC defendants contend that there is no right to confi-

dentiality for "civilly" committed sex offenders, who seek treatment, because c. 123A overrides all of the other statutory and common law protections of patient-therapist confidentiality. This is not correct, in the Callahan case the Supreme Judicial Court concluded that the legislature did not intend to overrule all of the other statutory and common law protections of patient-therapist confidentiality in c. 123A, and in order to interpret c. 123A harmoniously with the existing protections for confidentiality, before evidence could be introduced under c. 123A of confidential patient-therapist communications, the trial court had to establish that the patient had waived confidentiality. Specifically the trial court had to find that the patient had been warned prior to making any statements to the therapist, that there would be no confidentiality, and chose to proceed waiving confidentiality. If there was no warning to the patient, as required in the case of Commonwealth v. Lamb, then the communications remain privileged. notwithstanding c. 123A. Callahan, at  442  , and Lamb, 372 Mass. 17  (1977 ).  The DOC and FHS could offer treatment which would remain privileged, simply by not requiring the patients to waive the privilege.

Clearly under the HIPPA regulations it is illegal to condition providing treatment on waiving confidentiality. It is also a violation of the professional ethics of any licensed therapist. Whether conditioning treatment on a waiver of confidentiality, also violates the plaintiff's statutory and common law rights to confidentiality appears to be a question of first impression in Massachusetts.  The defendants have cited no law to the contrary.

The fact that a complaint raises a novel issue of law is not grounds to dismiss it on a Rule 12(b)(6) motion.

### C. Violation of the Fifth Amendment.

The plaintiff has alleged that the defendants refuse to provide him with treatment unless he waives his Fifth Amendment right not to incriminate himself.    Complaint, ¶ 58.  The "Informed Consent for Treatment" form, Chart 2, is explicit that anything the plaintiff says in therapy will be shared with the District Attorney, and there is no limitation on what use the District Attorney may make of the information.  It is explicit that the information will be used to "civilly" commit the plaintiff, and maintain his commitment, under conditions which—taking the plaintiff's allegations  as true for the purpsoes of this motion—are more punitive than prison.

The DOC defendants argue that: 1) there is no requirement that the plaintiff incriminate himself to participate in the treatment program, "he may participate fully and make admissions about any uncharged sexual offenses; [or] he may participate and address only those sex offenses for which he has already been convicted...;" and 2) that there is no compulsion of the plaintiff to waive his Fifth Amendment privilege. (Def's memo. pp. 21-25.)

The plaintiff allegations are taken as true for purposes of a Rule 12(b)(6) motion.  Here the plaintiff has alleged that the defendants will not provide him with treatment unless he waives his privilege not incriminate himself.  This allegation

must be taken as true for purposes of this Rule 12(b)(6) motion.
If the defendants want to dispute the truth of this allegation
they are free to do so either by way of a trial, or possibly
by motion for summary judgment, but they cannot dispute its
truth in this Rule 12(b)(6) motion to dismiss, and certainly
not by a counter assertion of fact in a legal memorandum unsupported
by any affidavits or other documentation.  See Local Rule 7.2(B)(1).
Even if you accept the defendants' assertions at face value,
anything that the plaintiff says in therapy will be used to
prolong a confinement which is more punitive than prison, so
effectively it will incriminate him, even though the proceedings
are called "civil."

"Complusion" for Fifth Amendment purposes is the imposition
of any sanction which makes assertion of the Fifth Amendment
privilege costly.  Ainsworth v. Risley, 244 F.3d 209, 213 (1st
Cir. 2001), quoting Spevack v. Klien. 385 U.S. 511, 515 (1967).
The sanction that the defendants are imposing on the plaintiff
for not waiving his Fifth Amendment privilege is exclusion from
treatment. This is a costly sanction.  For a civilly committed
mentally ill person, the only practical hope of release is to
show participation in treatment.  More importantly, effective treat-
ment provides a way of overcoming a syndrome which is as debilitating
and destructive as drug addiction or alcoholism, if not more
so.  As a matter of substantive due process under the Fourteenth
Amendment, the plaintiff has a constitutional right to receive
treatment.  Forcing the plaintiff to give up his constitutional
right to treatment is costly to the plaintiff, and sufficiently
costly to be "compulsion" which violates the Fifth Amendment.

The defendants cite <u>McKune v. Lile</u>, 536 U.S. 24 (2002) to
support their contention that the plaintiff is not being compelled
to waive his Fifth Amendment Privilege. <u>Mckune</u> is neither factually
nor legally  on point. <u>McKune</u> is a prison case, and the plaintiff
is not a prisoner.  The treatment program offered to Lile, the
prisoner in the <u>McKune</u> case, while Lile was in prison serving his
sentence, was a voluntary program.  There was no requirement that
Lile take the program, nor was their any requirement that the
prison offer the program.  The consequences that Lile faced
for refusing to waive his Fifth Amendment right did not constitute
"atypical and significant hardships in relation to ordinary
incidents of prison life." <u>McKune</u>, at 41. By contrast the consequences
of the plaintiff's asserting his Fifth Amendment privilege is
that the defendants deny him his Fourteenth Amendment right
to treatment.  Even in a prison setting <u>Mckune</u> does not provide
a controlling standard what constitutes compulsion, because
it was a plurality decision of four justices, joined by Justice
O'Connor, who concurred in the result, but declined to articulate
a standard for determining compulsion in future cases.  <u>Ainsworth</u>
<u>v. Stanley</u>, 317 F.3d 1, 4 (1st Cir. 2002).

The plaintiff is entitled to  injunctive relief pursuant to
42 U.S.C.  § 1983, enjoining the defendants from failing to
provide the plaintiff with treatment without requiring him to
waive his Fifth Amendment privilege.

IV  THE PLAINTIFF'S  RIGHT TO TREATMENT

It is clearly established under the Fourteenth Amendment
that the plaintiff cannot be deprived of liberty by the state
because of a mental abnormality without the state's providing

24

treatment that is reasonable in light of the plaintiff's liberty
interests in safety and freedom from unreasonable restraints.
Youngberg, at 322; Hendricks, at 365-368; and Seling, at 261-
262; and Turay, at 1151. The treatment must not substantially
depart from accepted professional judgment, practice, or standards,
so that the treatment is not based on such professional judgment.
Youngberg, at 323; and Turay, at 1151. The plaintiff is also
entitled to treatment under G.L. c. 123a, § 2. While ordinarily
the failure to fulfill a state law does not create a § 1983 claim
for violation of civil rights, when a state deprives a person
of his liberty by civilly commitment for "care, custody, treatment
and rehabilitation" due process requires "that the nature and

duration of commitment bear some reasonable relation to the
purpose for which the individual is committed." Youngberg,
at 325, quoting Jackson v. Indiana, at 406 U.S. 738. Having
committed the plaintiff for the purpose of treatment and rehabi-
litation, due process binds the state to ensure that the conditions
of commitment bear some reasonble releation to those purposes,
including treatment. Youngberg, at 325-326, Blackmun, J. with
Brennan and O'Connor, concurring.

The plaintiff has alleged that the defendants have substan-
tially departed from accepted professional judgment, practice
or standards in the treatment provided by requiring the plaintiff
to waive all rights of confidentiality, by not basing the treat-
ment on methods that have been empirically proven to be effective,
by having unqualified treatment staff, and by having both ethical
and financial conflicts of interest. Again for purposes of
this motion these allegations must be taken as true.

See the Complaint, ¶¶ 58-68.

As noted above at pp. 19-20, under current professional standards and practice therapists have an ethical duty to maintain confidentiality which is "essential to treatment. Chief Justice Marshall of the Supreme Judicial Court criticized this policy stating:

> "Due to the perverse disincentives to treatment the Commonwealth has established, many attorneys apparently routinely advise their clients not to engage voluntarily in sex offender treatment. These lawyers fear that, because their clients must waive all confidentiality rights in order to receive treatment, the frankness that such treatment requires might later be grounds for sexually dangerous person proceedings. See Bernstein, A Question of Commitment, Commonwealth (Winter 2003).

> The Commonwealth's policy in this regard is especially disturbing in light of the consensus among experts that sex offenders benefit from prompt treatment during the term of incarceration. See An Overview of Sex Offender Management, United States Department of Justice, Center for Sex Offender Management 7 (2002); Detaining "Sexual Predators" in the Mental Health System, National Mental Health Association (1998).

Commonwealth v. Chapman, SJC-09370 Lawyers Weekly (April 14, 2005) n. 25, Marsh, C.J., disenting.

The need for adequate qualified staff to provide effective treatment would seem to be self evident. It has been a recurrent problem at Nemansket Correctional Center. See Langton v. Johnston, at 928 F.2d 1215-1216. See also Turay at 1155-56.

Current standards and practice for psychological treatment of mental disorders requires that threatment be "evidence based." The contract between the DOC and FHS specifies that treatment will be "empirically grounded and outcome research based." Contract, p. 12. The defendants have deviated substantially from accepted professional standards and practices in providing

treatment without confidentiality, without a community access plan, without providing the least restrictive alternatives or a tiered system of security; and the defendants have done this with no empirical evaluation of whether these deviations improve or degrade the effectiveness of the treatment offered.  The history of medical and psychological practice is littered with discarded treatments and methods which when carefully studied turned out to be useless or even harmful.  The classic example of this is the blood letting treatment which killed George Washington. Even treatments which seem  in theory and initial research to be very promising, all too often turn out, when rigourously tested in randomized comparison studies, to be no more effective than a placebo or no treatment at all.

The defendants have hired the same contractor, FHS, to do both its treatment and evaluations of civilly committed persons. The defendants require individual therapists to both treat and evaluate each of their patients.  The Ethics Committee of the American Pyschiatric Association has called this a "a classic example of 'double agentry'" which is ehtically prohibited. Opinions of the Ethics Committee on the Principles of Medical Ethics with Annotations Especially Applicable to Psychiatry, 2001 Edition, p. 41, § 4-H.  In addition under the contract FHS is paid on a per capita basis for treating inmates at the Nemansket Correctional Center, so the more inmates, the more FHS earns.  At the same time  the treatment staff of FHS and the FHS staff who work as "qualified examiners" and as members of

the Community Access Board for the DOC, all are participating

in decisions whether individuals should be committed, and whether

individuals should be recommended for discharge.  These are

decisions in which FHS has a direct financial interest, because

it is paid on a per capita basis.  This arrangement violates

G.L. c. 268A, which prohibits the employees of any corporation

from participating in any decisions in which the corporation

has financial interest.  G.L. c. 268A, § 6.

Based on the allegations of the complaint the defendants

have violated clearly established law that entiles the plaintiff

to receive treatment in accordance with professional judgment,

practice or standards.  Because this is a constitutional right

under the Fourteenth Amendment, the plaintiff is entitled to

injunctive relief and damages pursuant to 42 U.S.C. § 1983.

(There is no Count V, due to the plaintiff's inability

to count to five in Latin.)

COUNT VI VIOLATION OF THE MINIMUM STANDARDS
OF FITNESS FOR HUMAN HABITATION.

The plaintiff has alleged that the roof in his unit at

the Nemansket Correctional Center leaks, and has leaked for

over 16 years without ever being successfully repaired, and

it leaks into the plaintiff's cell.  Second Supplemental, ¶¶

141-143.  This condition has been cited as a violation by the

Massachusetts Department of Public Health. Id. ¶ 143.  The heat

was broken in the plaintiff's cell as of November 17, 2004,

though it has since been repaired. Id. ¶¶ 145-146.  In 2004

the defendants turned the heat off on April 15, two months

before the end of the heating season required by the State Sanitary
Code.   The defendants have overcrowded the plaintiff by forcing
him to double bunk in a cell with only 80 square feet of floor
space in violation of the State Sanitary Code.   This violation
has also been cited by the Department of Public Health. Complaint
¶¶ 69-74.   There is no access to toilets from the yard, a condition
which Judge Mazzone noted in 1999, and which still has not been
corrected. Complaint, ¶¶ 74-76; and King, at 53 F.Supp.2d 134.

G.L. c. 111, § 127A provides that the Department of Public
Health shall adopt public health regulations known as the State
Sanitary Code, which shall have the "force of law" and include
the Minimum Standards of Fitness for Human Habitation.   For
purposes of this action the State Sanitary Code is divided into
two parts: 105 CMR 451.00 which applies exclusively to "correctional
institutions and 105 CMR 410.00 which applies to all other places
of human habitation.   See 105 CMR 410.010(B)(2) and 105 CMR
451.010; G.L. c. 111, §§ 3, 5, 21, and 127A.   Which part of
the Code applies to the Nemansket Correctional Center, is in
one sense a matter of semantics, but since semantics is the
study of meanings, it is also a matter of substance.

The defendants argue that for purposes of the State Sanitary
Code the Nemansket Correctional Center is a "correctional facility."
Def's memo, p. 30.   The defendants refer to G.L.c. 125, § 1(d)
which defines a "correctional facility" as "any building, enclosure,
space or structure used for the custody, control and rehabilitation
of committed offenders and such other persons as may be placed
in custody therein in accordance with law."   This same section,

paragraph (k) defines a "penal institution" as a "correctional facility." Paragraph (j) defines "prison" as a "correctional facility," and paragraph (m) defines "prisoner" as "a committed offender and such other person as is placed in a correctional facility in accordance with law."

On the other hand the Supreme Judicial Court in light of the Hendricks decisions which it cited repeatedly, ruled that a person committed under c. 123A is "committed to a treatment center" and does "not remain incarcerated." Commonwealth v. Bruno, 432 Mass. 489, 504 (2000) (ruling that c. 123A is not punitive, and therefore does not violate the Double Jeopardy or Ex Post Facto Clauses of the Constitution). Four years later the Court reaffirmed that, "those confined [under c. 123A] are held in the Treatment Center (a secure mental health facility), not a correctional facility." Commonwealth v. Knapp, 441 Mass. 157, 166-167 (2004).

If the SJC is right and the Nemansket Correctional Center is not a correctional facility but instead a secure mental health facility, then 105 CMR 410.00 applies. There is no question that the conditions alleged by the plaintiff violate the Minimum Standards of Fitness for Human Habitation. To put two prisoners in one cell, 105 CMR 410.440(B) requires 120 square feet of floor space, not the 80 square feet that exists in the Nemansket cells. Heat is required by 105 CMR 410.210 from September 15 to June 15 of each heating season. The roof must be maintained in watertight condition, as required by 105 CMR 410.500.

The authority to enforce the State Sanitary Code comes from G.L. c. 111, § 127I, as amended in 1992, which provides

that:

> "Upon the filing of a petition to enforce the provisions
> of the state sanitary code, or any civil action concerning
> violations of the sanitary code by any affected occupants
> or a public agency, whether begun in the district, housing
> or superior court and whether brought under section 127C
> or otherwise, the court may issue temporary restraining
> orders, preliminary and permanent injunctions...."

This is consistent with the State Sanitary Code itself which

states at 105 CMR 410.010(C) that, "Nothing contained herein

shall be construed to limit or otherwise restrict any person

from seeking judicial relief in a court of competent jurisdiction

nothwithstanding any hearing, proceeding or other administrative

remedy set forth in 105 CMR 410.000." It is also consistent

with the holdings of Boston Housing Authority v. Hemingway,

363 Mass. 184 (1973) and Commonwealth v. Haddad, 364 Mass. 795

(1974); both of which came down strongly in support of broad

enforcement of the State Sanitary Code as a matter of public

policy.

Even if the court finds that the Nemansket Correctional

Center is a correctional facility, as the defendants argue,

the 1992 amendment which rewrote § 127I, broadened the language

describing who can bring an action to enforce the State Sanitary

Code to include "any affected occupant," which the plaintifff

is. This amendment effectively overrules the holding in Attorney

General v. Sheriff of Worcester County, 382 Mass. 57, a 1980

case. Nor is there anything in the two Superior Court decisions

cited by the defendants on this issue to indicate that the Superior

Court took into account the effect of the 1992 amendment to

§ 127I in these two pro se prisoner actions to enforce the Code.

Def's memo, pp. 31-32.  Superior Court decisions have no <u>stare</u>
<u>decisis</u> effect in Massachusetts.

The defendants raise the issue of Eleventh Amendment immunity
of state to suits brought against it by one of its citizens.
The state can waive Eleventh Amendment Immunity.  Section 127I,
when read in conjunction with the State Sanitary Code, indicates
a very broad intent to encourage enforcement of the Code in
any "court of competent jurisdiction" against anyone in control
of property occupied for human habitation, including governmental
units and the agents of governmental units.  105 CMR 410.010(C)
and 410.020, the definitions of "owner" and "person."

If the plaintiff's claims for correcting substandard condi-
tions cannot be resolved through  the Court's supplemental juris-
diction to enforce the plaintiff's state law claims, then it
is necessary to enter the "constitutional thicket," (<u>Langton</u>,
928 F.2d 1217), but the same minimum standards should be applicable.
Returnting to <u>Youngberg's</u> basic holding, "Persons who have been
involuntarily committed are entitled to more considerate treatment
and conditions of confinement than criminals whose conditions
of confinement are designed to punish;"  the Minimum Standards
for Correctional Facilities, 105 CMR 451.000, provides an excellent
base line for what the conditions of confinement for criminals
should be.  These are minimum standards issued by the Commonwealth
itself by its own Department of Public Health.  Using this base
line it is clear that the physical conditions at the Nemansket
Correctional Center do not even comply with what the conditions
of confinement for criminals should be.  With only 80 square
feet of floor space in each cell there should be no more than

one presoner per cell.  105 CMR 451.320 and 451.321.  Heat should
be supplied to prisoners from September 15 through June 15 of
each heating season.  105 CMR 451.330.  The roof of a prison
should be watertight. 105 CMR 451.350.  All prisoners must
have access to a toilet at all times.  105 CMR 451.112.

    The question    becomes:  if civilly committed persons
are entitled to more cosiderate treatment, then how much more
considerate?  For non-convicted pre-trial detainees the Fourteenth
Amendment requires that the government do more than provide
the "minimal civilized measure of life's necessities."  Rhodes
v. Chapman, 452 U.S. 337, 347 (1981); and Jones v. Blanas, 393 F.3d
918, 931-932 (9th Cir. 2004).  The State Sanitary Code is an
explicit itemization of the "minimal civilized measure of life's
necessities" in regard to dwelling places.  The standards set by
the State Sanitary Code for prisons and all other dwellings
are materially the same for the specific conditions raised by
this action.  More than 80 square feet of floor area are required
to have two people sharing a room under both parts of the code.
Roof must be watertight, the heating season is the same, and
toilets are required under boths parts of the code.  The housing
part of the code is mandatory, while the prisons part of the
code is mainly hortatory. Although the plaintiff has a clearly
established constitutional right to be treated more considerately
than prisoners and to more than the minimal civilized measure
of life's necessities, the plaintiff's is only requesting that
he be treated as considerately as prisoners should be treated
by the State's own Sanitary Code, or that he be provided with
dwelling space which meets the "Minimum Standards of Fitness

for Human Habitation." As a matter of equal protection of the laws, there is no rational basis for distinguishing between the plaintiff and other mental patients committed under c. 123 to whom the 105 CMR 410.000 applies.

The plaintiff is entitled to relief enjoining the plaintiffs from failing to correct the overcrowding, the leaking roof and the lack of access to a toilet from the yard, immediately, together with damages under  Title 42 U.S.C. §  1983.

VII CLASSIFICATION.

The Nemansket Correctional Center has no system of classification. Complaint, ¶¶ 77-82.  The plaintiff who is civilly committed because of a mental abnormality has no history of violence or escapes, and in prison the DOC classification system would have placed him in a minimum security prison or a work release program, except that no sex offenders are are allowed in these programs. Complaint, ¶ 77.  The plaintiff is subject to same high security as applies to other inmates with long histories of escapes, violence, murder and forcible rape, both inside and outside of prison and in the Nemansket Correctional Center. Complaint, ¶ 78.  Also imprisoned with the plaintiff are elderly, blind , paraplegic and mentally ill persons, all of whom are also subject to the same high level of restrictive security. Complaint, ¶ 79.  The community access plan is not operating. Complaint, ¶ 82.  These allegations are taken as true for purposes of the this Rule 12(b)(6) motion, the reprentations of counsel for the defendants to contrary are: 1) unsupported by any affidavit or other documents, as required by Local Rule 7.2(B)(1);

2) untrue; and 3) irrelevant to consideration of a Rule 12(b)(6)
motion.

As a practical matter the plaintiff cannot be provided
with the least restrictive conditions unless the defendants
implement an effective classification system.  A classification
system is "as system of differing security for different categories
of patients modifying the plant if necessary to permit less
restrictive conditions for those patients not requireing maximum
security."  Consent Decree, ¶ 5(c), quoted in Langton, 928 F.2d
1227.  See also the same requirement in the Management Plan,
December 10, 1999, p. 10, § II, ¶ E.  As a matter of clearly
established law the plaintiff is entitled to the least restrictive
conditions of confinement, and to be classified with other low
risk inmates so that those least restrictive conditions can
be achieved.  Youngberg at 324, Seling at 265, Turay at 1154–
55, Langton at 1217, King at 53 F.Supp.2d 132.

The plaintiff is also entitled to relief under the Americans
with Disabilities Act, (ADA).  The plaintiff fits the ADA defini-
tion of "disabled" because his alleged mental abnormality makes
him a person who is "regarded as having" a "mental impairment
that substantially limits one or more of the major life activities
of the" plaintiff. 42 U.S.C. § 12102(2)(A) and (C).  The ADA provides
that, "no qualified individual with a disability shall, by reason
of such disability, be excluded from participation in or be denied
the benefits of the services, programs or activies of a public
entity, or be subjected to discrimination by any such entity."
42 U.S.C. § 12132.  To implement this provision the United States

Attorney General has issued regulations, which further provide
that:  "A public entity shall administer services, programs,
and activities in the most integrated setting appropriate to
the needs of qualified individuals with disabilities."  28 CFR
§ 35.130(d) (1998).  "The most integrated setting appropriate
to the needs of qualified individuals with disabilities is further
defined to mean 'a setting that enables individuals with disabilities
to interact with non-disabled persons to the fullest extent
possible." 28 CFR pt. 35, App. A, p. 450 (1998).  To accomplish
this:

> "A public entity shall make reasonable modifications in
> policies, practices, or procedures when the modifications
> are necessary to avoid discrimination on the basis of dis-
> ability, unless the public entity can demonstrate that
> the modifications would fundamentally alter the nature
> of the service, program, or activity."

28 CFR § 35.130(b)(7) (1998).

Interpreting the ADA and it regulations, as the ADA applies
to persons with mental disablities, the Supreme Court concluded
that, "States are required to provide community-based treatment
for persons with mental disabilities when the State's treatment
professionals determine that such placement is appropriate,
the affected persons do not oppose such treatment, and the
placement can be reasonably accommodated, taking into account
the resources available to the State and the needs of others
with disabilities."  Olmstead v. L.C., 527 U.S. 581, 607 (1999).
The DOC is not providing any community based treatment.  The
plaintiff has been determined by two treating professionals
to be appropriate for community placement with appropriate
treatment in the community.  (Dr. Paul Lapuc, and David Kupen-

heimer, who was employed by the DOC to provide treatment at
M.C.I. Norfolk; also Dr. Haelet, a qualified examiner designated
by the DOC.)  Under the ADA the plaintiff is entitled to an
order requiring  the defendants to provide him with community
based treatment and to provide all other services, programs
and activities in the most integrated setting appropriate to
the needs of the plaintiff.

VIIA.  <u>REFUSAL TO MAKE LEGAL COPIES</u>.

The plaintiff has alleged that the defendants Pushkina
and O'Donnell refused to make legal copies for the plaintiff
on the law library copiers.  Complaint, ¶¶ 99-108.  The copies
requested included a "Notice of Lawsuit" form which the plaintiff
prepared to serve on the DOC defendants in this case as provided
by Rule 4 of the Federal Rules of Civil Procedure.  Complaint,
¶¶ 99-104.  The defendants also refused to make copies of the
plaintiff's legal pleadings to send to the local newspapers.
Complaint, ¶ 105.  The defendants refuse to make copies of court
decisions to enclose in letters to the Superintendent or to
attach an exhibit in this case.  Complaint, ¶¶ 107-108.

The defendants concede that prisoners have a constitutionally
protected right of access to the courts, citing <u>Bounds v. Smith</u>,
430 U.S. 817, 828 (1977).  Answer and Motion to Dismiss of the
Defendant Pushkina and O'Donnell, p. 7, n. 2.  The defendants
further agree that the right of access to the courts comes from
the First Amendment's guarantee of the right to petition the
government for redress of grievances, including the courts.
<u>Id</u>. citing <u>Cardtoons v. Major League Baseball Players Assoc.</u>,

208 F.3d 885, 890 (10th Cir. 2000), and <u>California Motor Tansport</u>
v. Trucking Unlimited, 404 U.S. 508, 510.  In <u>Bounds</u> the Supreme
Court affirmed a district court order which included providing
a copier as part of law library services for prisoners.

   All of the cases cited by the defendants in support of
their motion to dismiss are prison cases.  None of them address
the "more considerate" treatment that the plaintiff is entitled
to as a civilly committed person.  <u>Youngberg</u>, <u>supra</u>.  Nor do
these cases cited by the defendants indicate what the least
restrictive conditions should be for the plaintiff with regard
to copier access, or the extent to which access to a copier
is required to provide the plaintiff with the most integrated
setting appropriate to his needs.  The DOC regulations in effect
at the time provided that:

> "Photocopying services shall be for purposes of duplica-
> ting original legal documents and for the purpose of increas-
> ing access to the legal collection.  The Superintendent
> shall designate the staff members responsible for photo-
> copying legal documetns and legal reference materials."

103 CMR 478.11(4); (This regulations was amended this spring
to eliminate the copying of "legal reference materials.") 1/
If the defendants had simply complied with this regulation which
applies to all prisoners in DOC custody, they would not have
been subject to this litigation.

   The only reason the defendants advance for not providing
the copies is that: "The photocopying regulations serve a legitimate
penological interest as they prevent abuse library resources
by preventing incarcerated individuals from using library resources

_____

   1/  The new version of the regulation is quoted by the defendants
Pushkina and O'Donnell at page 5 of their Answer.  It was not
in effect at the time of the alleged incidents.

for purposes unrelated to their legal claims." Answer of Pushkina
and O'Donnell, p. 9.  All of the copies the plaintiff requested
were directly related to his legal claims.  There is no legitimate
"penological" interest which is   related to the plaintiff
since he is not a prisoner.  It is the plaintiff's understanding
that the law library copier is funded exclusively through the
inmate benefit account which is funded by commissions paid by
the canteen contractor as a percentage of the gross sales of
canteen to inmates directly into the inmate benefit account,
so no DOC resources are involved.  Because a First Amendment
right of free speech is being restricted by the defendants'
actions, the burden is on the defendants to show that whatever
compelling state interest  is at stake cannot be acheived by
a less restrictive alternative.  Reno v. American Civil Liberties
Union, 521 U.S. 844, 874 (1997).  A less restrictive alternative
would be to allow the plaintiff, who is not indigent, to pay for
as many copies as he wants, and to make a self service copier
available for use in some common area.  Virtually all libraries
provide such self service card or coin operated copiers, as
do many prisons.

The plaintiff is entitled to injunctive relief and damages
for the violation of his clearly established First and Fourteenth
Amendment rights, as well as his rights under the ADA.

VIII RIGHT TO A FUNERAL FURLOUGH.

The plaintiff's brother died on September 21, 2004.  The
plaintiff requested a furlough, escorted by two or more correctional
officers, to attend the funeral.  Complaint, ¶¶ 110-118. Superin-
tendent Murphy denied the plaintiff's request. Complaint, ¶¶

112-114.  The regulations of the DOC give the Superintendent
discretion to authorize inmates in "correctional facilites"
to attend the funeral of a relative by receiving an emergency
furlough under escort.  103 CMR 463.07(2) and 463.11.  Complaint,
¶ 115.

If prisoners in Massachusetts may attend funerals, the
plaintiff    should be treated at least as considerately, if
not more so, and should be allowed to attend in the most integrated
setting appropriate to his needs.  Youngberg, supra, the ADA,
supra. The issue of the plaintiff's brother's funeral is not moot,
because so long as the plaintiff remains incarcerated and he has
living relatives, it is an issue which unfortunately is  likely
to be  repeated, yet evade review.  The case therefore is not
moot.  Olmstead at 527 U.S. 594, n. 6.  The plaintiff is entitled
to declaratory relief, declaring his right to more considerate
treatment than prisoners and to the least restrictive conditions
and most integrated setting appropriate to his needs in the
event that any of his relatives die while he is civilly committed,
and the plaintiff requests to attend their funeral.

IX.  INTERFERENCE WITH MAIL

The defendants Murphy and Dennehy have interfered with
both the plaintiff's incoming and outgoing mail.  Complaint,
¶¶ 119-137. The court has allowed the plaintiff's motion to
                    as exhibits to this opposition
submit ∧ the mail that the defendants contrabanded.   These contra-
banded materials consist of five court decisions which were
e-mailed to the plaintiff at his home by Barbara Fell Johnson,
the Librarian of the Hampshire county Law Library.  Complaint
¶¶ 126-128.

The defendants' only argument on this count  is that the
plaintiff has not alleged any direct involvement by the defendants
Dennehy and Murphy in interfering with the plaintiff's  mail.
Def's  memo, pp. 39-41.  Filed herewith is the plaintiff's third
motion to supplement the complaint, which specifies the direct
involvement of the defendants Dennehy and Murphy.  Their involve-
ment was subsequent to the filing of the amended complaint
in which the initial contrabanding of the court decisions was
alleged.  The same day that the plaintiff received the notice
of contrabanding, September 24, 2004, the plaintiff filed a
grievance regarding this contrabanding.  It took the grievance
officer over a month to deny the grievance on October 31, 2004.
The plaintiff filed an appeal of the grievance denial and at
the same time sent a letter to both Dennehy and Murphy, asking
that they reverse the contrabanding.  The grievance appeal was
denied by Superintendent Murphy on November 4, 2004.  Commissioner
Dennehy never responded to the plaintiff's letter.  All of these
documents are attached to the proposed Third Supplemental Complaint.

The regulation, which the defendants in Superintendent
Murphy's grievance appeal decision claim to be enforcing, is
103 CMR 481.06, the definition of "Publication:"

> "Publication: any book, booklet, pamphlet, magazine, periodical
> newspaper or similar document...which is distributed or made
> available through any means or media for a commercial
> purpose.  This definition includes any portion extracted,
> photocopied, or clipped from such items, provided, however
> that an inmate may receive a maximum of five (5) pages
> per day, except Sundays and postal holidays, of a portion
> extracted, photocopied, or clipped from such items as an
> attachment to personal correspondence, as long as the material
> is not otherwise prohibited by 103 CMR 481, Inmate Mail."
> (emphasis added.)

41

This regulation is part of the "Inmate Mail Policy," which
applies to all "inmates in all state correctional institutions."
103 CMR 481.04.  On its face the regulation is designed to limit
the volume of materials copied from "publications" "made available"
"for a commercial purpose."  Court decisions copied by a county
law library are not publications made available for a commercial
purpose.  These are the written decisions of a government agency
made for a governmental purpose.  The defendants have therefore
acted outside of the scope of this prison regulation, which should
not apply to the plaintiff, since he is not a pisoner.  Nor have
the defendants applied this prison regulation in a way that would
treat the plaintiff more consideratley than prisoners.  Youngberg,
supra.

    The defendants have also violated the plaintiff's clearly
established First Amendment right to receive mail, as set out
in Procunier v. Martinez, 416 U.S. 396 (1974).  The plaintiff
quoted the following passage from Procunier in his November
1, 2004 letter to the defendants Murphy and Dennehy:

        "First the regulation or practice in question must
    further an important or substantial governmental interest
    unrelated to suppression of expresseion.  Prison officials
    ...must show that a regulation authorizing mail censorship
    furthers one or more of the substantial governmental interests
    of security, order and rehabilitation.  Second, the limita-
    tion of First Amendment freedoms must be no greater than
    is necessary or essential to the protection of the particular
    governmental interest involved.  Thus a restriction on
    inmate correspondence that furthers an important or substantial
    interest of penal administration will nevertheless be invalid
    if its sweep is unnecessarily broad."

Id. at 413-414.  This is a "least restrictive alternative analysis,"
which is no longer applicable to prisoners.  Thornburg v. Abbott,

490 U.S. 401, 410 (1989).  "Least restrictive alternative" is
still the standard applicable to civilly committed persons like
the plaintiff.

All other civilly committed mentally ill persons have the
right to "send and receive sealed, unopened, uncensored mail."
G.L. c. 123, § 23(b).  There is no rational basis for treating
the plaintiff more restrictively than persons who have been
civilly committed because they present an imminent danger of
harm to themselves or others.  As a matter of First Amendment
right, Fourteenth Amendment due process, and equal protection
of the laws, the plaintiff is entitled to declaratory and injunc-
tive relief, declaring that the plaintiff is entitled to the
same unrestricted, uncensored sending and receiving of mail
as is guaranteed to all other mental patients under G.L. c. 123,
§ 23(b).  The plaintiff is also entitled to damages for
violation of his clearly established First Amendment rights,
under 41 U.S.C. § 1983.

X.  FURTHER HOUSING CODE VIOLATIONS.

These violations:  the lack of heat in November of 2004,
and the still leaking roof in Unit A-2 and the plaintiff's cell,
are alleged in the second supplemental complaint, ¶¶ 139-142.
The plaintiff's right to relief, specifically an order for repairs,
is argued above with the other housing code violations in Count
IV, pp.       of this memorandum.

## XI.   INTERFERENCE WITH MAIL BASED ON CONTENT.

The plaintiff subscribes to the New Yorker magazine, which in its November 1, 2004, issue contained a pictorial entitled "Democracy" by the late Richard Avedon.  Second supplemental complaint, ¶ 147. The Deputy Superintendent contrabanded the entire issue of the New Yorker, because of one picture in the

in the "Democracy" pictorial on page 85, which showed members of the gay rights AIDS action group, ACT UP, standing naked with the letters "STOP AIDS" stencilled across their chests as a political protest.  Id. pars. 147-150.  Regarding Richard Avedon, the photographer, the plaintiff has alleged:

> "His definitive portraits of the powerful and powerless,
> encompassing, in a manner almost without equal in the history
> of portraiture, the artisitic and political hierarchies
> of the past half century of American life, were almost
> Roman in their severe authority.  But they were not the
> negation of his dancing and delighted fashion photographs,
> as critics sometimes thought: the portraits were the solid,
> mineral form of what was, in the fashion pictures, pure
> liquid.  Both were studies in human performance:  how we
> prepare a face to face the world, and how the world shows
> itself in our faces.  As long as people remain curious
> about life in the twentieth century, they will turn to Avedon's
> photographs to see how it looked, and what it meant."

Adam Gopnik, The New Yorker, October 11, 2004, an appreciation of Richard Avedon.  For purposes of this Rule 12(b)(6) motion to dismiss, it is a reasonable inference, if not explicitly alleged, that the New Yorker, and particularly the "Democracy" pictorial, taken as whole, has serious, literary, artistic or political value.

The plaintiff has never seen the pictorial, or any other part of the November 1 issue.  The entire magazine has been filed with the court, pursuant to a motion, which the court allowed, permitting the plaintiff to file it in support of this opposition.

Copies of page 85 have been mailed to counsel for the defendants, but not to the plaintiff.

The defendants argue that the contrabanding is justified under the "Inmate Mail" regulations which apply to all prisoners in all DOC correctional institutions. Def's memo, pp. 41-42. These regulations allow the exclusion of publications "solely because they contain sexually explicit material or feature nudity." 103 CMR 481.15(3)(c). The defendants claim added authority to exclude "additional types of material that may interfere with the treatment and rehabilitation process" at the Nemansket Correctional Center. 103 CMR 481.15(3)(c); Def's memo, p. 41.

This argument equates "nudity" with "sexually explicit." While many sexually explicit materials contain nudity, nudity per se, is not sexually explicit. If that were the case then Michelangelo's fresco of God reaching out to Adam, both shown with full frontal nudity, on the ceiling of the Sistine Chapel, would be classified as sexually explicit. It is not. Nor is the picture of the naked ACT Up members sexually explicit, they are simply naked.

The DOC's regulations contain limitations on what may be excluded and state that: "The deputy superintendent may not reject a publication solely because its content is religious, philosophical, social or because its content is unpopular or repugnant...." 103 CMR 481.15(3)(b). Also "Sexually explicit material doe not include materail of a news or information type, or material illustrative of medical, educational or anthropological content." 103 CMR 481.15(d). The pictures contained in Avedon's

"Democracy" are clearly of a "news or information type." ACT
UP is a major "gay rights organization." The tactics of ACT
UP are often "unpopular or repugnant," but that is precisely
what has made ACT UP arguably so effective, where other more
respectable organizations have been ineffective. Under the DOC's
own regulations neither the "Democracy" pictorial, nor the New
Yorker should have been excluded.

The only case, which the DOC cites to support its argument,
is a prison case: Thornburg v. Abbott, 490 U.S. 401 (1989).
In that case the Supreme Court upheld prison regulations which
banned sexually explict material which by its nature posed a
threat to the security, good order or discipline of the institution
or facilitated criminal activity. Id. at 413, nn. 6 and 7. Under
those regulations sexually explicit heterosexual material could
be admitted, if it had scholarly, social or literary value,
and there was no specific ban on nudity. Id.

Since the plaintiff is not in prison, Thornburg is not
applicable. Basic First Amendment law protects the plaintiff's
right to receive any speech or published materials which are
not obscene. Under the current constitutional definition material
is legally obscene, if:

> "(a)...the average person, applying contemporary community
> standards would find that work, taken as a whole appeals
> to the prurient interest....;
>
> (b)...the work depicts or describes, in a patently offensive
> way, sexual conduct, as specifically defined by the applicabble
> state law; and
>
> (c)...the work taken as a whole lacks serious literary,
> artistic, political, or scientific value."

Miller v. California, 413 U.S. 15, 24 (1973), as quoted by The

Breyer, J., dissenting in <u>Ashcroft v. American Civil Liberties</u> <u>Union</u>, 542 U.S.    (2004).  The "Democracy" pictorial taken as a whole does not come close to being obscene under this defini- tion.  The average person, applying contemporary community stan- dards, would not find that "Democracy" appeals to prurient interest. It does not depict sexual conduct of any kind; and it does have serious artistic and political value.

Content based restrictions on speech are presumed to be invalid under the First Amendment.  <u>R.A.V. v. St. Paul</u>, 505 U.S. 803, 817 (2000).  The Government has the burden of showing that the restrictions are constitutional.  <u>United States v.</u> <u>Playboy Entertainment Group, Inc.</u>,  529 U.S. 803, 817 (2000). To do this the Government must show that the restriction is narrowly tailored to serve a compelling state interest and that there are no less restrictive alternatives.  <u>Reno v. American</u> <u>Civil Liberties Union</u>, 521 U.S. 844, 874 (1997).

The defendants have not come clsoe to meeting this burden in their motion to dismiss under Rule 12(b)(6).  Essentially the defendants ask the court to take it on faith that because the defendants have a compelling state interest in treating sex offenders, it logically follows that seeing one picture of naked adults in a political demonstration, will interfere with both the security needs of the Nemansket Correctional Center and the rehabilitation program.  There is no explanation of how this will happen, it just self evident, according to the defendants, and therefore no affidavits or other documents are provided to support this assertion of fact, notwithstanding

the requirements of Local Rule 7.2(B)(1).

Under clearly established First Amendment law the plaintiff is entitled to injunctive relief ordering the defendants to allow the plaintiff to receive all issues of the New Yorker, including the November 1, 2004 issue, and to refrain from censoring or reading the plaintiff's incoming or outgoing mail. The plaintiff is also entitled to damages for violation of his First Amendment rights under 42 U.S.C. § 1983.

XII. RETALIATION FOR APPEALING CONTRABANDING.

The last letter, which the plaintiff's brother Daniel mailed to the plaintiff, before Daniel died, contained more than five pages of e-mailed material having to do with the poet Nikki Giovanni. Complaint, par. 131. Pursuant to the defendants' policy of not allowing inmates to receive more than 5 pages copies from a commercial publication per day, the defendants contrabanded the rest of the e-mailed material. Complaint, pars. 129-131. See also Count IX, pp. 39-40 , above. The defendants also have a regulation that provides that property, "permission slips shall not be approved for inmates who have documented contraband in temporary storage in any institution." 103 CMR 403.13(5). In order to receive typewriter ribbons, which the plaintiff had run out of, the plaintiff had to agree to dispose of the balance of his brother's letter, before he could receive the typewriter ribbons on September 9, 2004. Twelve days later Daniel died. Complaint, pars. 110 and 132. The contrabanding of the New Yorker and the five court decisions was still under appeal, when the plaintiff ran out of ribbons again. The defendants

under their regulations required the plaintiff to dispose of
the New Yorker and court decisions before the plaintiff could
receive his next of order of ribbons and other property.  By
the time the property office got around to mailing these items
out, the complaint had been supplemented to include the contra-
banding of these items, and the plaintiff had these items mailed
to the court as exhibits in support of this opposition.
Complaint, pars. 154-159.

"Retaliation, though it is not expressely referred to in
the Constitution, is nonetheless actionable because retaliatory
actions tend to chill individuals' exercise of constitutional
rights.  A.C.L.U. v. Wicomico County, 999 F.2d 780, 785 (4th
Cir. 1993).  Only retaliatory conduct that would deter a similarly
situated individual of ordinary firmness from exercising his
or her constitutional rights constitutes an adverse action to
form the basis of a retaliation claim.  Thaddeus-X v. Blatter,
175 F.3d 378, 398 (6th Cir. 1999) (en banc).  Retaliation may
be actionable even when the retaliatory action does not involve
a liberty interest.  Stanley v. Litscher, 213 F.3d 340, 343
(7th Cir. 2000).  Government actions which standing alone do
not violate the Constitution, may nonetheless be constitutional
torts, if motivated in substantial part by a desire to punish
an individual's exercise of a constitutional right.  Thaddeus
-X, at 386.  What constitues retaliation is not static across
contexts, but rather must be tailored to the different circum-
stances in which retaliation claims arise.  Id. at 398.
"Prisoners may be required to tolerate more than public employees,
who may be required to tolerate more than average citizens,

49

before a retaliatory action taken against them is considered adverse. Id.

Applying this law to the present the case, the Plaintiff has a First Amendment right to seek redress of grievances by using the appeal or grievance process to contest the contrabanding of his incoming correspondence by the defendants. For purposes of this Rule 12(b)(6) motion, the allegation or inference that the defendants' regulation had a chilling effect on the plaintiff's exercise of his First Amendment right to appeal the contrabanding of correspondence, and resulted in his disposing of property before the appeal process was completed, must be taken as true. The plaintiff is not a prisoner or public official. He has to tolerate the least amount of adverse action. As a civilly committed person with a mental abnormality, the plaintiff is if anything, more vulnerable to adverse actions which are retalia-tory. Outside of the Nemansket Correctional Center the plaintiff would be free to go elsewhere to buy ribbons or clothing. In the Correctional Center the plaintiff's only option is to go without, if he wants to pursue his appeal of the contrabanding.

The plaintiff is entitled to relief declaring that the defendants' regulation requiring the plaintiff to dispose of property while an appeal is pending regarding the contrabanding of the property is unconstitutional, and the plaintiff is entitled to an injunction ordering the defendants from enforcing this regulation so long as an appeal is pending.

OTHER ISSUES RAISED BY THE DEFENDANTS' MOTION

    1.  Qualified Immunity.

    The defendants[*] are not entitled to qualified immunity in this case because:

    1)  the constitutional rights asserted were all clearly established at the time of the alleged violations; and

    2)  a reasonable official situated in the same circumstances would have understood that the challenged conduct violated the established right. St. Hillire v. City of Laconia, 71 F.3d 20, 24 (1st Cir. 1995), cert. denied, 518 U.S 1017 (1996). As the defendants observe, "Qualified immunity therefore, does not turn on the government official's state of mind. Rather, it turns on the 'objective legal reasonableness' of the official's action, in light of legal rules that were 'clearly established' at the time time the action was taken. Anderson v. Creighton, 483 U.S. 635, 639 (1987)." Def's memo, p. 46. For purposes of this Rule 12(b)(6) motion, the actions of the defendants, as alleged by the plaintiff, are taken as true to determine whether those action violated clearly established law. Accord, Mitchel v. Forsyth, 472 U.S. 511, 526 (1985). Although the defendants in their memorandum provide the court with an extensive summary of the law of qualified immunity, they have not provided any argument that is specific to each of the rights that the plaintiff alleges was violated by the defendants. For instance, to determine whether the right to the least restrictive conditions of confinement was clearly established during the relevant time period, December 24, 2003 through the present, the court has to examine whether the court decisions, statutes and regulations

  *The defendants Pushkina and O'Donnell have not raised this defense and are not public officials entitled to it.

cited by the plaintiff and determine that they predate the
alleged violation.  The cases cited: <u>Youngberg</u> (1982), <u>Hendricks</u>
(1997), <u>Seling v. Young</u>, (2001)  and <u>King v. Greenblatt</u>, 53
F.Supp.2d (1999); as well as the Consent Decrees (1974) and
the Management Plan (1999) all predate the plaintiff's incarceration
at the Nemansket Corectional Center begining December 23, 2003,
under conditions more restrictive than the prison he had just
come from.  The plaintiff has provided the court with specific
cases, statutes and regulations for each count of the complaint
to show that each action of the defendants violated clearly
established law at the time of the violation.  See the argument
for each count above.

Neither Commissioner Dennehy nor Superintendent Murphy
acted as a reasonable Commissioner of Correction, or Superintendent
should in light of the clearly established law.  This case does
not involve a guard working alone on a cell block at three o'clock
in the morning faced with a spur of the moment decision.  The
Commissioner has a full time Legal Division of lawyers at her
disposal.  Superintendent Murphy has four full time lawyers
of whom Attoney Murray is the supervisor with their office in
the Nemansket Correctional Center.  The decisions by the Commissioner
and the Superintendent involve the implementation of long term
policies and procedures.  These violations have occurred because
the defendants have violated their own Management Plan, Library
Regulations, Mail Regulations, and ignored citations by the
Department of Public Health for violation of its regulations.
Similarly the defendants have ignored the accepted professional
judgment, practice, or standards of treatment professionals,

and ignored the statutes and regulations mandating confidentiality
in treatment.  The defendants have persisted in these violations,
even when the clealy established law has been called to their
attention in correspondence, grievances and appeals.  Under
all of these circumstances a reasonable Commissioner or Superin-
tendent would not have violated the plaintiff's clearly established
rights.  The defendants are not entitled to qualified immunity.

    2.  <u>Liability for Damages</u>.

    The individual defendants are liable for damages in their
individual capacities.  The plaintiff brought this action against
each of the individual defendants in both their individual and
offical capacities.  The defendants argue that they are not
liable for damages in their official capacities.  Def's memo,
pp. 43-44.  The plaintiff has never suggested that they are.
Complaint, pars. 4, 5, 96 and 97.  Under 42 U.S.C. § 1983 the
defendants are liable for damages in their individual capacities
for violation of the plaintiff's civil rights, and the plaintiff
is entitled to injunctive relief against the indivudal defendants
in the official capacities, as well as against Department of
Correction.  In <u>Hafer v. Melo</u>, 502 U.S. 21, 31 (1991) the court
said, "state officials, sued in their individual capacities
are 'persons' within the meaning of Sec. 1983.  The Eleventh
Amendment does not bar such suits, nor are state officers absolutely
immune from personal liability under Sec. 1983 solely by virtue
of the 'official' nature of their acts."  With regard to injunctive
relief, the Court noted that, "Of course a state official in
his or her official capacity, when sued for injunctive relief,

would be a person under Sec. 1983 because 'official-capacity' actions for prospective relief are not treated as actions against the State." See also Kentucy v. Graham, 473 U.S. 159, 167, n. 14; Ex Parte Young, 209 U.S. 123, 159-160 (1908) and Will v. Michigan Dept. of State Police, 491 U.S. 58, 71 (1989).

   3. The Plaintiff's Claims are Not Barred by Res Judicata.

   Res judicata does not apply to any of the plaintiff's claims in the present case, because there is neither identity of the plaintiff  in the present case with the plaintiffs in the King cases, nor is the law under which the plaintiff has been commited the same.  (Contrary to the defendants' arguments. Def's memo, pp. 8-13.)  None of the plaintiffs in the King litigation were committed under the new 1999 version of c. 123A, which enacted a  new and different form of civil commitment some two months after the King litigation concluded with the dissolution of the consent decrees.  King v. Greenblatt, 53 F.Supp.2d 117 (June 21, 1999); St. 1999, c. 74, enacting the new form of civil commitment effective September 10, 1999; Commonwealth v. Bruno, 432 Mass. 489, 491 (2000).

   The plaintiffs in King could not have raised claims for more considerate treatment than prisoners, because most of them were prisoners, still serving their criminal sentences.  Neither the plaintiffs in King nor the courts botherered to distinguish the few plaintiffs whose criminal sentences had expired.  The King litigation began in 1972.  Langton, at 1212.  The Americans with Disabilities Act was not enacted until 1990, and the decision applying the ADA to persons with mental disabilities was not

54

announced until the day after the final <u>King</u> decision on June 22, 1999. <u>Olmstead v. L.C.</u>, 527 U.S. 581 (June 22, 1999). There is one case in the 27 year history of the <u>King</u> litigation which did distinguish between a civilly committed plaintiff, whose criminal sentence had expired, and all of the other plaintiffs, who were still serving concurrent criminal sentences with their civil commitments. In that case the court ruled that the civil plaintiff could not be forced to be double bunked. See <u>Langton</u>, at 1212. If that case is <u>res judicata</u>, then the defendants should be ordered to immediately to stop forcing the plaintiff to double bunk.

In the <u>King</u> litigation when confronted with the plaintiffs' dual status, as both prisoners under a criminal sentence and patients under a concurrent civil commitments, the courts repeatedly retreated to the plaintiffs' prisoner status and applied correctional standards to determine their rights. <u>Langton</u>, at 1212, 1213, 1217; and <u>King v. Greenblatt</u>, 149 F.3d 9, 20 (1st Cir. 1998). For a more detailed history of the "Treatment Center" and the 27 years of federal litigation it engendered, please see the attached appendix on its history. The First Circuit explicitly said that comparing a program for civilly committed persons only with the Nemansket Correctional Center's program for concurrently sentenced and committed prisoners, was "essentially comparing oranges to...apples." <u>King</u>, at 149 F.3d 20 (1998).

The new version of civil commitment which Massachusetts enacted in 1999 was modelled on the Kansas statute approved in <u>Kansas v. Hendricks</u> 521 U.S. 346 (1997) in many respects. See <u>Commonwealth v. Bruno</u>, 432 Mass. 489 (2000). Unlike the

55

the old version where civil commitment was either concurrent
with or in lieu of a criminal sentence, under the new version
civil commitment is a separate proceeding initiated at the conclusion
of all criminal sentences.  In re: Dutil, 437 Mass.  9,  19-20
(2002); and Bruno, at 495.  In upholding the Kansas statute
the court found it not punitive in violation of double jeopardy,
because " the conditions surrounding that confinement do not
suggest a punitive purpose on the State's part. The State has
represented that an individual confined under the Act is not
subject to the more restrictive conditions placed on state prisoners,
but instead experiences essentially the same conditions as any
involuntarily  committed patient in the state mental institution.
Because none of the parties argues that people institutionalized
under the Kansas civil commitment statute are subject to punitive
conditions, even though they may be involuntarily confined, it
is difficult to conclude that persons confined under this Act
are being punished." Hendricks, at 363.

    In addition to the changes in the civil commitment statute
and the recent federal cases interpreting how this form of civil
commitment must be implemented to be constitutional, the facts
of how civil commitment is implemented at the Nemansket Correctional
Center have changed significantly from the facts stated in the
various King decisions. The single biggest change is the overcrowing
of the facility, which was designed to hold 216 prisoners in single
cells, now holds some 300 prisoners in the facility and 300
additional prisoners in an adjoining modular unit which shares
the same chow hall, library, health services unit, gym and yard.
By tripling the number of inmates crowded into the facility the

56

have effectively reduced access to educational and recreational
programs to one third of what it was previously.  Compare the
description of the facility in Langton at 1212-1217, to the
allegations in the Complaint, pars. 14-46.  Vocational and avocational
programs have shriveled to almost nothing, as compared to when
"a large majority of participating patients were usefully involved
in the construction of greenhouses at Bridgewater State Hospital."
Langton, at 1214. Now there is no work release program of any
kind, and                      not a single flower or shrub is planted
on the grounds of the Nemansket Correctional Center.  Complaint,
par. 22.  The yard described in Langton, at 1214, was bulldozed
to construct the modular units which house the additional 300
state inmates, and the new yard is approximately one third the
size.  The authorized absence program ordered by Judge Garrity
in 1989 had 49 patients participating.  Langton, at 1216.
by 1999 no one was participating in the authorized absence program,
renamed the Community Access Program, (CAP).  King, 53 F.Supp.2d
at 131.  Even though Judge Mazzone found that "A community access
program is indispensable in a treatment program." Id. At the
present time no one is in the CAP or the so called Community
Transition House.  Complaint, par 82.  In 1989 there was a "tier
system, under which patients are theoretically threated in the
least restrictive environment." Langton, at 1217. The least
restictive tier was the community transition house.  Id.
Now there is no tier system, and all inmates are subject to
the same level of restrictions.  Complaint, pars. 77-82.

    There is no identity between the plaintiff in the present

case and the plaintiffs in the <u>King</u> cases.  The facts and civil

commitment statute have both changed significantly since <u>King</u>

the cases were decided, and a series of federal decisions,

including <u>Hendricks</u>, <u>Seling</u> and <u>Olmstead</u> have been decided directly

affecting how the new version of civil commitment must be imple-

mented.  All of these factors mean that the <u>King</u> cases have

no collateral estoppel effect on the present case.

    4. <u>Class Certification</u>.

    The plaintiff has not moved for class certification.  It

is therefore premature to rule on class certification.  The

plaintiffs complaint has stated facts which would allow the court

in its discretion to certify a class, so at this stage of the

proceedings under   Rule 12(b)(6), there is no basis to dismiss

this part of the complaint.

    5.  C. 123A is Unconstitutional As Applied to the
        <u>Plaintiff and All Other Civilly Committed Persons</u>.

    The plaintiff has alleged that he and all other civilly committed

persons are being held at the Nemansket Correctional Center

under conditions that are more punitive than the conditions

in comparable level 4 prisons.  Complaint, pars. 13-46.  The

plaintiff alleges that c. 123A is therefore punitive as applied

to all persons "civilly" committed under it, and the statutory

scheme is so punitive in either purpose or effect as to negate

any intention to make the act civil.  Complaint, par. 86.

The plaintiff requests that the court declare that c. 123A is

unconstitutional as applied defacto to the plaintiff and all

other persons committed to the Nemansket Correctional Center,

and order the immediate release of the plaintiff.  Complaint,

58

Prayer for relief, 5.    The defendants argue that even if these allegations are true the relief requested is precluded by the decision in <u>Seling v. Young</u>, 531 U.S. 250, (2001). Def's memo, pp. 37÷39.

In <u>Seling</u> the court held that:  "An Act, found to be civil cannot be deemed punitive 'as applied' to a single individual in violation of the Double Jeopardy and <u>Ex Post Facto</u> Clauses and provide cause for release." <u>Id</u>. at 267.  In reaching this holding the court noted that, "the question whether an Act is civil or punitive is initially one of statutory construction. <u>Id</u>. at 261.  A court must ascertain whether the legislature intended the statute to establish civil proceedings.    <u>Id</u>. "A court will reject the legislature's manifest intent only where a party challenging the Act provides the clearest proof that the statutory scheme is so punitive in either purpose or effect as to negate the State's intention." <u>Id</u>.    In making this deter-mination the court will examine "the conditions of confinement provided by the Act." Id.    The Court in <u>Seling</u>  proceeded on the "assumption" that the Act is civil, and that the allegations of the plaintiff would not be sufficent to refute the prior decision of the Washington State Court that the Act is civil.    Id. at 264-265.    The Court was careful to deliniate that:

1) it was not deciding that a statute cannot be challenged on the basis that it is punitive as applied to everyone  confined under its provisions; <u>Id</u> at 264-265 and 276, n. 2;

2) it was not making a first instance determination of whether the statute is punitive; <u>Id</u>.;

3) it did not "express any view as to how (the plaintiff's)
allegations would bear on a court determining in the first instance
whether Washington's confinement scheme is civil;" Id. at 262;

4) it did not consider the extent to which a court may
look at actual conditions of confinement and implementation
to determine in the first instance whether a confinement scheme
is civil in nature." Id. at 266, and 267, Scalia, J., concurring,
and 270, Thomas, J., concurring in the judgment.

The present case, as alleged by the plaintiff, is distinguish-
able from Seling. The plaintiff is alleging that c. 123A is
is punitive as to all persons confined pursuant to it. The
plaintiff is asking the court to make a "first instance" deter-
mination of whether c. 123A is punitive. The plaintiff is asking
the court to determine whether the conditions of confinement,
as they exist now, and as they have existed over the 50 year
history of c. 123A, are sufficient to refute the determination
of the Supreme Judicial Court that c. 123A is civil.

Factually the Nemansket Correctional Center is very different
from Washington State's Special Commitment Center.  The Nemansket
Correctional Center has a 45 year history of being a correctional
facility, primarily for prisoners still serving their prison
sentences with the added component of treatment.  For at least
the past ten years the Nemansket Correctional Center has been
under the exclusive control of the Department of Correction.
When "civil" commitment was reenacted in 1999 the legislature
adopted the criteria for commitment, which the Supreme Court
had approved in Hendricks, but unlike Kansas and Washington
State, the legislature chose to put the new "civil" commits

into an existing correctional facility that housed 300 state
prisoners still serving their prison sentences, plus, as of
1989 some 189, so called "old civils," many of whom to this
day are still serving prison sentences concurrently with their
commitment.  When the legislature did this, it is presumed to
be aware that there were a number of Federal court decisions
upholding the DOC's imposition of correctional regulations
and restrictions on what these courts considered to be a
correctional facility.  See for instance, <u>King</u>, 149 F.3d 9,
20-22 (1998).  By contrast both Kansas and Washington State
put their commitment centers under the control of their depart-
ments of mental health with the DOCs only providing security
services, and they treated their civil commits in "essentially
the same conditions as for other involuntarily committed persons
in mental hospitals."  <u>Seling</u>, at 262.

Also unlike Kansas and Washington State, in Massachusetts
the Supreme Judicial Court has authoritatively interpreted
c. 123A as permitting the punitive conditions that are alleged
in this complaint.  <u>In re: Dutil</u>, **437** Mass.  **9, 19-20**
(2002)  See also <u>Seling</u>, at 269-270,  Scalia, J., concurring
and explaining that in his opinion if "the state courts authora-
tatively interpret the state statute as permitting the impositions
that are indeed punitive, then and only then, can federal courts
pronounce the statute that on its face is civil to be criminal;"
citing <u>Railroad Comm'n of Texas v. Pullman Co.</u>, 312 U.S. 496,
500-501 (1941).

61

Chapter 123A, its interpretation by the Supreme Judicial
Court, and the actual conditions of confinement are all distinctly
different from the statutes, interpretations and conditions
on which the <u>Hendricks</u> and <u>Seling</u> decisions were based. The
legal issues raised by the plaintiff in this case are also different.
Many of the legal issues, are issues which the Court in Seling
specifically declined to decide, because of the particular posture
of that case when it reached the Court.  The fact that the plaintiff
raises legal issues which are still unsettled, "does not consitute
an 'insuperable bar to relief,' and therefore does not justify
dismissal for failure to state a claim upon which relief may
be granted." <u>Ybara v. City of San Jose</u>, 503 F.2d 1041 (9th
Cir. 1974).

<u>CONCLUSION</u>

With no history of violence or escape, having served his
complete prison sentence for statutory rape for having consensual
sex with four fifteen year old boys, the plaintiff has been
"civilly" committed for a day to life to the Nemansket Correctional
Center, under the exclusive control of the Department of Correction,
confined in conditions more restrictive and punitive than prison.
These conditions of confinement are not the result of the "vagaries"
of the implementation of c. 123A, they are the intended result
of its implementation.  The legislature called this facility
the "Nemansket Correctional Center" intentionally. G.L. c.
123A, Sec. 2.  It gave the Department of Correction exclusive
control of the facility intentionally.  It chose the Nemansket
Correctional Center as the place of confinement, when it reenacted

62

"civil" commitment, even though the Nemansket Correctional
Center was already occupied by 500 prisoners serving state
prison sentences.  It did so in light of 27 years of federal
court litigation, which ended when the federal courts concluded
that the Nemansket Correctional Center, holding primarily prisoners
is esentially correctional, and therefore subject to correctional
restrictions.

   Perhaps the strongest argument that the defendants are
intentionally running the Nemansket Correctional Center as
a prison, is the memorandum of the DOC defendants in support
of their motion to dismiss.  Every case, statute and regulation
cited by the DOC defendants to justify the current conditions
of confinement, is a prison case, statute  or regulations,
establishing standards for the treatment of prisoners .  The
defendants argue vigorously and persuasively that the Nemansket
Correctional Center is just what the legislature called it:
a "correctional facility."  Def;s mem, pp. 29-32.

   "The state cannot have it both ways...Civil status means
civil status, with all the Fourteenth Amendment rights that
accompany it."  Jones v. Blanas, at 393 F.3d 933.  In this
case the state clearly intended to have it both ways:  chosing
the criteria of "civil" commitment to determine who is committed,
and chosing the facilities of a prison as the place of commitment.
This is punitive.  This is intentional.  This is unconstitutional.

   The plaintiff is entitled to relief.

Respectfully submitted,

Joel Pentlarge, Plaintiff

Joel Pentlarge, Pro Se
Nemansket Correctional Center
30 Administration Rd.
Bridgewater, MA 02324

## Certificate of Service

I, Joel Pentlarge, state under the pains and penalties of
perjury that I have served a copy of the foregoing Memorandum
on Mary Murray, Esq., Nemansket Correctional Center, 30 Administration
Road, Bridgewater, MA 02324 by DOC mail, and on Kevin Mulvey, Esq.
1622 Beacon St., Brookline, MA 02446-2201 by first class mail
postage prepaid.

May 11 , 2005

Joel Pentlarge