UNITED STATES DISTRICT COURT
FOR THE
DISTRICT OF MASSACHUSETTS

2005 MAY 13 ⊃ 12: 35    C.A. No. 04-30177-PBS

JOEL PENTLARGE,

U.S. DISTRICT COURT
DISTRICT OF MASS

        Plaintiff,

vs.

ROBERT MURPHY, et al.,

        Defendants.

## APPENDIX

A History of

"Civil" Commitment in Massachusetts,

and the Nemansket Correctional Center

Joel Pentlarge, Plaintiff
Nemansket Correctional Center
30 Administration Rd.
Bridgewater, MA 02324

In 1947 Massachusetts enacted a sexual psychopath law on
the assumption that a specific mental illness exists which is
characterized by the commission of sex crimes, and that there
must be a cure for this mental illness.  Governor's Special
Advisory Panel on Forensic Mental Health, Final Report, September
1989, pp. 11 and 52.  See also King v. Greenblatt, 149 F.3d
9, 19-20 (1st Cir. 1998) (We do not rely on opinions expressed
by that Panel, but on some factual statements which have never
been impugned.)  In 1954 the legislature mandated development
of a Treatment Center.  Report, p. 52.   The statute was further
revised in 1957 as a result of public outrage over an "especially
gruesome sexual murder of two young boys." Id. Initially the Treatment
Center was established at Concord State Prison.  The committed
sex offenders were housed with the general prison population.
There was no staff available for the treatment of the sex offenders
other than such therapy as was available to the total prison
population.  Commonwealth v. Page, 339 Mass. 313, 159 N.E.2d
82, 84-85 (1959).  In Page the Supreme Judicial Court assumed
that c. 123A was nonpenal, but held "that a confinement in a
prison which is undifferentiated from the incarceration of convicted
criminal is not remdial so as to escape constitutional require-
ments of due process," and therefore held Page's commitment
to be invalid. Id. at 85-86.  A year later the SJC upheld the
civil commitment of a defendant to the Treatment Center which
had been moved to a four story wing of the Bridgewater State
Hospital for the criminal insane, using part time staff from
the State Hospital and sharing dining and infirmary facilities
with the criminal insane.  Commonwealth v. Hogan, 341 Mass.372, 376,
170 N.E.2d 327, 329-30 (1960).

the plaintiff in more restrictive conditions than prison
based solely on a generalized statutory requirement that the
plaintiff be held in a "secure facility," because detention
of the plaintiff under these conditions "appears 'excessive
in relation to' this purpose, and could have been carried out
via 'alternative less harsh methods.'" Jones at 934 , citing
Demery v. Arpaio, 378 F.3d 1020, 1028 (9th Cir. 2004); and
Hallstrom v. City of Garden City, 991 F.2d 1473, 1484 (9th Cir.
1994) (quoting Bell at 441 U.S. 539, n.20).  While the require-
ment of Massachusetts State law that civil "residents" be kept
separate from prison inmates, St. 1990, c. 150, § 104, may be
a "sensible" goal, the Commonwealth must "show how "the bevy
of restrictions" faced by the plaintiff is not "excessive in
relation to keeping civil and criminal" inmates apart, and why
this purpose "could not have been achieved by 'alternative and
less harsh methods.'" Jones at 934-5.  If the plaintiff could
be safely housed at Norfolk prison without the extra restrictions
of the Nemansket Correctional Center, it is difficult to see
why he cannot be safely housed without these extra restrictions
now.   Jones at 935 .

     The plaintiffs claims are not barred by res judicata, as
result of the extensive prior litigation regarding the Treatment
Center. (See the Memo of the DOC defendants, pp. 8-13.)  Unfortunately
to understand what was and what was not decided by the prior
litigation it is necessary to review the unexpurgated history
of the Treatment Center.

     In 1947 Massachusetts enacted a sexual psychopath law on

Conditions on the State Hospital side of this facility during this era were exposed in the documentary film "Titicutt Folies" by Frederick Wiseman.  On the Treatment Center side condition in 1972 were "medieval--worse than those obtaining in the prison system."  Langton v. Johnston, 928 F.2d 1206, 1212 (1st Cir. 1991).  Specifically:

> Residents lived in cramped, poorly furnished cells which were built in 1895.  Their water supply came from the highly polluted and inadequately treated Taunton River.  At various times in 1972, 1973, and 1974, the bacterial level of the river water after chlorination failed to meet safe drinking water standards.  Even the potable water supply from wells was exposed to danger of pollution from a nearby dump. Moreover, it was continually interrupted due to the Center's antiquated plumbing system which dated back to 1888.  The Center's sewerage system was similarly outmoded and substandard having had no work done on it since 1934.  The cells were without toilets or sinks.  Instead, residents were forced to keep small chamber pots in thier cells in which to defecate and urinate.  Every morning residents lined up and carried their human waste to empty into a service sink at the end of their floor.  The service sink was located within a few feet of a large cast iron trough used for washing. Washing and shaving took place in open view of urinating and defecating activities. The shower facility was located outside the housing unit across an outdoor courtyard.  Thus, residents seeking to shower were forced to walk outside, even during the cold winter months.  Heating and ventilation equipment was obsolete, and some cells were without heat for periods of several days.  There was only one licensed doctor at the Treatment Center and no nurses.  Medication was handed out by correctional officers.  There was no library, no educational programs, no gymnasium, no outdoor recreation area, and no work-release or community access program. Vocational facilities were very limited.  Nor was there any tier-system of security.  Instead, all residents were housed under maximum security conditions.  Movement was restricted as correctional officers on patrol did not carry cell keys.  All keys were kept in one location and each cell had to be opened individually.  These were the conditions that existed at the time of the consent decrees. They are representative of the circumstances that the consent decrees aimed to correct.

King v. Greenblatt, 53 F.Supp.2d 117, 119 (D. Mass. June 21, 1999

Mazzone, J.)

The consent decrees are surprisingly succint and in five short paragraphs vested control of the Treatment Center in the Department of Mental Health with the DOC responsible for custodial staff. Id. at 120.  This was consistent with c. 123A as it was then written.  Id. n. 5.  As noted above the essence of the original decrees was in paragraph 5 which provided that "patients at the Treatment Center should have the least restrictive conditions necessary to achieve the purposes of commitment." King v. Greenblatt, 149 F.3d 9, 15 (1st Cir. 1998).  The relevant portions of the consent decrees are set out in less than one page in Langton v. Johnston, 928 F.2d 1206, at 1227-28 (1st Cir. 1991).

As a result of the consent decrees the Treatment Center was moved from the "ancient buildings of old Alms Farm at Bridge-water" to a new facility constructed in 1986 with 216 single bunked cells.  The Governor's Panel Report, p. 52; and King, at 53 F. Supp.2d 125.  Judge Mazzone in describing the new facility wrote:

> Patients now live in humanly scaled housing units of twenty-four or thirty rooms, with large multi-level common areas. Depending on the unit's privilege status, washing machines and kitchen facilities may be located in the common area. All individual rooms are well-lit and nicely furnished. Unlike their predecessors, they are equipped with modern toilets and sinks, and a shower room is located off of the common area within each housing unit.

Langton v. Johnston, 928 F.2d 1206, 1212-13.  By the 1989 Governor's Panel Report, the Treatment Center had been averaging 19 commitments per year and 11 releases per year, so the population was continually growing, and exceeded the capacity of the newly constructed facility.  Report, p.53.

In order to deal with the excess prisoners the Treatment Center
began conditioning maximum privileges and treatment on the inmate's
agreeing to be double bunked.  Langton v. Johnston,  928 F.2d at
1211.

     In 1986 six pro se patients at the Treatment Center filed
a complaint alleging that (1) no adequate treatment was being
provided, and (2) " the Treatment Center was being run impermissibly
as a correctional facility rather than as a mental institution."
Id.  All of the plaintiffs in that case were still serving
criminal sentences at the Treatment Center, with the exception
of one plaintiff, whose criminal sentence had expired, so that
he was only being held on the basis of a civil commitment to
the Treatment Center.  Id. at 1212.  This case Langton v. Johnston,
was certified as a class action and tried before Judge Mazzone. Id. 1212.

     Judge Mazzone found, and the First Circuit affirmed, that the
treatment was adequate, examining five separate areas.

     1.Education.  The reading proficiency of 75% of the population
was below the eighth grade and less than 25% had a high school
diploma or the equivalent. Id. at 1213.  As of mid-March 1989,
102 patients were participating in various special needs/educational
programs, and 34 were receiving classroom instruction for five
periods per day, five days per week. Id. 105 patients were taking
part in other educational efforts, including 31 who were taking
college courses offered by visiting faculty from Massasoit Com-
munity College and Bridgewater State College, and 6 who were
taking G.E.D. courses. Id.  On average 89 patients visited the
library each day.

2.  Vocational and Avocational Programs.  By 1989, 195
patients were participating in either vocational or avocational
programs. Id. at 1214.  A large majority were involved in the
construction of greenhouses at Bridgewater State Hospital.
Nine patients were in a work-release program, leaving each day
to work at local jobs and returning each evening.  Id.

3.  Recreation.  The gym was used by 146 patients per day
with a weight lifting area which included free weights.  Id.
and ancedotally from older inmates regarding the free weights.
An "excellent outdoor recreation area" included a baseball
diamond and track, as well as picnic tables, benches and access
to a bathroom. Id.  anecdotal as to the benches, picnic tables
and bathroom access.  Board games were available in the common
areas adjacent to each unit.  Id.  There was also a recreation
advisory board composed of patients. Id.

4.  Theraputic Programs.  In 1989 the Treatment Center
was in the process of switching "psychodynamic treatment" to
behavioral/rehabilitative or cognitive behavioral therapy. Id.
at 1215.  Judge Mazzone concluded that the treatment offered
satisfied the requirements of the consent decrees, notwithstanding
short comings in staffing, and failures to follow or update
individual treatment plans.

5.  The Authorized Absence Program.  The Authorized Absence
Program was ordered by Judge Garrity and allowed patients to
live in the outside community on a limited basis. Id. at 1216.
As of 1989 some 58 patients had some form of access to the community
through this program.  Governor's Panel Report, p.48.

Judge Mazzone changed the second issue raised by the 1986 law suit from is "the Treatment Center ... being run, impermissbly, as a correctional facility rather than as a mental health institution;" to "did a correctional philosophy so dominate operations as to impede development of an effective therapeutic regime?" Id. at 1211 and 1213.  The First Circuit affirmed Judge Mazzone's conclusion that the security based classification system materially advance the therapeutic environment. Id. at 1217.  In affirming this decision the First Circuit took a number of factors into account.

The psychiatric profile of the Treatment Center population included 15% who did not suffer from any known mental disorders, 10% who suffered from extreme psychoses, such as schizophrenia and bipolar disorders, the remaining 75% who suffered from "an array of moderate mental disabilities, including problems associated with substance abuse, boderline personality disorders, and paraphilia." Id. at 1216.

The court went on to explain:

> Commitment to the Treatment Center is intended not only to provide an opportunity for treatment but also to protect society.  Knight v. Mills, 836 F.2d 659 667 n.11 (1st Cir. 1987)  Because every patient is a convicted sex offender, and a majority of them have some kind of mental deficiency, the defendants face legitimate security concerns. These concerns are exacerbated by the absence of statutory authority to deny commitments or to transfer intractable patients.  Thus, the Treatment Center is forced to accomodate patients who are continually disruptive and who show no signs of rehabilitation.  According to expert testimony, credited by the lower court, the lack of transfer authority, combined with the involuntary nature of the commitment process, distinguishes the Treatment Center from every other facility for sexually dangerous persons in the United States.

Id.

According to the court the Treatment Center had implemented
a movement control system, and tier system, "under which patients
are theoretically treated in the least restrictive environment"
and the level of privileges is inversly proportional to the
level security threat posed by each patient.  Id at 1217.
The trial judge found these limitations    reasonable in light
of the "violent and aggressive" nature of certain patients.
Id.  At the time of trial 16 patients were in the pre-release
house, 149 patients had maximum privilege status, 78 had moderate/
maximum status, 21 patients had moderate status, and 22 had
minimum status. Id. n. 12.

    The Governor's Special Advisory Panel in 1989 reached substan-
tially different conclusions.  It concluded that "only a handful
of men at the Treatment Center suffer from a diagnosable mental
illness."  Report, p. 11.  Since "sex offenders generally are
not mentally ill; repeat sexual violence is a criminal behavior,
not a mental illness, and therefore cannot necessarily be 'cured.'"
Report at 48.  Of the 264 men committed at the Treatment Center
in 1989, 188 were still serving criminal sentences concurrently
with their commitment to the Treatment Center, and 75 had either
completed their criminal sentence or had never received a sentence
and were being held at the Treatment Center based on their day
to life civil commitment only.  Report, p. 56.  The effectiveness
of sex offender treatment "remains questionable" and "the data
seems to indicate that the efficacy of treatment programs for
sex offenders has not been proven."  Report. p. 60.  The Panel
recommended that c. 123A be reformed by making no new commitments
to the Treatment Center.  Report, p. 68.  The legislature adopted

the Panel's recommendation and repealed civil commitment, so
that no new commitments would be made, but the persons still
                              would remain there
in the Treatment Center^until they were either found to be no
longer sexually dangerous or they died. Report, p. 68, and St.
1990, c. 150, §304. King v. Greenblatt, 53 F.Supp.2d at 121.
See also In Re Donald Pearson, 990 F.2d 653, 662, n.3.

        The Governor's Panel also recommended that the Treatment
Center be turned over to the exclusive control of the DOC, and
that c. 123A be completely repealed by 1994. Report, pp. 68-
69.   The legislature by St. 1993, c. 489, amended c. 123A to
give the DOC exclusive control of the Treatment Center. King
v. Greenblatt, 52 F.3d 1, 3 (1st Cir. 1995). The rest of c.
123A was left intact and the statute as a whole was never repealed.
After substantial further litigation the courts approved the
transfer.  King v. Greenblatt, 149 F.3d 9 (1st Cir. 1998).
In litigating the issue of exclusive DOC control, the court
allowed a class of "48 + 1" to intervene as plaintiffs in the
King case.  In approving exclusive DOC control the First Circuit
noted that consent decrees remained unmodified in their "requirement
that 'patients at the Treatment Center should have the least
restrictive conditions necessary to achieve the purposes of
commitment.'" Id. at 15.  The plaintiffs' appeal was based on
the claim that the DOC had "essentially turned the Treatment
Center into a prison and fundamentally altered the therapeutic
community." Id. at 16. The plaintiffs pointed out that the
Authorized Absence Program, now renamed the Community Access
Program (CAP) had shrunk from 56 participants in 1988 to two
in 1997. Id.  Although the process of being approved for community
access          "indeed daunting" and "attenuated", it could not rule

10

the new CAP program "out of bounds", or in "this most sensitive
area of tension between safety and treatment  and between the
individual and the community," could it say that "CAP is not
the least restrive feasible response." <u>Id</u>.  The court also
found that the more restrictive behavior control approach of
the DOC was justified based on expert testimony that, "every
attempt must be made to apply program rules, and sanctions for
violation of such rules, in a uniform and fair manner, and to
avoid the perception (or reality) that civilly committed residents
have privileges and rights which exceed those of their DOC peers."
<u>Id</u>. at 20.  This expert also found "the restrictions on residents'
privileges, such as visits and mail, to be 'consistent with
standards found in correctional treatment programs nationwide.'"
<u>Id</u>.  Dr. Barbara Schwartz, who was then the Clinical Director
of the Treatment Center added her opinion that, "Every sex offender
program in the country which is operated by a corrections department
adheres to the disciplinary policy of the institution." <u>Id</u>.
The court concluded by observing:

> What we have said in upholding modifications of the Decrees
> concerning the DOC's Plan should not be construed as rulings
> foreclosing issues arising out of Plan administration in
> the future.  What we have done is to survey the new regime,
> its general approach, and to give a green light.  That
> does not mean that reckless driving will be immune from
> review.  We rely on the district court, which has commendably
> shown it readiness to exercise its oversight powers.

<u>Id</u>. at 22.

The same legislation which ended civil commitment, c. 150,
§ 104 of the Acts of 1990, also allowed the DOC to use the empty
cells, which became available through attrition of the civilly

11

committed, for state prison inmates, provided the prisoners
were kept separate and apart from the civils. King at 53 F.Supp.2d
117, 125 (D. Mass. 1999, Mazzone, J.)  Following another recom-
mendation of the Governor's Panel, the DOC began offering voluntary
sex offender treatment to state prisoners, who were housed in
the empty cells at the Treatment Center. Id. at 121.  The district
court allowed the DOC to construct a 300 bed "modular unit"
on the grounds of the Treatment Center to house 300 convicted
sex offender prisoners, who were still serving their prison
sentences, so that their treatment could be integrated into
the treatment offered to remaining civilly committed inmates.
Id. at 122.  Judge Mazzone was persuaded that inspite of this
influx of prisoners into the Treatment Center, its program "would
remain the same, that is, remedial, and that the DOC's plan
provided priority to residents over inmates whenever possible
and feasible." Id.  Judge Mazzone noted that the prisoners were
being double bunked in the cells that they occupied in the Treatment
Center, and cautioned the DOC that its "operation of the Treatment
Center, particularly with regard to the separation of the civils
[from the prisoners], will never be immune from  scrutiny." Id.
at 125.

     The DOC moved to disolve the consent decrees.  Judge Mazzone
saw two major problems confronting the Treatment Center.  Id.
at 135.  One was the Community Access Program. Id. At the time
of the hearing on the motion to disolve the consent decrees,
not a single resident was involved in the CAP, yet the clinical
director and other experts testified, and the court found, a

12

"community access program is indispensable in a treatment program.
Id. at 132.  One witness "candidly acknowledged, there are
difficulties in operating a sex offender treatment program in
Massachusetts at this time." Id.   The court felt "This acknowledg-
ment is especially noteworthy because it underlines the challenge
to the DOC to operate the Treatment Center amidst a currently
adverse political climate." Id. Judge Mazzone's other concern
was the influx of 360 DOC prisoners. Id. at 135.  Notwithstanding
these reservations Judge Mazzone terminated the consent decrees.
Id. at 136.

Judge Mazzone issued his decision terminating the consent
decrees on June 21, 1999.  On September 9, 1999, the legislature
in response to the brutal murder and rape of ten year old Jeffrey
Curley by Salvatore Sicari and Charles Jaynes, renacted civil
commitment.  See Commonwealth v. Sicari, 434 Mass. 732 (2001).
Unlike the former version of civil commitment which provided
for civil commitment concurrently with criminal sentences or
in lieu of a criminal sentence, the new version provided for
civil commitment only after the individual to be committed had
completed all of his criminal sentences.  The new version was
closely modelled on the Kansas civil commitment statute which
had been recently upheld in Kansas v. Hendricks, 521 U.S. 346
(1997).

Instead of the steadily decreasing number of civil inmates
that the legislature, the DOC and Judge Mazzone assumed, the
number of civils has increased from 188 in 1999 to just over
300 at present.  Of the 300 civils roughly 75 are detainees
who have completed their criminal sentence and are being held

13

pending the outcome of a hearing on petitions to civilly commit
them.  Once again more men are being committed each year to
the Treatment Center than are being released, and the trend
is for increasing numbers of commitments.

Two years  after Judge Mazzone issued his decision on
July 16, 1999, Judge Hinkle sitting in the Suffolk Superior
decided Durfee v. Maloney, et al.,  Docket numbers 98-2523 and
98-3082, declaring that St. 1990, c. 150, §104 was still in
effect and required that civilly committed inmates be kept separate
and apart at all times from state prison inmates.  Until the
Durfee  civils and prisoners used the yard, gym, library and
classrooms together.  After the Durfee decision, the DOC to keep
civils and prisoners apart, instituted separate times for each
to use the yard, gym, library, classrooms, and even corridors
and chow hall.  This meant that the time available for each
group to use the common facilities was literally cut in half.

In the 27 years of litigation over the consent decrees
from 1972 to 1999 the vast majority of the plaintiffs were
still serving prison sentences at the same time that they were
civilly committed, and in this respect the plaintiffs accurately
mirrored the composition of the population in the Treatment
Center.  When confronted with the plaintiffs' dual status as
both patient and prisoner, the courts repeatedly retreated to
the plaintiffs' prisoner status and applied correctional standards
to determine their rights. Supra, pp. 20, 22, 23 and 25.
The First Circuit explicitly said that comparing a program for
civil commitments only to the Treatment Center's program of both
civils and prisoners, was "essentially comparing oranges to

14

...apples." <u>King</u>, at 149 F.3d 20 (1998).  The only time that the courts made a distinction based on a plaintiff's status of civil versus prisoner, was in 1987 when Judge Youn ruled that a plaintiff whose criminal sentence had expired and who was therefore being held only on his civil commitment, could not be forced to agree to being double bunked as a condition of receiving treatment.  <u>Langton v. Johnston</u>,  928 F.2d 1212.

Respectfully submitted,

Joel Pentlarge, Plaintiff

Joel Pentlarge
Nemansket Correctional Center
30 Administration Rd.
Bridgewater, MA 02324