UNITED STATES DISTRICT COURT
DISTRICT OF MASSACHUSETTS
EASTERN DIVISION

**CIVIL ACTION NO. 04-30177-PBS**

**JOEL PENTLARGE,**
  **Plaintiff,**

v.

**ROBERT MURPHY,** *et al.,*
  **Defendants.**

### MEMORANDUM OF LAW IN SUPPORT OF MOTION OF DEFENDANTS ROBERT MURPHY AND KATHLEEN DENNEHY TO DISMISS THE THIRD SUPPLEMENTAL COMPLAINT

Robert Murphy and Kathleen Dennehy (collectively, the "DOC Defendants") submit this memorandum in support of their motion to dismiss the Third Supplemental Complaint. For the reasons set forth below, this Court should grant this motion.[1]

In support of their motion, the DOC Defendants rely on the memorandum of law submitted on March 1, 2005 ("original memorandum").

### **FACTUAL ALLEGATIONS**[2]

The plaintiff alleges that, in September 2004, he wrote the librarian at the Hamphire County Law Library, requesting copies of five cases allegedly not available at the Treatment Center law library. Supplemental Complaint, ¶ 125. He alleges that the librarian downloaded these cases from Westlaw and e-mailed them to his office. Supplemental Complaint, ¶ 127. The plaintiff alleges that the entire e-mail was printed (by an unidentified person) at his office and mailed to him. Supplemental Complaint, ¶ 128. On September 28, 2004, he received the first six pages of the e-mail, along with a notice informing him that the balance of the printed pages were

---

[1]   The plaintiff does not raise a claim against the Department of Correction in this Count.

deemed to be contraband under 103 CMR 403, <u>Inmate Property</u>. Supplemental Complaint, ¶ 129. The plaintiff also alleges that his brother sent him a letter with more than five pages of e-mailed material. Supplemental Complaint, ¶ 131. According to the plaintiff, the e-mailed pages exceeding five pages were also deemed to be contraband. Supplemental Complaint, ¶ 131.

The plaintiff alleges that he filed a grievance relating to the contraband. Third Supplemental Complaint, ¶ 162. He alleges that the grievance was denied. Third Supplemental Complaint, ¶ 162. He appealed the denial of the grievance, which appeal was denied. Third Supplemental Complaint, ¶¶ 163, 164, 166. He also claims that he wrote to Superintendent Murphy and Commissioner Dennehy about this issue, but did not receive a response from Commissioner Dennehy. Third Supplemental Complaint, ¶ 165.

## ARGUMENT

### THE PLAINTIFF HAS FAILED TO STATE A CLAIM AGAINST SUPERINTENDETN MURPHY AND COMMISSIONER DENNEHY FOR INTERFERENCE WITH MAIL.

The plaintiff alleges that the DOC Defendants have violated his First Amendment rights to freedom of speech and to seek redress of grievances and his Fourteenth Amendment right to access to the courts. Supplemental Complaint, ¶ 135. He seeks damages and injunctive relief under 42 U.S.C. § 1983. The plaintiff also claims that the "interference" with his mail violates the provisions of 103 CMR 481, <u>Inmate Mail</u>. Supplemental Complaint, ¶ 136. He also claims that the "interference" with his mail violates his right to substantive due process under the Fourteenth Amendment because it is not "the least restrictive alternative" and does not treat him more considerately than prisoners. Supplemental Complaint, ¶ 137. The plaintiff's claims fail on their face.

---

[2]     The plaintiff's allegations are accepted as true for purposes of this motion only.

### A.   The Exclusion of the E-Mailed Material Does Not Violate the Plaintiff's Constitutional Rights.

The plaintiff claims that the contrabanding of the e-mailed material violated his right to seek redress of grievances and his right of access to the courts. The plaintiff has failed to state a claim upon which relief may be granted.

Notably absent from his complaint is any allegation of actual harm arising from the DOC Defendants' alleged conduct. The plaintiff has made no allegation that he has been prevented from pursuing claims related to his confinement, prior convictions or civil commitment. Indeed, his filings in this case alone demonstrate that he has been provided with ample access to the courts.[3] The absence of an allegation of actual injury is fatal.

To establish a denial of access to the courts, a plaintiff must allege actual injury in the presentation of a nonfrivolous claim relating to his sentence or his conditions of confinement. *See Lewis v. Casey*, 518 U.S. 343, 116 S.Ct. 2174, 2179, 2181, 2182 (1996). The injury suffered must be substantial, such as the dismissal of an action or the inability to file a complaint. *Id.* at 2180-2181. The plaintiff baldly asserts that he has been deprived of access to the courts but makes no specific claim of an actual, substantial injury. Indeed, the plaintiff makes no specific allegation that he sought to acquire copies of these cases to pursue his own legal matters involving his conviction or conditions of his confinement. Accordingly, this claim must be dismissed.[4]

The plaintiff's claim that the contrabanding of the e-mailed material violates his right to freedom of speech also fails. The plaintiff was not prevented from communicating with his

---

[3]   Since the plaintiff is now represented by privately retained counsel, he certainly cannot claim any ongoing harm.

brother or the other unnamed person who sent the other e-mailed materials to the plaintiff.[5] Rather, the plaintiff was not permitted to communicate by receipt of the e-mailed material. The plaintiff retained other ways to communicate with his brother, including by telephone and correspondence. Likewise, the plaintiff was not precluded from communicating with anyone else. Indeed, he has not claimed that he was even prevented from obtaining copies of these cases. Rather, he has merely claimed that he was not able to obtain these documents in e-mailed form through incoming non-privileged mail. Accordingly, the plaintiff has failed to state a claim upon which relief may be granted.

### B. The DOC Defendants Are Entitled to the Protection of Qualified Immunity.

To the extent that the plaintiff claims that the application of the inmate property regulations and the inmate mail regulations to him *per se* violates his federally protected rights, his claim fails because the DOC Defendants are entitled to the protection of qualified immunity.

As discussed in the DOC Defendants' original memorandum at pages 44-48, the plaintiff must establish that the DOC Defendants deprived him of a federally protected right that was clearly established at the time of the alleged conduct. The plaintiff cannot make this showing.

As detailed in the DOC Defendants' original memorandum, DOC submitted an Amended Management Plan to this Court in the context of the consent decree litigation. See Original Memorandum, pp. 4-5. In the Amended Management Plan, DOC specifically indicated its intention to apply 103 CMR 403, Inmate Property Policy, and 103 CMR 481, Inmate Mail, to

---

[4] This Court should not entertain any further motions to amend from the plaintiff. The plaintiff has been given leave to amend the complaint several times.
[5] While the plaintiff claims that he had to agree to have the e-mailed material sent from his brother destroyed in order to receive incoming property, Supplemental Complaint, ¶ 132, that is not the case. Under the property regulations, the plaintiff had the choice of having the property retrieved by a visitor, having the property mailed out to a specific destination or having the property disposed of as seen fit by the Treatment Center. 103 CMR 403.14(l).

SDP's.  See Exhibit 1, pp. 35-36, 38-39.[6]  When SDP's complained about changes in the Treatment Center's operation, the First Circuit held that "`the Plan justifies some reduction in these privileges because of past experiences with security, assault, gambling, coercion and interruptions in treatment," and `[n]o reduction rises to the level of a constitutional infraction.'" *King v. Greenblatt*, 53 F.Supp.2d 117, 134 (D.Mass. 1999), *quoting King v. Greenblatt*, 149 F.3d 10, 19 (1st Cir. 1998).  This Court has stated that it is the Amended Management Plan, "together with the policies and procedures implemented under that Plan, which are the governing documents for the Treatment Center."  *King*, 53 F.Supp.2d at 122.

The consent decrees mandated that Treatment Center residents "have the least restrictive conditions necessary to achieve the purpose of commitment." *See, e.g., King v. Greenblatt*, 52 F.3d 1, 2-3 (1st Cir.), *cert. denied*, 516 U.S. 863 (1995).  By approving the Amended Management Plan that specifically incorporated the application of the inmate property and mail regulations to SDP's, the federal court has already approved these procedures as the least restrictive conditions necessary to achieve the purposes of commitment.  Indeed, after reviewing the Amended Management Plan, the Court stated that:

> Effective treatment is offered; physical conditions have improved greatly; there are differing levels of security; meaningful work, education, and avocational programs; and discipline, including sequestration, conforms to acceptable standards of due process; all under the least restrictive conditions necessary to achieve the purposes of commitment, namely, the care, treatment, rehabilitation, and custody of sexually dangerous persons.

*King*, 53 F.Supp.2d at 137.

Thus, the plaintiff cannot show that the application of these regulations to SDP's violated any of his clearly established federal rights.  Rather, just the opposite is the case.  That is, DOC's ability to apply these regulations to SDP's has been established and approved by the federal

---

[6]   To the extent that this motion addresses facts outside the plaintiff's various complaints, the Court may treat

courts through the consent decree litigation. The plaintiff's claim, therefore, fails as a matter of law.

Further, for the reasons set forth in the DOC Defendants' original memorandum at pages 8-12, the principles of res judicata and collateral estoppel also bar any claim that application of these regulations violates any federally protective right or requirement that SDP's be held in conditions that constitute the "least restrictive alternative" to achieve the purposes of commitment.

Accordingly, this Court should dismiss this claim against the DOC Defendants.

### C. The Plaintiff Has Failed to State a Claim for Violation of the Mail Regulations.

To the extent that the plaintiff seeks to pursue a claim under state law for alleged violation of the mail regulations, he fails to state a claim.

The DOC Defendants have not violated the mail regulations because 103 CMR 481, <u>Inmate Mail</u>, specifically provides that incoming non-privileged mail is subject to the provisions of 103 CMR 403, <u>Inmate Property Policy</u>. 103 CMR 481.13. Thus, incoming non-privileged correspondence and packages are subject to opening and inspection before delivery. 103 CMR 481.13.

The property regulations provide, in relevant part, that "Authorized inmates may possess a maximum of ten books, magazines and newspapers. <u>All publications must come directly from the publisher or a pre-approved distributor or book club.</u>" 103 CMR 403.10(7)(d) (emphasis added). The e-mailed material did not come directly from the publisher. Some of the e-mailed materials came from the plaintiff's brother. The reminder of the e-mailed materials were apparently sent by some unidentified individual to the plaintiff. Accordingly, these e-mailed

---

this as a motion for summary judgment.

materials were properly excluded.  Indeed, allowing the plaintiff to retain five pages from each set of e-mailed materials gave the plaintiff more than he was entitled to under the property regulations.  The plaintiff has failed to state a claim.

## CONCLUSION

For the foregoing reasons, the DOC Defendants respectfully request that the Court dismiss the Third Supplemental Complaint and Count IX as it relates to them.

> Respectfully submitted,
> Massachusetts Department of Correction,
> Kathleen Dennehy and Robert Murphy,
>
> By their attorneys,
>
> NANCY ANKERS WHITE
> Special Assistant Attorney General
>
> /s/ Mary P. Murray_____
> By:  Mary P. Murray, Counsel  (BBO # 555215)
> Department of Correction
> Massachusetts Treatment Center
> 30 Administration Road
> Bridgewater, Massachusetts 02324
> (508) 279-8184
> (508) 279-8181 (fax)
> MPMurray@DOC.state.ma.us

Dated: July 29, 2005

## Certificate of Service

I hereby certify that I caused a copy of the within document to be served by first class mail, postage pre-paid as follows:(1) John Swomley, Esquire, counsel for plaintiff Joel Pentlarge; and (2) Kevin Mulvey, Esquire, counsel for defendants Pushkina and O'Donnell, Mulvey & Sneider, LLP, 1622A Beacon Street, Brookline, MA  02446-2201.

> /s/ Mary P. Murray_____
> Mary P. Murray

Dated:  July 29, 2005

COMMONWEALTH OF MASSACHUSETTS

DEPARTMENT OF CORRECTION

AMENDED MANAGEMENT PLAN

FOR THE

ADMINISTRATION OF THE

TREATMENT CENTER

November 29, 1996

continue to be available for supervised unit functions and for therapy groups, where JRI staff will be present.

    2. The Department of Correction will modify room visits, which is currently a level 2 and 3 privilege. Room visits have presented a problem for the facility. In a treatment facility where residents are sent to learn to control their inappropriate and often violent sexual impulses, it is simply counterproductive to provide them unlimited opportunities to engage in sexual activity contraindicated by their treatment regimens. The practice of permitting residents in each others' rooms has facilitated sexual coercion and rape, strongarming, assaults, substance abuse, escape[18] and other illicit and harmful activities. The Treatment Center has taken the first step in addressing these problems by making room visits a privilege. Moreover, room visits have been limited to visits within one's own housing unit; residents cannot visit the rooms of residents in other housing units. During room visits, the doors must remain open. The Department will continue the effort to make room visits safer by requiring that any resident visiting the room of another check in with a unit officer before entering and after exiting the room. The officer will be better able to monitor room visits and ensure that only those approved for room visits enter the rooms of others. Also, the unit officer will note the visit in the unit log. This will make it more difficult for a resident who is assaulted in a room or who engaged in inappropriate behavior in a room to deny that he was in the room.

    3. Preferential job assignment and/or job hours will be considered as a privilege to be awarded for treatment participation.

    4. Although not a specific function of privilege level, it is noted that since 1995, earned good time has been awarded for treatment participation.

    B.    <u>Property and Furnishings</u>

The original plan documented significant safety and security problems with the existing room furnishings and the existing property policy. The problems and the Department's plans to remedy these issues are summarized as follows:

    1. To improve fire safety standards, the Department will replace the wooden room furnishings with metal furnishings as funding becomes available.

---

[18] The three individuals who escaped from a room on the Minimum Privilege Unit on October 1, 1989, took advantage of the room visit privilege to work together in breaking out of the room.

36

2. The Department of Correction will replace existing property rules with the Department's property policy, 103 CMR 403 (Appendix 10). However, because of the unique nature of the institution and its civilly committed population, a special institutional Property Policy Statement, 103 MTC 403 (Appendix 11) will issue at the same time for the purpose of to authorizing property for retention by Treatment Center residents in addition to the property approved for retention pursuant to 103 CMR 403.

C. Funds

As set forth in the original plan, the Department of Correction has found significant safety and security problems with certain existing practices for handling inmate funds and financial transactions, including unlimited expenditures on canteen items, unrestricted property transfers among residents, and the utilization of credit cards. Such practices have resulted the creation of a "black market" economy, strongarming, extortion, gambling, drug purchases, and mail-order fraud.

The Department of Correction will implement its Inmate Funds policy, 103 CMR 405 (Appendix 5). Utilization of this policy will result in the following: First, resident-to-resident transfer of funds will be eliminated. Second, credit card usage will be prohibited, except for participants of the transition program. Third, weekly canteen expenditures will be restricted to $60.00 per resident. Canteen expenditures will be made by direct transfer of funds from the resident's account, eliminating the use of tickets.

D. Visits

The Department of Correction will implement the visitation regulations at 103 CMR 483 (Appendix 12), with a procedural statement addressing any special institutional procedures.[19] The following changes in existing visitation rules will occur:

1. Treatment Center policy currently permits "professional visits," which allows the residents on their own to retain the services of private clinicians and therapists. This practice will be eliminated since it is incompatible with the goals of providing quality care and treatment. First, it is a fundamental principle of quality assurance in any in-patient setting that only persons who have been granted staff privileges may practice at the facility. Staff privileges are granted only to persons who meet the facility's credentialing criteria. No reasonable facility permits outsiders to walk in off the street and practice on its patients. Second, there can be no clinical accountability and quality assurance without complete clinical records. Under the current

---

[19] Separate regulations for attorney access, 103 CMR 486, are attached in Appendix 13.

38

and to prevent the flow of contraband, in particular controlled substances, into the facility. First, in addition to emptying their pockets as is done now, all visitors will have to turn their pockets inside out so that security staff may look for holes, which may indicate an intention to transfer contraband. Second, the facility will adopt the "search of the day." Essentially, the Shift Commander will order on random days that each visitor or each "nth" visitor submit to an additional search procedure, either a pat frisk or a metal detector wand search, or both. Third, all residents who request to use the rest room during a visit will be strip searched prior to its use, in order to ensure that items are not concealed on the resident's person to bring into the institution. Fourth, visitors will no longer be permitted to bring items of property for delivery to the residents. All property must be delivered by the mail and handled in a manner consistent with the Department of Correction mail policy. <u>See</u> Section V(E), below. Fifth, visitors desiring to provide funds to a resident may only leave checks and money orders, and only for the resident visited. This practice will help to verify the source and recipient of deposited funds, and will prevent resident-to-resident financial transfers through visitors. Finally, dress codes for residents and visitors will help ensure that staff will be able to identify residents without difficulty.[20]

    5.    Routine visits in the health services unit by outside visitors and by other residents will be discontinued. The visitor's safety may be compromised by movement through the facility, and his or her health may be compromised by entering the health services area. In exceptional circumstances, such as terminal illness, on a case-by-case basis, the Superintendent, at his discretion, will approve visits to persons in health services.

    6.    Currently, photography in the visiting room of residents and their visitors is a resident business. This will change to become a resident work assignment in order to prevent resident-to-resident financial transactions by visitors leaving funds for the resident photographer.

    E.    <u>Mail</u>

To address safety and security problems in the current system for processing residents' mail, the Department of Correction will adopt its regulations governing mail, 103 CMR 481 (Appendix 14). The new mail procedures will differ from the current practices at the Treatment Center as follows:

    1.    Under the current Treatment Center policy, indigent residents receive eight stamps monthly plus unlimited postage for

---

[20] Residents' dress will be determined by the property policy discussed above.

39

legal mailings. The current Department of Correction policy provides three one ounce first class letters weekly at institutional expense plus postage for legal mailings to residents who meet the Department's indigence standard at 103 CMR 481.06. 103 CMR 481.10.

    2.    The current policy provides for the opening and inspection of outgoing non-privileged mail at the discretion of the Superintendent. The new policy describes the circumstances in which the Superintendent may authorize the inspection of non-privileged outgoing mail. 103 CMR 481.14.

    3.    Currently, incoming non-privileged mail is opened for inspection by staff. Incoming privileged mail cannot be inspected unless the Superintendent believe that it contains contraband. Then the resident is required to open the mail in the presence of staff. Under the Department of Correction policy, incoming non-privileged mail will continue to be opened for inspection by staff, and all incoming privileged mail will be opened by staff in the presence of the resident. Under the current system, it is a simple matter to smuggle contraband into the facility under the guise of privileged mail. The facility has had instances of drugs, cash and checks detected in privileged mail. Weapons, maps and pornography may enter the facility in privileged mail. It is not difficult to obtain or print envelopes with legal return addresses. A resident's relative or acquaintance working for a law firm could mail contraband to the facility. Routine inspection of the content of all mail will eliminate these risks.

    4.    The Department of Correction requires return addresses on all outgoing mail, including mail from the Treatment Center. This practice serves to discourage residents from mailing threatening letters or engaging in fraudulent business schemes. Moreover, without return addresses, the post office cannot return anything to the sender where delivery is not possible. This mail ends up in a dead file and the resident may complain that the mail officer had failed to post it.

    F.    <u>Telephone</u>

The Treatment Center currently has twenty-two (22) telephones for use by the residents. There are two types of telephones, collect call only telephones and coin operated phones. The collect call telephones permit the user to make collect calls out of the institution and do not accept incoming calls. The coin operated telephones are standard pay telephones which can place and receive calls. The collect call telephones are located as follows: two in each of the eight general population housing units; one in the Crisis/Minimum Privilege Unit; and one in the Health Services Unit. The main corridor of the Treatment Center and the Transition House each has two coin operated telephones.